Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION


- - - - - - - - - - - - - - - -
JEFFREY HODGES,                 :
TOMMY LEE BONDS, and            :
JOHN PAUL SPANGLER,             :
                                :
              Plaintiffs  :
                                :
-vs-                            : Civil Action
                                : No. 7:12cv00362
FEDERAL-MOGUL CORPORATION,      :
et al.,                         :
                                :
              Defendants  :
- - - - - - - - - - - - - - - -

                        November 11, 2013
                        9:30 a.m.



                  DEPOSITION OF:

                  MARTIN SCHLOSS




            CENTRAL VIRGINIA REPORTERS
                  PO BOX 12628
              ROANOKE, VIRGINIA
                 (540)380-5017

Schloss (Morris)

Page 26

1          Q      Okay.  If Mr. Hodges, Mr. Bonds, and

2     Mr. Spangler were not present cleaning the ductwork at

3     Federal-Mogul on December 31, 2010, would that

4     explosion have occurred?

5          A      Could that explosion have occurred, or

6     would that --

7          Q      I am asking first would that.

8          A      It's possible that the explosion could

9     have occurred based on the information that I have

10    saw.  The role that the employees played in that

11    decision -- or in that explosion, it's -- I would say

12    based on what I found, it could have exploded without

13    them being there.  That's my -- my professional

14    opinion is, is from what I saw and working on

15    different dust collectors like that that there's a

16    possibility that that could happen.

17         Q      Okay.  So to put it another way, I

18    suppose -- well, let me go into another question with

19    that.  Do you have an opinion as to whether or not any

20    of the actions taken by the plaintiffs that day in

21    cleaning the ductwork caused or contributed to the

22    explosion occurring specifically on that day?

23         A      From my analysis of the explosion and

24    of the equipment and the videotape and the -- you

Schloss (Morris)

Page 27

1    know, based on all of those things and where I

2    determined the explosion originate, it would have made

3    no difference if they were working on it or not

4    working on it.

5              Q      Okay.  Why is that?

6              A      Because I don't think they had -- in my

7    professional opinion, the explosion didn't originate

8    at the employees.  It originated in the dust

9    collector, and there was nothing that the employees

10   were doing that was going to change that fact or

11   contribute to it in the dust collector per my

12   findings.

13             Q      All right.  And this ventilation system

14   had been operating for approximately seven years --

15             A      Yes.

16             Q      -- prior to this day?

17             A      Uh-huh.

18             Q      Okay.  Were there any conditions that

19   were present on December 31, 2010, that were different

20   than any other day that it had been operating up until

21   then?

22             A      I don't have that information.

23             Q      Okay.  Do you have an opinion with a

24   reasonable degree of engineering probability as to why

Schloss (Morris)

Page 30

1   That's something that is present at all times and had

2   been present in this system every day, correct?

3        A    Yes.

4        Q    Okay.  Fuel.  In this case, what, in

5   your opinion, was the fuel for the explosion?

6        A    The aluminum dust.

7        Q    And, again, the aluminum dust was

8   something that had been present in the system since it

9   started operating some seven years earlier, correct?

10       A    Yes.

11       Q    And was there any difference on this

12  day in terms of the characteristics of the aluminum

13  dust in the system?

14       A    I -- without, you know, analyzing the

15  dust, I would assume that the same equipment and their

16  process is the same day after day, and the dust is

17  going to be the same every day that goes into it.  I

18  have no information of a process change that was made

19  prior to this or that had been made in the seven

20  years.

21       Q    All right.  I am going to skip over

22  ignition source for just a second because I know you

23  already mentioned the exothermic reaction there.

24  Dispersion of the dust cloud, is that a condition that

Schloss (Morris)

Page 39

1    procedures of the workers?

2           A       When I teach it and teach safe

3    operation of dust collectors, lockout/tagout is a big

4    issue in it.

5           Q       Okay.  And are you familiar that with

6    lockout/tagout that it's the individual working on the

7    equipment that's responsible for making sure that's

8    done?  Are you familiar with that standard?

9           A       Yes.  And I don't know who locked out

10   what or how many locks were on it.

11          Q       Okay.

12          A       Or what Federal-Mogul's internal

13   procedures are or requirements.

14          Q       Let's see.  Now, this may be similar,

15   but the operational condition of the plant, I guess

16   that -- we are talking about the same thing, either --

17   whether that's the machines or the dust collection

18   system.  And, again, you were just provided the

19   information that there was a lockout and tagout, but

20   you are not -- you don't have any information as to

21   whether or not that was checked by the plaintiffs?

22          A       No.

23          Q       Or who did it?

24          A       That was outside the scope --

Schloss (Morris)

Page 40

1          Q      Or whether it was actually done?

2          A      That was outside of the scope of what I

3   was looking at.

4          Q      You mentioned specifically water

5   vapor-generating equipment in the plant?

6          A      Yes.

7          Q      Where did you get information about

8   that subject?

9          A      From the proposal -- or from

10  Federal-Mogul's specs on the original project, it

11  required two dry dust collectors and then two wet dust

12  collectors for the process, a different part of the

13  process.  A wet dust collector works by either

14  spraying water into the air to take out the

15  particulate or by running the air through a tank and

16  through a bath to remove the particulate as well.

17         Q      Okay.

18         A      There was talking about -- then their

19  specifications also had a sludge-handling equipment,

20  which meant what was coming off of the dust collector

21  is going to be a mixture of both particulate and water

22  that's going to come out wet to be dried.

23                So just the inclusion of those two

24  pieces of equipment in the general area, because they

Schloss (Morris)

Page 41

1    were all installed at the same time for this

2    production line, would mean there would be vapor --

3    free water vapor in the air.

4            Q       Okay.  And that would be for the entire

5    plant?

6            A       Well, I mean, you would have just in

7    the -- I looked at just the area of where they were

8    doing the production side of it.

9            Q       Okay.  With respect to the water

10   vapor-generating equipment, okay, does that raise the

11   relative humidity of the air for the entire plant?

12           A       Yes.  Relative humidity is a number

13   that says just exactly what it is.  It's relative to

14   how much moisture does it have versus how much

15   moisture can it have.  So what it was actually doing

16   was raising the entire dew point of the plant.

17           Q       Didn't you do any calculations for the

18   extent to which the dew point was raised in the

19   plant --

20           A       No.

21           Q       -- as a result of this equipment?

22           A       Other than my experience with wet dust

23   collectors is you are putting water vapor into the

24   plant.  You have got employees that are putting water

Schloss (Morris)

Page 42

1   vapor into the plant.

2            Q       Is there any way to test that?

3            A       Yes.

4            Q       How would you test that?

5            A       You can test versus the outside.  You

6    take a measuring device that's going to measure

7    temperature and wet-bulb temperature or temperature

8    and absolute humidity.  There is different devices

9    that you can tell how much moisture is being added.

10           Q       And for this case, did -- did you do

11   any type of model or any type of testing -- well,

12   withdrawn.  Let me ask you this first:  Are the water

13   vapor-producing equipment that you referred to still

14   operating at Federal-Mogul?

15           A       The understanding I had was the plant

16   was running at -- up until the time it was shut

17   down --

18           Q       I'm sorry to cut you off.  Not that

19   day.  I am talking about after the explosion and when

20   you got the request to do your review in this case.

21   Do you know, as of today or at any time since you have

22   had it, whether or not that equipment is still being

23   used?

24           A       I don't have any direct knowledge.

Schloss (Morris)

Page 43

1          Q      Okay.  Have you done any testing or

2    created any models to determine the extent to which

3    that particular equipment in the Federal-Mogul plant

4    would raise the dew point or increase the relative

5    humidity for the plant air?

6          A      No, but I know how to do it.  I do it

7    as part of my business.  I just did not do it in this

8    case.

9          Q      So, as you sit here today, can you

10   provide any basis for -- withdrawn.  Can you tell us

11   what the dew point was for the Federal-Mogul plant

12   inside the plant on December 31 of 2010?

13         A      No.

14         Q      Do you know whether or not the water

15   vapor-producing equipment was operating at

16   Federal-Mogul on that day?

17         A      I have been told that it was.

18         Q      Okay.  Told by who?

19         A      Again, when I asked the question was

20   the plant operating, they said up to the time when it

21   was shut down to start cleaning the ductwork.

22         Q      And when you say the plant being shut

23   down, is that the entire plant or --

24         A      No, the process.

Schloss (Morris)

Page 44

1          Q      -- just the production line that was

2     for the aluminum dust, that created the aluminum dust?

3          A      My understanding was -- again, I didn't

4     check to see if the rest of the plant was running.  My

5     interest was in the lines that were served by that

6     dust collector.  And if you were running the process

7     -- if you were running the dry dust collectors, you

8     would have to be running the wet dust collectors to

9     handle another part of this same production line.  So

10    my assumption was is that since both of them were

11    running at that -- required to run, that it would be a

12    requirement that both the dust collector and the wet

13    dust collector would be running.  And, again, that's

14    based on how the system is currently designed or --

15    and what was specified in Federal-Mogul's design

16    documents.

17         Q      Okay.  And based on your prior answer,

18    it's your understanding that that particular line, the

19    aluminum dust ventilation system, including the water

20    vapor-producing equipment, had been shut down between

21    a half hour and an hour and a half before LCM started

22    its work?

23         A      Yes.

24         Q      The fact that it's shut down, does that

Schloss (Morris)

Page 71

1    the area where the plaintiffs were working.

2            A       That could have been just by the

3    vacuum.  It could have been by the flow.

4            Q       Okay.

5            A       I guess any material flowing through a

6    pipe like that is going to cause a static buildup.

7    Just different materials dissipate it differently.

8            Q       But you indicated previously that

9    that -- that the creation of the static electricity

10   and generation of sparks was a potential source of

11   ignition for combustion and explosion in this case?

12           A       In -- it's a source of sparks and

13   having air going through a PVC pipe, yes, anything

14   that's ungrounded.  Even ungrounded or unbonded steel,

15   you can still have the same issues.

16           Q       Okay.  Now, with respect to the

17   explosion itself, in your report you indicate that the

18   number one fact that you relied upon here was the

19   testimony of Mr. Hodges that he saw an explosion in

20   the bag house; is that correct?

21           A       He saw a fireball coming down the

22   ductwork.  He said he could see past the backdraft --

23   or backblast damper into the elbow, and he saw the

24   fireball originate from that point.

Schloss (Morris)

Page 72

1          Q      Okay.  And what did you do to test that

2     account from Mr. Hodges?

3          A      The other thing I used in doing that

4     was the video and looked at the flashes and where

5     those flashes originated.  And so by using that with

6     his reaction, I determined that the explosion had

7     taken place in the duct -- in the bag house, not in

8     the ductwork, the initial explosion.

9          Q      Did you consider Mr. Hodges' statement

10    to be reliable?

11         A      Yes.

12         Q      Okay.  And what was that based on?

13         A      Based on that he was there and seeing

14    it.  I have talked to other people that have been

15    involved in them, in explosions and in flash fires,

16    and found them to be very reliable in what they

17    remember.  It may be something as easy as they saw,

18    you know, bright orange flash coming out of a

19    55-gallon drum and landing 30 feet or 40 feet away

20    from the -- but they remember where the origin and

21    what they saw.

22         Q      Okay.  And when Mr. Hodges stated that

23    he could see that the fireball originated beyond the

24    damper, or the flue or whatever he called it, okay,

Schloss (Morris)

Page 73

1   did that give you any information?

2          A      That the fireball had originated in the

3   bag house.

4          Q      In terms of his description --

5   withdrawn.  Do you recall what his description of the

6   damper was at his deposition?

7          A      No, but I can look at it.

8                 THE WITNESS:  Do you have a copy of his

9          deposition, for Hodges?  I may have a copy,

10         just that page.

11                MR. BROWN:  No, not without my notes on

12         it, but we can -- we can take a quick break

13         and get a copy of these pages if you like.

14         Want to do that?

15                MR. HUDGINS:  What were you looking

16         for?

17                MR. MORRIS:  Let me see if I want --

18                MR. ALEXANDER:  Does he want it?

19

20   BY MR. MORRIS:

21         Q      If you have his deposition, if you

22   looked at Page 101 --

23                MR. BROWN:  It's on a number of pages.

24         It starts well before that.

Schloss (Morris)

Page 86

1        prejudiced.

2                MR. ALEXANDER:  You are right.  Thank

3        you.

4                MR. HUDGINS:  Without belaboring the

5        whole thing, I think everybody on this side

6        of the table would disagree that his

7        questions are misleading in any respect.  And

8        the witness who has indicated that he

9        reviewed the record is in a position to agree

10       or disagree with the foundation for his

11       opinion.

12               MR. BROWN:  I hear you.  I made my

13       objection.  Unless you want to continue to

14       make the argument, then why don't we move on.

15               MR. HUDGINS:  That's all.

16               THE VIDEOGRAPHER:  Off the Record.

17

18               (Discussion off the Record.)

19

20   BY MR. MORRIS:

21           Q     Mr. Schloss, thank you for your

22   patience.  Again, now, referring back to Chapter 17 in

23   NFPA 921, one of the obligations that you have as an

24   investigator is to test witness statements and, in

Schloss (Morris)

Page 85

1           know.

2                   So that is what my -- that's what my

3           objection is, is that when you characterize

4           it, you are characterizing him saying that

5           this is the way it is.  That is not an

6           accurate characterization.  With that, then

7           you can go ahead and ask your questions.  I

8           just didn't want to do that in front of the

9           witness.

10                  MR. MORRIS:  I appreciate that.  Thank

11          you.

12                  MR. HUDGINS:  Assuming we were at trial

13          and you had just gone to the bench and made

14          that same objection, wouldn't the response of

15          the court be you're welcome to redirect your

16          witness and bring that out as part of your

17          case?

18                  MR. BROWN:  My duty in a deposition is

19          to, if I have a form of the question

20          objection, then I have to bring that up.  And

21          I view this as being form of the question.  I

22          think it's just misleading and incorrect.  So

23          with that said, it's not being done in front

24          of the witness, so nobody is being

Schloss (Morris)

Page 84

1              MR. BROWN:  I want to make an objection

2         to your question, line of questioning, in

3         that it's mischaracterizing the deposition

4         testimony of Jeffrey Hodges, testimony as to

5         the condition of the -- or the location of

6         the hinge at the top.  The question was on

7         Page 101:  Was it a flap or a hinge at the

8         top?  And the answer was:  I don't know.  I

9         know I could see that the flapper was in

10        there, and to me it looked like it pivoted

11        from the center, but I don't know.  To

12        categorically say that he is testifying

13        affirmatively that, you know, absolutely this

14        is the way it is is a mischaracterization of

15        the evidence.  The evidence is very clear

16        that what he was clear on because what he

17        says is in terms of the location of the -- of

18        the fire.  It says on Page 75, But you are

19        clear in your mind that there was some fire

20        that came from behind the damper apparatus?

21        Answer:  Yes, absolutely.  So you have the

22        location of the fire coming from beyond there

23        absolutely.  And in terms of the structure of

24        what he is seeing, he is saying he doesn't

Schloss (Morris)

Page 83

1          Q      Where it says witness observations, are

2    you familiar with that section?

3          A      Yes.

4          Q      Now, based on our discussion of

5    Mr. Hodges' testimony regarding his observations of

6    the backblast damper in addition to his observations

7    of the fireball, did you do anything to support or

8    refute his observations with respect to the condition

9    of the backblast damper?

10         A      I don't understand the question.

11         Q      Okay.  Having read that and heard his

12   description that it was open at the top and it looked

13   like it was hinged in the center, okay, did you do any

14   follow-up in order to assess the -- to either support

15   that statement or refute that statement?

16              MR. BROWN:  Before you answer that

17         question, I'd like to make an objection.  It

18         may be a speaking objection.  Let's go off

19         the Record.  Could you leave the room for

20         just a moment?

21              THE VIDEOGRAPHER:  Off the Record.

22

23              (Discussion off the Record.)

24

Schloss (Morris)

Page 82

1    any other eyewitnesses to the events.

2             Q      Okay.  And did you ask whether or not

3    there were any other people present?

4             A      I don't remember if I inquired on that

5    or not.

6             Q      Have you read any of the depositions of

7    the LCM employees who are not plaintiffs in this case?

8             A      No.  Well, I did -- versus what's on

9    that list, there is other LCM employees.  Danny

10   Collins -- ones I looked at were David Garard, Tommy

11   Lee Bonds, Jeff Hodges, John Paul Spangler, Danny

12   Collins, and Ed Thompson.

13            Q      Okay.  And was there any information

14   other than from Mr. Hodges that you had in terms of

15   specific facts and observations as to where the

16   explosion occurred?

17            A      Not that I recollect.

18            Q      Now, referring back to Schloss 1 again,

19   if we look to -- let me get to it -- 17.3.3.15, which

20   is on Page 162 at the top.

21            A      17?

22            Q      .3.3.15.  It will be at the bottom

23   right of Page 162.

24            A      Okay.

Schloss (Morris)

Page 81

1           A       Yes.

2           Q       Okay.  And under 17.1.2 we have -- it's

3    that determination of the origin of the fire involves

4    the coordination of information derived from one or

5    more of the following:  1, witness information.  The

6    analysis of observations reported by persons who

7    witnessed the fire or were aware of conditions present

8    at the time of the fire, correct?

9           A       Yes.

10          Q       And you previously told us that the

11   information that you have is from the depositions of

12   the plaintiffs, correct?

13          A       And fact --

14          Q       That's one, first?

15          A       I mean, Federal-Mogul.

16          Q       And the deposition of Federal-Mogul was

17   of David Garard, correct?

18          A       Yes.

19          Q       But Mr. Garard, you are not aware of

20   whether he was at the plant that day or not?

21          A       No.

22          Q       Okay.

23          A       And I am not familiar with if anybody

24   from Federal-Mogul was at the plant or if there was

Schloss (Morris)

Page 80

1    BY MR. MORRIS:

2            Q      Mr. Schloss, we were referring to NFPA

3    921, and we have marked as Schloss 1 for

4    identification today a portion of 921 that starts with

5    Chapter 17, origin determination.  Do you see that?

6            A      Yes.

7            Q      Okay.  And would you agree that that's

8    a applicable standard for your investigation in this

9    case?

10           A      Yes.

11           Q      And do you accept NFPA 921 as

12   authoritative in terms of the investigation of fires

13   and explosions?

14           A      Only in the combustible dust side of

15   it.  I don't know anything about investigating a house

16   fire or a car fire or something along that.

17           Q      Fair enough.  As it relates to --

18           A      As it relates to combustible --

19           Q      -- your field --

20           A      -- dust and what I do, yes, it does.

21           Q      Okay.  And within Chapter 17, origin

22   determination, there is sort of a recap of the

23   methodology and the scientific method for origin

24   determination, correct?

Schloss (Morris)

Page 79

1    that it would be subject to criticism?

2            A      Yes.

3            Q      And within NFPA 921 in I believe it's

4    Chapter 17, there is a section that deals with witness

5    statements, correct?

6            A      To know what chapter and what page and

7    what -- I am not familiar.

8            Q      Let's see if we can get to it.

9                   MR. MORRIS:  Okay.  Let's mark this as

10           Schloss 1.

11

12                  (Deposition Exhibit Schloss 1 was

13           marked and entered into the Record.)

14

15                  MR. BROWN:  Do you have a copy for me?

16                  MR. MORRIS:  I don't.

17                  MR. BROWN:  Let's just take a moment,

18           and I'll make a copy.  Does anybody else want

19           a copy of the exhibit?

20                  THE VIDEOGRAPHER:  Off the Record.

21

22                  (A recess was taken.)

23

24

Schloss (Morris)

Page 78

1    collector.

2            Q      So the only relevant fact that you took

3    in order to rely on his testimony was the fact that he

4    said he could see past the damper.  The details of

5    that description were not important to you?

6            A      No, they were not important to me.  I

7    mean, the bigger thing was is that he could see past

8    the damper and see the elbow, and that's where he saw

9    the fireball generate and come out.

10           Q      Okay.  I saw on your resume that you

11   are a member of NFPA.

12           A      Yes.

13           Q      And I understand that to be a member of

14   NFPA, all you have to do is pay the dues?

15           A      That's right.

16           Q      Okay.  But you are familiar with NFPA

17   921?

18           A      Yes.

19           Q      And you use the scientific methodology

20   as directed by NFPA 921?

21           A      Yes.

22           Q      And if -- is it your opinion that if

23   the scientific methodology as set forth in NFPA 921 is

24   not used in a investigation of a fire or an explosion,

Schloss (Morris)

Page 77

1    top or bottom?

2            A       You couldn't tell where it was hinged.

3            Q       Could you tell whether it was at the

4    top of the duct or at the bottom of the duct where it

5    was open?

6            A       What he saw at that distance, I don't

7    know.

8            Q       Okay.  So --

9            A       I just -- without reading and believing

10   what he described, I used more of the concept that he

11   could see past that and see the elbow.

12           Q       Okay.  Well, you said previously the

13   fact that you had his -- his testimony that he saw a

14   fireball from --

15           A       Yes.

16           Q       -- beyond the damper, that you accepted

17   that as true?

18           A       Yes.

19           Q       Okay.  We have testimony from him

20   indicating that his observations of the damper, which

21   he had been able to see for a period of time prior to

22   the explosion occurring, was incorrect?

23           A       It was incorrect, but he still said you

24   could see past it to see the elbow going to the dust

Schloss (Morris)

Page 76

1    it would make that much of a difference on him looking

2    at it.

3            Q      And do you recall him testifying as

4    follows:  Question:  Where you saw that you could see

5    a gap on the side, the top or the bottom.

6                    MR. BROWN:  What page are you on?

7

8    BY MR. MORRIS:

9            Q      101 Line 5.  The total question is:

10   That's what I am trying to find out, where you saw

11   that you could see a gap on the side, the top or the

12   bottom.  I apologize for the paraphrase.  Answer:  I

13   could see over the top of it from the center up.  Do

14   you recall reading that in his deposition?

15           A      Yes.

16           Q      Okay.

17           A      I don't remember what was just ahead of

18   that.

19           Q      Is that an accurate description of the

20   configuration of the backblast damper?

21           A      No, but looking down 40 feet of

22   ductwork with a flashlight, that may have been what

23   his interpretation of what he saw is.

24           Q      That you couldn't tell whether it was

Schloss (Morris)

Page 75

1    explosion.

2            Q       Okay.  Where is the hinge located for

3    the flap?

4            A       At the top of the flap.

5            Q       Do you recall reading in Mr. Hodges'

6    deposition when he was asked:  Was the flap of the

7    hinge at the top?  And he answered:  I don't know.  I

8    know that I could see the flapper that was in there,

9    and to me it looked like it pivoted from the center,

10   but I don't know.  Do you recall reading that?

11           A       Yes.  Yes, I recall that.

12           Q       Is that an accurate description of the

13   damper?

14           A       From the -- the flap would have been

15   hinged at the top.  He may have been looking at the --

16   I am not sure what his interpretation of the damper

17   and the hinge was.  I used more that he could see past

18   that to see the elbow.

19           Q       Do you recall that he testified that he

20   thought it was a center hinge and that it moved both

21   up and down?  Do you recall that testimony?

22           A       Yes.

23           Q       Okay.

24           A       I don't see where that -- the design of

Schloss (Morris)

Page 74

1   BY MR. MORRIS:

2          Q      For the purposes of my question, okay,

3   can you refer to Page 101?

4                 MR. BROWN:  He would have to have the

5          deposition.  I don't think he has the

6          deposition in there.

7                 THE WITNESS:  I don't think I do.

8                 MR. BROWN:  I think he quotes the

9          deposition in his report.

10                THE WITNESS:  But I don't think I

11         pulled that out separately.

12

13  BY MR. MORRIS:

14         Q      Mr. Schloss, let me ask you another --

15         A      Uh-huh.

16         Q      Okay.  Can you describe for me the

17  construction of the backblast damper?

18         A      It's a rectangular box with -- in just

19  general terms, rectangular box with round collars on

20  either end to fit the ductwork, a incline blade that

21  seals against a -- one of those collars to stop the

22  transmission of energy back through the ductwork.

23  It's made to be open while the equipment is running

24  and the air is flowing across it and closed during an

Schloss (Morris)

Page 73

1   did that give you any information?

2          A       That the fireball had originated in the

3   bag house.

4          Q       In terms of his description --

5   withdrawn.  Do you recall what his description of the

6   damper was at his deposition?

7          A       No, but I can look at it.

8                  THE WITNESS:  Do you have a copy of his

9              deposition, for Hodges?  I may have a copy,

10             just that page.

11                 MR. BROWN:  No, not without my notes on

12             it, but we can -- we can take a quick break

13             and get a copy of these pages if you like.

14             Want to do that?

15                 MR. HUDGINS:  What were you looking

16             for?

17                 MR. MORRIS:  Let me see if I want --

18                 MR. ALEXANDER:  Does he want it?

19

20   BY MR. MORRIS:

21          Q       If you have his deposition, if you

22   looked at Page 101 --

23                 MR. BROWN:  It's on a number of pages.

24             It starts well before that.

Schloss (Morris)

Page 72

1          Q      Okay.  And what did you do to test that

2    account from Mr. Hodges?

3          A      The other thing I used in doing that

4    was the video and looked at the flashes and where

5    those flashes originated.  And so by using that with

6    his reaction, I determined that the explosion had

7    taken place in the duct -- in the bag house, not in

8    the ductwork, the initial explosion.

9          Q      Did you consider Mr. Hodges' statement

10   to be reliable?

11         A      Yes.

12         Q      Okay.  And what was that based on?

13         A      Based on that he was there and seeing

14   it.  I have talked to other people that have been

15   involved in them, in explosions and in flash fires,

16   and found them to be very reliable in what they

17   remember.  It may be something as easy as they saw,

18   you know, bright orange flash coming out of a

19   55-gallon drum and landing 30 feet or 40 feet away

20   from the -- but they remember where the origin and

21   what they saw.

22         Q      Okay.  And when Mr. Hodges stated that

23   he could see that the fireball originated beyond the

24   damper, or the flue or whatever he called it, okay,

Schloss (Morris)

Page 71

1   the area where the plaintiffs were working.

2           A        That could have been just by the

3   vacuum.  It could have been by the flow.

4           Q        Okay.

5           A        I guess any material flowing through a

6   pipe like that is going to cause a static buildup.

7   Just different materials dissipate it differently.

8           Q        But you indicated previously that

9   that -- that the creation of the static electricity

10  and generation of sparks was a potential source of

11  ignition for combustion and explosion in this case?

12          A        In -- it's a source of sparks and

13  having air going through a PVC pipe, yes, anything

14  that's ungrounded.  Even ungrounded or unbonded steel,

15  you can still have the same issues.

16          Q        Okay.  Now, with respect to the

17  explosion itself, in your report you indicate that the

18  number one fact that you relied upon here was the

19  testimony of Mr. Hodges that he saw an explosion in

20  the bag house; is that correct?

21          A        He saw a fireball coming down the

22  ductwork.  He said he could see past the backdraft --

23  or backblast damper into the elbow, and he saw the

24  fireball originate from that point.

Schloss (Morris)

Page 70

1          A       No.

2          Q       Are you aware whether or not flexible

3   hose is manufactured so that it does have grounding

4   material in it?

5          A       Yes, it does.

6          Q       In this case there is nothing to

7   suggest that this flexible hose had any grounding

8   material in it, correct?

9          A       I have no information on that.

10         Q       And then we get to the PVC pipe, or the

11  lance as you referred to it.  And was the use of PV --

12  is the use of PVC pipe in cleaning aluminum dust

13  ventilation systems appropriate?

14         A       It's nonconductive.  So in anything

15  that's combustible dust, you need to use conductive

16  materials.  PVC is not conductive, and I don't know of

17  anything that's commercially available like that that

18  is conductive.

19         Q       Is it nonsparking?

20         A       It will -- it will not transfer a

21  spark.  A spark will build up on the surface of the

22  PVC, but it's not going to release a spark.

23         Q       And, in fact, in this case the

24  information we have is that it did generate sparks in

Schloss (Morris)

Page 69

1    be conductive nonsparking material?  Is that --

2             A        Yes.

3             Q        -- part of NFPA requirements?  In this

4    case, we had the vacuum truck, which we have already

5    discussed.  And then from that there was aluminum pipe

6    that was attached to the vacuum truck, correct?

7             A        Yeah, per my understanding and the

8    pictures.

9             Q        Would that aluminum pipe fit those

10   requirements?

11            A        Yes.

12            Q        Okay.  The flexible hose that was used

13   here?

14            A        There are flexible hoses that are

15   conductive.  I don't remember exactly whether the hose

16   that was used at this point was conductive material or

17   nonconductive construction.

18            Q        You had an opportunity to see --

19            A        I saw it.

20            Q        -- that hose?

21            A        I took a picture of it and was more --

22   looked at the lance and the PVC there.

23            Q        The flexible hose that was used, do you

24   know whether or not that was grounded in any way?

Schloss (Morris)

Page 68

1    reporter, please wait until I finish my question

2    completely before you start your answer.  I will do my

3    best to extend you the same courtesy and allow you to

4    finish your answer completely before I move on.  If at

5    any time you feel that you have not finished your

6    answer, please let me know, and we will make sure that

7    we get a complete record and one that we will all be

8    able to read for the benefit of our reporter, okay?

9           A       Thank you.

10          Q       We were discussing the vacuum truck

11   previously and the equipment that was being used by

12   the plaintiffs in their cleaning operation.  You

13   mentioned a few things, so I just want to go through

14   the equipment that was being used in terms of the

15   bonding and grounding of the equipment.

16                  With respect to the cleaning of ducts

17   involving aluminum dust ventilation system, would you

18   agree that you should use grounded and nonconductive

19   equipment?

20          A       Yes.  NFPA requires that all of the

21   ductwork, both in that type of system, a vacuum

22   system, a dust collection system, be grounded and

23   bonded.

24          Q       And that whatever is being used should

Schloss (Morris)

Page 67

1    going across that in that vacuum truck, going in the

2    ductwork, not in the vacuum truck.

3             Q      Okay.  And we do know that there was a

4    fire or some type of explosion within the vacuum truck

5    itself, correct?

6             A      Which -- yes.

7             Q      And that's not revealed on the video as

8    to when that occurred?

9             A      No.

10            Q      And we have no eyewitness information

11   as to when that occurred in relation to any other --

12            A      Not that I am --

13            Q      -- event of the explosion?

14            A      -- familiar with.

15                   MR. MORRIS:  I apologize.  Can we take

16            a quick break?

17                   MR. BROWN:  Sure.

18                   THE VIDEOGRAPHER:  Off the Record.

19

20                   (A recess was taken.)

21

22   BY MR. MORRIS:

23            Q      Mr. Schloss, continuing on -- first,

24   before we go further, at the request of our court

Schloss (Morris)

Page 66

1   you -- are you aware of that?

2           A       No.  It may have been in deposition,

3   but I don't recollect it.

4           Q       Next question:  So the only operating

5   machinery that we have in this closed system is the

6   vacuum truck, correct?

7           A       Yes.

8           Q       Okay.  And in your analysis, you -- you

9   didn't ask for any information or did not find any

10  information as to any safety procedures in terms of

11  grounding the truck and/or the system that were taken

12  with respect to the vacuum truck, correct?

13          A       No.  The vacuum truck -- the vacuum

14  truck itself is intrinsically safe.  The ductwork and

15  everything that's hooked up to it would be hard --

16  would be hard to ground in that you have hose, you

17  have PVC hose, and PVC pipe that you are using as a

18  wand.  So you would not have a continuous bonded path

19  from the time you are collecting it until the time you

20  are getting to the vacuum truck.

21          Q       Does that create --

22          A       It creates --

23          Q       -- any additional risk of --

24          A       It can create a potential of a spark

Schloss (Morris)

Page 65

1                    THE WITNESS:  The system grounded or

2          the vacuum truck grounded?

3

4   BY MR. MORRIS:

5          Q     Well, two things that -- we will go

6   through that.  First of all, there has been testimony

7   that there was no grounding of the truck itself, okay?

8   What grounding of the system are you referring to?

9          A     The grounding of the piping and

10  everything off of the vacuum truck, from the vacuum

11  truck out.

12         Q     And in your investigation, is there any

13  information that you have that any of the equipment

14  that was connected to the vacuum truck was grounded?

15         A     No.

16         Q     Okay.  So we haven't -- so the truck

17  isn't grounded and the system isn't grounded; is that

18  correct?

19         A     Well, if the -- I don't understand the

20  truck not being grounded.

21         Q     There has been testimony that there is

22  a specific method that they use in order to ground the

23  truck, that they can take a ground wire and attach it

24  somewhere.  That was not done in this case.  Were

Schloss (Morris)

Page 64

1    points between the air that's being brought into it

2    and the air outside?

3          A      No, because the friction that you are

4    going to -- the friction of sucking through all those

5    devices is going to heat that air up quite a bit.  You

6    are going to end up with about a 2 degree rise for

7    every horsepower that those vacuums pull.

8                 And the vacuum truck itself are

9    intrinsically safe, which means they are grounded,

10   bonded, everything.  It by itself is a safe operating

11   -- if that wasn't true, you would be blowing up a lot

12   of vacuum trucks.

13         Q      All right.  And did you read in the

14   deposition transcripts in this case that the vacuum

15   truck was not grounded at the time of its operation at

16   Federal-Mogul?

17         A      I did not read that.

18         Q      Okay.  And so --

19         A      But, again, being grounded as the --

20         Q      Mr. Schloss, I am going to --

21         A      -- truck or the system being grounded?

22                MR. BROWN:  He can answer the question.

23                MR. MORRIS:  He did answer the

24         question.  He went beyond my question.

Schloss (Morris)

Page 63

1          A        The vacuum truck, in my professional

2     experience, is a very safe device by itself.  It's

3     only when you start hooking things up to it.  So the

4     vacuum truck actually creating and originating the

5     explosion in the vacuum truck I ruled out.

6          Q        Okay.  Well, my first question was:

7     Did you consider it as a potential source of ignition

8     for the explosion that occurred in this case?

9          A        Yes.

10         Q        Okay.  And the vacuum truck,

11    essentially, is similar to a bag house in that you are

12    pulling the dust and debris into a collection system,

13    correct?

14         A        Yes.

15         Q        And as part of this operation, we have

16    a closed system between the bag house, the ductwork,

17    the --

18         A        Yes.

19         Q        -- PVC pipe, the flexible hose, the

20    aluminum pipe, into the vacuum truck, correct?

21         A        Yes.

22         Q        The vacuum truck is outside similar to

23    the bag house.  Would that be subject to the same

24    situation in terms of the difference between dew

Schloss (Morris)

Page 62

1              factor?  Was that the factor that -- of an

2              explosion?  I don't see it.

3

4    BY MR. MORRIS:

5              Q      Is it fair to say that in evaluating

6    all the potential causes of the explosion here that

7    eventually you came down to two possible causes, one

8    being the generation of the static electricity by the

9    use of the PVC pipe by the plaintiffs, or, as you

10   mentioned earlier, an exothermic reaction in the bag

11   house?

12             A      Yes.

13             Q      And you were able to eliminate every

14   other cause at that point?

15             A      I'd have to go back through that list

16   of what I gave you, but, I mean, that was really --

17   really, at that point it came down to the video and my

18   opinion or my interpretation of the video of which

19   flashes were the bag house exploding and what flash

20   was the stuff coming back down the ductwork.

21             Q      Now, did you consider -- just consider

22   as part of your evaluation here whether or not the

23   vacuum truck could have been a potential source of

24   ignition for this explosion?

Schloss (Morris)

Page 61

1           A       No.  I looked at -- you know, looked at

2       the devices, you know, looked at a piece of PVC pipe

3       and the hose and the duct and how they had it all

4       hooked together and, you know, you can generate a

5       spark --

6           Q       Okay.

7           A       -- with the --

8               MR. BROWN:  Excuse me.  Let him finish

9           his answers.  Please don't talk over him.

10              THE WITNESS:  You can generate a spark

11          in it.  Whether every other condition was

12          there at the time of the spark is really --

13          you know, again you are vacuuming something

14          in, so you are not generating a dust cloud.

15          You are sucking the dust cloud into it.  You

16          are vacuuming, you know, the -- you are

17          vacuuming, you know, where the PVC will flow

18          through any type of -- any type or any type

19          of material is going to cause a static

20          buildup.  PVC is not recommended to use for

21          that.  You know, yes, there was things that

22          were not safe that were going to generate

23          sparks or less safe than they could have

24          been, but was that, you know, a contributing

Schloss (Morris)

Page 60

1    your --

2            A       Yeah.

3            Q       -- prior investigations and otherwise,

4    that had they been following proper safety procedures,

5    you could have eliminated that as a cause; is that --

6    is that fair?

7            A       You can never eliminate a hundred

8    percent of the risk of doing something like that even

9    safely, you know, following every safety procedure.

10                   I have a chemical plant that I do work

11   in that had six people clean out a dust collector, a

12   welder strike an arc, and get burned across the faces.

13   You know, they met every one of their safety

14   requirements.  They had everything -- he had the

15   proper PPE on.  Luckily, it didn't burn his eyes, but

16   burned the hair off of his face.

17           Q       And in this case, did you evaluate all

18   of those things as well?

19           A       I was told about it.  I didn't evaluate

20   that.  It was for a customer that I was doing some

21   work with and an --

22           Q       No, no, in this case.

23           A       -- incident they talked about.

24           Q       I understand.

Schloss (Morris)

Page 59

1          A       -- cause that has to be considered in

2     my evaluation.

3          Q       And as part of that analysis, you have

4     to look at what equipment is being used?

5          A       Yes.

6          Q       And what potential there is for that

7     creating a -- an environment in which there could be

8     an explosion, correct?

9          A       Yes.

10         Q       And in this instance, in looking at

11    that and determining whether or not the equipment that

12    was being used for the cleaning of the aluminum duct,

13    did you reach any opinions as to whether or not that

14    was a potential cause?

15         A       It was potential cause of -- what they

16    were doing could cause an explosion, yes.  In terms of

17    if you isolate just that one part of it, yes, that

18    would --

19         Q       But that's part of your analysis?

20         A       Yeah.  If you isolate and say they were

21    taking a piece of PVC and putting it -- hooked to a

22    vacuum truck, putting it into aluminum, there is a

23    cause there that you are going to generate sparks.

24         Q       And based on your experience and

Schloss (Morris)

Page 58

1   was.  And you would agree with me, as we said before,

2   that you have to go through all possible causes and

3   eliminate them through scientific --

4          A      Yeah.

5          Q      -- methodology pursuant to NFPA 921,

6   correct?

7          A      Yes.

8          Q      Okay.  One of those causes could be the

9   actions of the workers in this case.  Could be,

10  correct?

11         A      It was generating sparks and --

12         Q      Okay.  Just -- will you agree with

13  me --

14         A      If you want me to stop right there,

15  that that's as far as you want me to go --

16         Q      I want you to answer my question right

17  now.

18         A      Okay.

19         Q      My question is:  The actions of the

20  plaintiffs, of the LCM employees, that is a potential

21  cause that has to be considered in your evaluation

22  of --

23         A      That is potential --

24         Q      -- this explosion?

Schloss (Morris)

Page 57

1    potential causes for the explosion.

2              Q       And can the failure to follow proper

3    safety procedures be a contributing cause to an

4    explosion?

5              A       How about rephrase the question?

6              Q       Sure.  Do you need to eliminate the

7    improper use of equipment or a failure to follow

8    necessary safety procedures as a cause of an

9    explosion?

10             A       I look at what they were doing as a

11   cause of an explosion.  How they picked them and the

12   decision that they made to pick those types of devices

13   doesn't really matter.  It's -- it's what was

14   physically being done at the time of the explosion.

15             Q       Okay.  And in this particular instance,

16   did you reach any opinion as to whether or not the

17   actions of the plaintiffs could have caused or

18   contributed to the explosion that occurred?

19             A       I don't -- in my professional opinion,

20   it didn't contribute to the explosion in the dust

21   collector.

22             Q       Not my question.

23             A       Okay.

24             Q       I understand what your final opinion

Schloss (Morris)

1          Q        Well, in evaluating the potential

2    causes of an explosion, would one of the factors be

3    what the individuals were doing and whether or not

4    they were taking appropriate safety procedures before

5    you reach your final opinion?

6          A        Before -- I looked at what they were

7    doing, not what they were trained to do.  I looked

8    at --

9          Q        Okay.  Well --

10         A        -- devices they were using on the

11   cleaning when we did the field -- looked at it in the

12   field and looked at the devices they used and the hose

13   and tubing and things like that.  I looked at those.

14   I did not look at whether they were trained in -- they

15   may have been trained, and that's the decision they

16   made to use those equipment.  It doesn't necessarily

17   mean training equals results.

18         Q        And for the purpose of this question, I

19   am not asking about their training.  I am asking about

20   actually what they were doing and whether or not they

21   followed proper safety procedures, if that's a factor

22   that you would consider in evaluating the potential

23   causes for this explosion.

24         A        I evaluated what they were doing as

Schloss (Morris)

Page 55

1          Q      I understand.  But based on your

2  experience where you have evaluated explosions and you

3  have trained people on how to work around these types

4  of systems --

5          A      If I was contracted with LCM, I

6  would -- I would have evaluated their systems.  And if

7  they were deficient, I would have made the

8  recommendations to do the training.

9          Q      Did you read in the deposition

10  transcripts that the supervisor of the job was aware

11  that aluminum dust was the product in the system they

12  were cleaning?  Do you recall that?

13          A      Yes, that it was -- aluminum dust was

14  the product.  Whether he realized that aluminum dust

15  was combustible, I didn't see that.

16          Q      Okay.  And if he testified that he was

17  not aware that aluminum dust was combustible, do you

18  have an opinion as to whether or not that is a safe

19  procedure for LCM to proceed in cleaning the ducts at

20  Federal-Mogul?

21          A      Well, really, I am not here to evaluate

22  what LCM did, you know, and -- you know, and whether

23  they trained their people onto it.  I can only look at

24  the results of what that was.

Schloss (Morris)

Page 54

1    very strong about teaching of -- training of your

2    employees.

3            Q      And have you evaluated Federal-Mogul's

4    training procedures for its employees relating to the

5    aluminum dust ventilation system?

6            A      I have seen in Federal-Mogul's

7    combustible dust management guidance and the

8    management program where they talk about that.  I have

9    looked at what -- what's available at that point, but

10   no farther than that.

11           Q      Okay.  And what about LCM?  Did you

12   evaluate their --

13           A      No.

14           Q      -- procedures with respect to working

15   on an aluminum dust ventilation system?

16           A      No.

17           Q      And why not?

18           A      My understanding from reading the

19   depositions, I guess, was is that they were not

20   advised of the risk of aluminum combustible dust.  The

21   actual workers that were on the platforms were not

22   advised of combustible dust.  Again, whether LCM is,

23   you know, negligent at that point or liable for that

24   point, I am not here to talk about that.

Schloss (Morris)

Page 53

1          A       More likely than not.

2          Q       -- the function of the system, it was

3    able to handle those small explosions if it did occur?

4          A       But you don't design for small

5    explosions.

6          Q       That's not my question at this point.

7    I understand --

8          A       That's my answer.  That's my answer at

9    this point is is you can have explosions in anything

10   that's not going to result in the damage or even

11   triggering any, you know, explosion protection device.

12   It depends on what the dust is at that moment, what

13   the ignition source is at that moment, how much

14   dispersion you have at that moment, how much volume of

15   material you have.  All those things together are

16   going to determine how strong of an explosion do you

17   get.

18         Q       And would you agree with me that when

19   you are working with an aluminum dust ventilation

20   system, that whoever is working on that should be

21   aware of the risk of explosion in a system of that

22   type?

23         A       Federal-Mogul is required to teach

24   their people the risks around that.  I mean, NFPA is

Schloss (Morris)

Page 52

1    going to burn anything.  You can get exothermic

2    reaction of a bigger pile of dust, and it may catch it

3    on fire.

4            Q       I understand that.  I understand that,

5    but what -- if I understand what you have told me is

6    that there could have been prior exothermic

7    reactions --

8            A       There could have.

9            Q       -- in the bag house that resulted in

10   smoldering and then, for whatever reason, fizzled out

11   or stopped.

12           A       Yes.

13           Q       Because if it continued, we would have

14   seen something else occur.  There could have been

15   exothermic reactions that led to a small explosion

16   that went undetected because no one was in the area to

17   see it, hear it, or --

18           A       And not be --

19           Q       -- know it happened?

20           A       And not be strong enough to activate

21   the explosion vents.

22           Q       Right, okay.  So all I am saying is

23   that if that occurred, and you say that's a

24   possibility that it did occur, that in terms of --

Schloss (Morris)

Page 51

1    BY MR. MORRIS:

2              Q      I will adopt probability.

3              A      I have been in a plant that did shot
4    blasting, and I asked and said, Have you ever had an
5    explosion?  They said, No, but every now and then our
6    dust collector goes plump and the sides pulse out.
7    You know, have they been having explosions?  Yes.
8    They just didn't have one at a high enough degree that
9    was going to cause the thing to rip apart or, you
10   know, the vents to actuate.  You could have had
11   exothermic reactions for all those seven years that
12   would have went undetected and not cause an explosion.
13   It could have been the first time in seven years there
14   was an exothermic reaction.

15             Q      So based on that then, in terms of the
16   explosion containment of that, if that did occur, then
17   the system operated properly on those prior occasions,
18   correct?

19             A      No.  I mean, no, because it may not
20   have met -- it may not have resulted in an explosion.
21   It may not have resulted in a fire.

22             Q      Well --

23             A      You can have exothermic reaction of a
24   small pile of dust that's sitting there, and it's not

Schloss (Morris)

Page 50

1          things line up that's going to happen.  A lot

2          of bag houses explode for no apparent reason.

3          Why did they explode that day versus 40 years

4          prior to it?  You know, a lot of times there

5          is no real definite answer and say, well, it

6          blew up this day because of this and it blew

7          up this day -- you know, why didn't it do for

8          the last 40 years?  So it -- all those things

9          have got to come together at one time.

10

11   BY MR. MORRIS:

12          Q     And I understand that.  That's why I am

13   asking you -- you can't say to a reasonable degree of

14   engineering certainty as to why it did not occur on

15   any other prior day, even though the same conditions

16   may have been present?

17          A     It may have --

18               MR. BROWN:  Before you answer, form of

19          the question objection.  You asked about

20          engineering certainty, and that's certainly

21          not what the standard is.  It's probability.

22               MR. ALEXANDER:  Reasonable degree of

23          engineering probability.

24

Schloss (Morris)

Page 49

1  opinion that the conditions for an exothermic reaction

2  and the other -- as an ignition source and the other

3  elements that would lead to an explosion were present

4  in that bag house?

5        A    Yes.

6        Q    All right.  And as you sit here today,

7  you cannot give an opinion with a reasonable degree of

8  engineering certainty as to why an explosion would not

9  have occurred on any day prior to this?

10       A    Well, it really depends on if the

11  equipment -- if the dust collector itself is running,

12  is operating.  You are moving warm air across the

13  steel, so you have less condensation.  If it's

14  running, you know, it's -- an explosion is a perfect

15  storm.  All those things have got to come together.

16       Q    Well, let me --

17            MR. BROWN:  Excuse me, he is not

18       finished answering yet.

19            MR. MORRIS:  I think he is going beyond

20       the question.  That's why -- so --

21            MR. BROWN:  He is entitled to finish

22       his answer.

23            THE WITNESS:  I think an explosion is a

24       perfect storm.  You have to have all these

Central Virginia Reporters (540) 380-5017

Schloss (Morris)

Page 48

1    exothermic reaction then isn't dependent on additional

2    water.  Once it starts that reaction, it's going to

3    keep heating itself.  It's all self-contained.

4          Q      Okay.  Well, then, based on what you

5    have told us so far, when this ventilation system

6    started operating back in 2003 or so and you had those

7    conditions, are you saying that an exothermic reaction

8    very likely would have started back in 2003?

9          A      If you have the same situation that you

10   have there that day, that's very possible or, in my

11   opinion, would happen.

12         Q      Okay.  Well --

13         A      In my opinion, you would have that

14   same -- whether it would have resulted into a fire or

15   an explosion really would have been dependent on the

16   material in the bag house.

17         Q      I think that's obviously where we are

18   going to get to next is -- and, again, the ignition

19   source we come to is why on this day was there a

20   confluence of factors that occurred here.  And I am

21   not asking the question yet, but that's obviously

22   where I am going.

23                Previously, based on your testimony and

24   based on the conditions that were there, is it your

Schloss (Morris)

Page 47

1   set it down, pretty soon the water starts condensing

2   on the outside of it and going -- running down the

3   sides of your Coke can.  Okay.

4                    Take the same Coke can when it's 20

5   degrees outside, and the water does not form because

6   the temperature of the Coke is higher than the dew

7   point temperature of the air around it.

8                    Reversing that and putting the moisture

9   on the inside of the bag house in a cold skin

10  temperature with steel that has very rapid temperature

11  exchanges, you are going to have a -- the bag house is

12  going to cool very quickly down to that outside

13  temperature and then the dew point, and you are going

14  to start having sweating on the inside of that bag

15  house.  It can sweat on the bags.  It can sweat on the

16  sides, in the hoppers.

17       Q      If -- if the bag house is shut down for

18  an extended period of time, for more than the up to

19  hour and a half that we have here, let's say 24 hours,

20  48 hours or longer, does that affect the -- that

21  situation with the condensation?

22       A      Once the condensation is into the

23  material, in the case with metal, as in aluminum, you

24  are going to start exothermic reactions.  That

Schloss (Morris)

Page 46

1          A       Depending on the -- one, if the bag

2    house is operating, and two is is what the outside

3    conditions are.  If the bag house is not operating

4    or -- or if it's cold outside, depending on what the

5    outside temperature and the dew points are, you will

6    start to condense on the inside of the bag house.

7                   A lot of processes that are in

8    metal-producing plants, you insulate the bag house to

9    keep that transfer from happening so that you don't

10   end up with the skin temperature dropping below the

11   dew point temperature and condensing water into it.

12         Q       Okay.  And what if -- okay.  Is there

13   any similar type of situation that would occur when

14   the temperature outside is hotter than it is inside?

15         A       No.

16         Q       Okay.  So the difference in dew

17   point -- you could have a difference in dew point --

18         A       Two things.  One is the outside

19   temperature, which is going to determine what the

20   temperature of the steel in the bag house is and what

21   your inside humidity is on the -- on the bag house.

22                 To use an example, if you have a Coke

23   can in the middle of the summertime, and the Coke is

24   40 degrees inside the can, you walk outside and you

Schloss (Morris)

Page 45

1    have any effect on the amount of -- or will that have

2    any effect on the dew point for the interior of the

3    Federal-Mogul plant?

4           A      Over time it would.  In that amount of

5    time, I don't think you would see -- my personal or my

6    professional opinion is you wouldn't see much of a

7    change in it.  Again, too, by having that

8    water-producing equipment, it was producing water

9    while it was running as well.  So the dust collector

10   would have been seeing that moisture over an extended

11   period of time.

12          Q      So, again, that -- whenever it was

13   operating over the seven years before, you are

14   indicating that there would have been moisture in the

15   air that was being transported into the bag house?

16          A      Yes.

17          Q      Is that correct?  Okay.  And that the

18   moisture that's being transported, if it's shut down

19   for a short period of time, such as a half an hour to

20   an hour and a half, would have no effect on the

21   moisture being transferred to the bag house?  That's a

22   bad question.  Let me withdraw that.  Let me ask

23   another question.  The -- the water vapor that gets to

24   the bag house, what happens to it when it's in there?

Central Virginia Reporters (540) 380-5017

Schloss (Morris)

Page 44

1          Q       -- just the production line that was

2     for the aluminum dust, that created the aluminum dust?

3          A       My understanding was -- again, I didn't

4     check to see if the rest of the plant was running.  My

5     interest was in the lines that were served by that

6     dust collector.  And if you were running the process

7     -- if you were running the dry dust collectors, you

8     would have to be running the wet dust collectors to

9     handle another part of this same production line.  So

10    my assumption was is that since both of them were

11    running at that -- required to run, that it would be a

12    requirement that both the dust collector and the wet

13    dust collector would be running.  And, again, that's

14    based on how the system is currently designed or --

15    and what was specified in Federal-Mogul's design

16    documents.

17         Q       Okay.  And based on your prior answer,

18    it's your understanding that that particular line, the

19    aluminum dust ventilation system, including the water

20    vapor-producing equipment, had been shut down between

21    a half hour and an hour and a half before LCM started

22    its work?

23         A       Yes.

24         Q       The fact that it's shut down, does that

Schloss (Morris)

Page 43

1          Q     Okay.  Have you done any testing or

2   created any models to determine the extent to which

3   that particular equipment in the Federal-Mogul plant

4   would raise the dew point or increase the relative

5   humidity for the plant air?

6          A     No, but I know how to do it.  I do it

7   as part of my business.  I just did not do it in this

8   case.

9          Q     So, as you sit here today, can you

10  provide any basis for -- withdrawn.  Can you tell us

11  what the dew point was for the Federal-Mogul plant

12  inside the plant on December 31 of 2010?

13         A     No.

14         Q     Do you know whether or not the water

15  vapor-producing equipment was operating at

16  Federal-Mogul on that day?

17         A     I have been told that it was.

18         Q     Okay.  Told by who?

19         A     Again, when I asked the question was

20  the plant operating, they said up to the time when it

21  was shut down to start cleaning the ductwork.

22         Q     And when you say the plant being shut

23  down, is that the entire plant or --

24         A     No, the process.

Schloss (Morris)

Page 42

1    vapor into the plant.

2              Q     Is there any way to test that?

3              A     Yes.

4              Q     How would you test that?

5              A     You can test versus the outside.  You

6    take a measuring device that's going to measure

7    temperature and wet-bulb temperature or temperature

8    and absolute humidity.  There is different devices

9    that you can tell how much moisture is being added.

10             Q     And for this case, did -- did you do

11   any type of model or any type of testing -- well,

12   withdrawn.  Let me ask you this first:  Are the water

13   vapor-producing equipment that you referred to still

14   operating at Federal-Mogul?

15             A     The understanding I had was the plant

16   was running at -- up until the time it was shut

17   down --

18             Q     I'm sorry to cut you off.  Not that

19   day.  I am talking about after the explosion and when

20   you got the request to do your review in this case.

21   Do you know, as of today or at any time since you have

22   had it, whether or not that equipment is still being

23   used?

24             A     I don't have any direct knowledge.

Schloss (Morris)

Page 41

1   were all installed at the same time for this

2   production line, would mean there would be vapor --

3   free water vapor in the air.

4          Q      Okay.  And that would be for the entire

5   plant?

6          A      Well, I mean, you would have just in

7   the -- I looked at just the area of where they were

8   doing the production side of it.

9          Q      Okay.  With respect to the water

10  vapor-generating equipment, okay, does that raise the

11  relative humidity of the air for the entire plant?

12         A      Yes.  Relative humidity is a number

13  that says just exactly what it is.  It's relative to

14  how much moisture does it have versus how much

15  moisture can it have.  So what it was actually doing

16  was raising the entire dew point of the plant.

17         Q      Didn't you do any calculations for the

18  extent to which the dew point was raised in the

19  plant --

20         A      No.

21         Q      -- as a result of this equipment?

22         A      Other than my experience with wet dust

23  collectors is you are putting water vapor into the

24  plant.  You have got employees that are putting water

Schloss (Morris)

Page 40

1          Q       Or whether it was actually done?

2          A       That was outside of the scope of what I

3    was looking at.

4          Q       You mentioned specifically water

5    vapor-generating equipment in the plant?

6          A       Yes.

7          Q       Where did you get information about

8    that subject?

9          A       From the proposal -- or from

10   Federal-Mogul's specs on the original project, it

11   required two dry dust collectors and then two wet dust

12   collectors for the process, a different part of the

13   process.  A wet dust collector works by either

14   spraying water into the air to take out the

15   particulate or by running the air through a tank and

16   through a bath to remove the particulate as well.

17         Q       Okay.

18         A       There was talking about -- then their

19   specifications also had a sludge-handling equipment,

20   which meant what was coming off of the dust collector

21   is going to be a mixture of both particulate and water

22   that's going to come out wet to be dried.

23                 So just the inclusion of those two

24   pieces of equipment in the general area, because they

Schloss (Morris)

Page 39

1    procedures of the workers?

2          A      When I teach it and teach safe

3    operation of dust collectors, lockout/tagout is a big

4    issue in it.

5          Q      Okay.  And are you familiar that with

6    lockout/tagout that it's the individual working on the

7    equipment that's responsible for making sure that's

8    done?  Are you familiar with that standard?

9          A      Yes.  And I don't know who locked out

10   what or how many locks were on it.

11         Q      Okay.

12         A      Or what Federal-Mogul's internal

13   procedures are or requirements.

14         Q      Let's see.  Now, this may be similar,

15   but the operational condition of the plant, I guess

16   that -- we are talking about the same thing, either --

17   whether that's the machines or the dust collection

18   system.  And, again, you were just provided the

19   information that there was a lockout and tagout, but

20   you are not -- you don't have any information as to

21   whether or not that was checked by the plaintiffs?

22         A      No.

23         Q      Or who did it?

24         A      That was outside the scope --

Schloss (Morris)

Page 38

1          Q       -- and were told either by plaintiffs'

2    counsel or --

3          A       Either in deposition or that it was

4    locked out and tagged out.  That was also part of

5    LCM's proposal is that the lockout/tagout would be by

6    Federal-Mogul.

7          Q       And while we are talking about

8    lockout/tagout, are you offering any opinions with

9    respect to the safety procedures followed by the

10   plaintiffs or LCM in their work here?

11         A       No, other than I know, you know, safe

12   work around the -- around combustible dust.  I teach

13   it.  I do seminars on it.

14         Q       So, for example, Mr. -- I want you to

15   assume Mr. Hodges testified at his deposition that he

16   did not check to see whether or not the Federal-Mogul

17   equipment was locked out or tagged out or whether the

18   bag house -- the dust collecting system had been

19   locked out and tagged out.  You are not here to offer

20   any opinion as to whether that's proper procedure or

21   otherwise; is that correct?

22         A       I have no information on that.

23         Q       Okay.  Is that something that would be

24   within your expertise, to evaluate the safety

Schloss (Morris)

Page 37

1    I have seen between a half hour and an hour and a

2    half.

3           Q      Do you remember where you got that

4    information from?

5           A      No.  It could have been provided by

6    counsel.

7           Q      In what form?  By --

8           A      Just asking a question and statement.

9    Or it may have been in one of the depositions.  I am

10   not sure.

11          Q      But did you do anything to verify that

12   other than either being told by counsel or maybe

13   reading it in one of the depositions?

14          A      No.  I didn't contact the plant or

15   anybody at that point.  I requested -- I mean, I

16   requested that information, and that's what I was

17   told.

18          Q      I guess the other one similar to that

19   was whether or not the dust collector system was

20   operating at the time, correct?

21          A      Yes.

22          Q      Okay.  And that's information that you

23   asked was it on at the time --

24          A      I have seen that --

Central Virginia Reporters (540) 380-5017

Schloss (Morris)

Page 36

1    go through and eliminate the potential sources of

2    ignition, correct?

3            A       Yes.

4            Q       And when you do that, do you have a

5    process whereby you go through eliminating the least

6    likely to the most likely?  Or do you go most likely?

7    Do you have a process to do that?

8            A       I look at what the impact of each one

9    of them would be and whether that was available, you

10   know, that -- like say the process equipment, whether

11   it was running or not.  If it's not running, then

12   that's -- eliminates it as a source.  I look through

13   each one of them equally to make that decision.

14           Q       So based on the list that you gave me,

15   it's fair to say that there were some that you easily

16   eliminated as a source of ignition?

17           A       Yes.

18           Q       First being the Federal-Mogul equipment

19   because, based on the information provided to you,

20   that equipment had been shut down that day, correct?

21           A       Uh-huh, yes.

22           Q       And do you know how long it had been

23   shut down for prior to the work on the ductwork?

24           A       I was told anywhere from a half hour --

Schloss (Morris)

Page 35

1            A      If they were -- if there was a reason

2     as a flashlight breaking or any source -- external

3     source of electrical spark.

4            Q      Okay.

5            A      If the dust collectors were operating,

6     which I am told they were not, that they were

7     electrically locked out.  Again, the type of material,

8     the aluminum dust.

9            Q      Okay.  Anything else?

10           A      The condition of settling in the

11    ductwork of the aluminum dust.  You know, if there was

12    an ignition source from the process equipment, which I

13    am told was locked out.

14           Q      When you say process equipment, you

15    mean the Federal-Mogul equipment?

16           A      The Federal-Mogul equipment, not the

17    dust collection.  NFPA will tell you ignition sources

18    are free.  You can never design all the ignition

19    sources out of a system.  You could have a short

20    circuit.  You can have lightning come in on it.  There

21    is a lot of different sources of ignition.

22           Q      Understood.  And --

23           A      Exothermal.

24           Q      Sure.  And part of your process is to

Schloss (Morris)

Page 34

1    documents, did you have various possible causes that

2    you were considering?

3              A      Yes.

4              Q      And can you tell me what causes you

5    were looking at or what sources of ignition you were

6    looking at as the cause of the explosion?

7              A      When I looked at the entire system --

8    and, again, taking the video out of it, I looked at

9    the role of what the workers would have been doing.

10             Q      When you say the workers, who are you

11   referring to?

12             A      The three individuals that were

13   injured, the two --

14             Q      The LCM employees, the plaintiffs, not

15   the Federal-Mogul employees?

16             A      No, the LCM employees.

17             Q      Okay.  So you look at what were the

18   plaintiffs doing.

19             A      What were the weather conditions, what

20   was the operational condition of the plant.

21             Q      Okay.

22             A      Was there water-generating or vapor --

23   water vapor-generating equipment in the plant.

24             Q      What else?

Schloss (Morris)

Page 33

1    operating.  Is that fair?

2            A       Based on that information, the

3    information provided, yes.

4            Q       Based on the information that you have

5    had to reach your opinion, that's -- that's the key to

6    determining what the cause of this explosion was,

7    correct?

8            A       Yeah.  Yes.

9            Q       Okay.  And in determining what the

10   ignition source was, that would also help to determine

11   where the origin of the explosion was as well,

12   correct?

13           A       Yes.  Again, looking at the video --

14           Q       Well, there is no question before you.

15   There is no question before you, so --

16           A       That could be carrying off from the

17   last one, so...

18           Q       Okay.  So in terms of your

19   investigation of this incident, is it fair to say that

20   you came to a point where you had to focus on what was

21   the source of ignition for the explosion on December

22   31?

23           A       Yes.

24           Q       And at your initial review of the

Schloss (Morris)

Page 32

1    was no.

2            Q      Okay.  So -- and again just to go back,

3    so the dispersion of the dust cloud was a condition

4    that would have been present on any day prior to this

5    as well, correct?

6            A      Yes.

7            Q      Okay.  Containment.  When you say

8    containment, what are you referring to?

9            A      The dust collector itself.

10           Q      And when you say the dust collector, is

11   that --

12           A      The enclosure of the bag house.

13           Q      So that's not the 55-gallon drum that's

14   at the bottom?  Or is that part of it?

15           A      It could be.  It could be.  If it's not

16   isolated, that's included in that volume as well.

17           Q      Okay.  And, clearly, that containment

18   system had been present since the system had been

19   installed and operated?

20           A      Yes.

21           Q      So the only -- only factor that we have

22   to consider is what's the source of ignition in terms

23   of what's different on this day to cause the explosion

24   than any other day that this system has been

Schloss (Morris)

Page 31

1   is present on a daily basis in this system?

2           A       Yes.  And a dust collector is a perfect

3   product classifier.  The heavy particles fall down

4   onto the -- into the hopper.  The light particles go

5   up onto the bags.  The filtration is actually provided

6   by a dust cake on those bags.  It's like your home

7   furnace filter.  About the time that you look at it

8   and it's all dirty, it's finally starting to work.  So

9   at that point you -- using the dust is actually what's

10  providing the filtration efficiency on the dust.  The

11  dust collector in normal operation is going to pulse

12  off that dust down into the -- into it, but, also, a

13  dust collector that's shut down will experience dust

14  falling off of the bags over a period of time.

15          Q       So fair to say that the bags don't get

16  rid of everything while it's on?

17          A       And they don't clean while it's --

18  while it's -- they don't completely clean when you

19  turn it off.

20          Q       Okay.

21          A       You can also end up with buildup on the

22  walls of the dust collector.  And I think in one of

23  the depositions it was asked had the dust collector

24  ever been cleaned or the bags changed, and the answer

Schloss (Morris)

Page 30

1    That's something that is present at all times and had

2    been present in this system every day, correct?

3           A     Yes.

4           Q     Okay.  Fuel.  In this case, what, in

5    your opinion, was the fuel for the explosion?

6           A     The aluminum dust.

7           Q     And, again, the aluminum dust was

8    something that had been present in the system since it

9    started operating some seven years earlier, correct?

10          A     Yes.

11          Q     And was there any difference on this

12   day in terms of the characteristics of the aluminum

13   dust in the system?

14          A     I -- without, you know, analyzing the

15   dust, I would assume that the same equipment and their

16   process is the same day after day, and the dust is

17   going to be the same every day that goes into it.  I

18   have no information of a process change that was made

19   prior to this or that had been made in the seven

20   years.

21          Q     All right.  I am going to skip over

22   ignition source for just a second because I know you

23   already mentioned the exothermic reaction there.

24   Dispersion of the dust cloud, is that a condition that

Schloss (Morris)

Page 29

1           In the -- by having a dust collector

2    that's handling combustible metals, especially, it's

3    important that the dust collector not have

4    condensation on the inside of the dust collector.

5           Based on the weather data that I

6    reviewed as well as the fact that the plant has wet

7    dust collectors that will be adding moisture to the

8    air on the inside of the plant, that the probability

9    -- or, in my opinion, is is that the dust collector

10   was condensing.  The material that was in there had a

11   exothermic reaction.  The exothermic reaction caused

12   the explosion.  And all of those things are

13   independent of what they were doing in the ductwork or

14   what somebody was doing on the other end of the plant.

15      Q    Okay.  Let's -- well, let's go through

16   what was present on that day.  And I will ask this in

17   a -- I may ask this a couple ways.  So if I say it in

18   a confusing way, please let me know.

19      A    Okay.

20      Q    I will rephrase the question, or we

21   will repeat it back so that we make sure that we are

22   talking about the same thing.

23           You said five things need to be present

24   for an explosion to occur.  The first one is oxygen.

Schloss (Morris)

Page 28

1    the explosion occurred on that day?

2            A       Explosions don't really pick what day

3    they want to happen.  It's a coming together of, you

4    know, multitude of things all at one time.  Nobody

5    gets up and schedules one for 10 o'clock in the

6    morning.  So it could have -- it could have happened

7    that day, and it could have went 40 more years without

8    running.

9            Q       Okay.  Well then --

10           A       The length of time really doesn't --

11   the length of time that the equipment has been running

12   does not make it any safer.  I have a lot of customers

13   that say, well, we have run 20 years without an

14   explosion.  Say, well, yep, you ran 20 years without

15   an explosion, and you had one.  What happened in the

16   first 20 years.

17           Q       Well, I guess that's where I am going

18   next is, then what are the factors that need to be

19   present or were present on December 31, 2010, that, in

20   your opinion, brought about this explosion?

21           A       To have an explosion, you need five

22   things:  You need oxygen, you need fuel, you need an

23   ignition source, you need dispersion of the dust

24   cloud, and you need containment.

Schloss (Morris)

Page 27

1    know, based on all of those things and where I

2    determined the explosion originate, it would have made

3    no difference if they were working on it or not

4    working on it.

5              Q      Okay.  Why is that?

6              A      Because I don't think they had -- in my

7    professional opinion, the explosion didn't originate

8    at the employees.  It originated in the dust

9    collector, and there was nothing that the employees

10   were doing that was going to change that fact or

11   contribute to it in the dust collector per my

12   findings.

13             Q      All right.  And this ventilation system

14   had been operating for approximately seven years --

15             A      Yes.

16             Q      -- prior to this day?

17             A      Uh-huh.

18             Q      Okay.  Were there any conditions that

19   were present on December 31, 2010, that were different

20   than any other day that it had been operating up until

21   then?

22             A      I don't have that information.

23             Q      Okay.  Do you have an opinion with a

24   reasonable degree of engineering probability as to why

Schloss (Morris)

Page 26

1          Q      Okay.  If Mr. Hodges, Mr. Bonds, and

2    Mr. Spangler were not present cleaning the ductwork at

3    Federal-Mogul on December 31, 2010, would that

4    explosion have occurred?

5          A      Could that explosion have occurred, or

6    would that --

7          Q      I am asking first would that.

8          A      It's possible that the explosion could

9    have occurred based on the information that I have

10   saw.  The role that the employees played in that

11   decision -- or in that explosion, it's -- I would say

12   based on what I found, it could have exploded without

13   them being there.  That's my -- my professional

14   opinion is, is from what I saw and working on

15   different dust collectors like that that there's a

16   possibility that that could happen.

17         Q      Okay.  So to put it another way, I

18   suppose -- well, let me go into another question with

19   that.  Do you have an opinion as to whether or not any

20   of the actions taken by the plaintiffs that day in

21   cleaning the ductwork caused or contributed to the

22   explosion occurring specifically on that day?

23         A      From my analysis of the explosion and

24   of the equipment and the videotape and the -- you

Schloss (Morris)

Page 25

1    that correct?  Are those two different things, or is

2    that the same?

3              A      Yes, it's two different things.

4              Q      All right.  Let me ask you this

5    question:  In -- I understand that this was a -- the

6    event took place on December 31 of 2010, correct?

7              A      Per the information that I have been

8    handed, yes.

9              Q      Okay.  And that was at the

10   Federal-Mogul plant in Blacksburg, Virginia, correct?

11             A      Per the information that I have been

12   provided, yes.

13             Q      So my question to you is:  Would this

14   event have occurred on December 31, 2010, whether or

15   not the plaintiffs were at the Federal-Mogul plant

16   that day?

17             A      Can you clarify?  I don't understand.

18             Q      Sure.  We know an explosion occurred on

19   that day, and we know that the three plaintiffs were

20   there for LCM cleaning the ductwork.  My question is:

21   Was -- would that explosion have occurred on December

22   31, 2010, whether or not the plaintiffs, as LCM

23   employees, were there cleaning the ductwork that day?

24             A      Try one more time.

Schloss (Morris)

Page 24

1    been a component in making those decisions.  But

2    looking at the actual equipment that as it was

3    destructed, it wouldn't have changed my opinion of the

4    designs.

5              Q    Okay.  And, again, I am trying to

6    separate two parts out here, because part of your

7    opinion seems to be that the ventilation system

8    itself -- that you were reviewing its design at the

9    outset.

10             A    Uh-huh.

11             Q    Whether it was capable of performing

12   the functions that it was intended to do at that time;

13   is that correct?  That's one aspect?

14             A    Based on the information that was

15   available.

16             Q    Okay.

17             A    Publicly available at that time.

18             Q    All right.  The second thing that you

19   are referring to here is looking at the event of the

20   explosion itself.

21             A    Yes.

22             Q    And whether or not the component parts

23   that had been selected as part of that design were

24   appropriate based on that event and what occurred; is

Schloss (Morris)

Page 23

1    information to make a determination is, was the

2    information that would have been available at the time

3    that the equipment was selected, if that was -- if the

4    equipment was selected for that -- you know, based on

5    that information or also reviewing the explosion is

6    did a higher pressure or a higher Kst did the

7    equipment experience in the explosion.

8            Q    Is it fair to say that if you had that

9    information, you could give a more precise or a more

10   certain opinion with respect to the design of the

11   ventilation system?

12           A    It would have been part of making the

13   analysis of it, but it wouldn't have changed the

14   outcome of my opinion.

15           Q    Okay.  Why not?

16           A    Because the equipment -- the

17   destruction of the equipment indicated that the -- in

18   the case of the dust collector, that the vent weren't

19   properly -- or weren't large enough to release the

20   vents, and the dust collector tore itself apart or had

21   structural failure.  In the case of the back blast

22   damper, it structurally failed due to the pressures.

23                Again, that doesn't -- changing --

24   changing knowing what the dust going into would have

Schloss (Morris)

Page 22

1    the application.

2          Q      And since that information is not

3    available, does that have any impact on your certainty

4    or your opinion as to what you have expressed in your

5    report here?

6          A      It has had an impact in what was the

7    final -- or the initial design information to -- and

8    by -- let me get my thoughts together here.

9          Q      Well, let me see if I can ask it more

10   specifically.  You said one of the things that you

11   were reviewing was the design of the system itself.

12   How would knowing the composition of the dust affect

13   your opinion in this case on the design of the system?

14         A      It would determine if the dust

15   collection equipment and the dust collection system

16   was capable of withstanding the pressures and the

17   selection of the equipment would react fast enough for

18   the type of dust that was -- it was asked to filter.

19         Q      And without that information, were you

20   able to reach an opinion as to the design of the

21   system?

22         A      Based on the destructive forces that I

23   observed on the equipment -- and, again, this is based

24   on -- this is what I do all the time.  Backed into the

Schloss (Morris)

Page 21

1          A        Minimum ignition energy that it would

2    take to ignite it, minimum explosive concentrations,

3    things that you would use to analyze the dust and the

4    proper selection of the equipment.

5          Q        For the ventilation system itself?

6          A        For the ventilation system itself,

7    including the dust collector, ductwork.

8          Q        And why would that be important to your

9    final opinion?

10          A        To determine the cause of the

11    explosion; determine the severity of the explosion in

12    the dust collector, in the backdraft damper, and in

13    the ductwork; to determine the origin of the explosion

14    as well as severity of the dust cloud that was -- or

15    the gasses that were given off by it.

16          Q        And, again, so you are referring to

17    dust that was collected in the ductwork itself as well

18    as the dust that was present in the bag house at the

19    time?

20          A        Yes.  The reason that is is to properly

21    select the equipment and the explosion protection, you

22    have got to know the numbers of the Kst, which is rate

23    of pressure rise over rate of time, and pressure

24    maximum to decide the selection of the equipment for

Schloss (Morris)

Page 20

1          Q     And can you explain to me what you mean

2    by dust testing of the aluminum dust?

3          A     The dust test would have been provided

4    by a company similar to Chilworth, Fenwal, where they

5    actually run the chemical characteristics and have --

6    explode the dust to measure what the rate of rise of

7    the pressure over time, delta P over delta T, which is

8    used in calculating Kst, and also Pmax, which is the

9    maximum pressure involved in the explosion.

10               I was told that the dust had not been

11   tested prior to that, that there was dust that --

12   there was dust samples available.  But due to the time

13   since the explosion, unless it was really tested prior

14   to the explosion, anything after that point wouldn't

15   give you an accurate representation of what was in the

16   dust collector or the ductwork at that time.

17         Q     Okay.  And, again, sometimes I will

18   need to go and clarify just so that I understand.

19   Your interest in finding out was what the components

20   were of the dust that was described as being in the

21   vents at the time of the explosion, correct?

22         A     Both components and the chemistry of

23   it, what the explosive values of the material was.

24         Q     All right.

Schloss (Morris)

Page 19

1          A       No.

2          Q       Have you had any personal interviews

3     with any other LCM employees, such as Danny Collins?

4          A       No.

5          Q       Prior to preparing your report for

6     plaintiffs' counsel, did you request any additional

7     information that was not provided to you?  You know,

8     let me withdraw that and ask it another way.  Have you

9     asked for any information from plaintiffs' counsel

10    that has not been provided to you?

11         A       There is nothing that I have asked for

12    that's not been provided to me.  To give you a more

13    full answer, on the -- what I reviewed and the

14    information is in my report on Pages 7, 8, 9, and 10.

15    So that's more of a total listing of what I received

16    and what I reviewed.

17         Q       And I understand that.  I understand

18    what you did use.  I am just asking if there was

19    something that you asked for that you were told either

20    it doesn't exist or we don't have it or we will get it

21    for you, anything like that.

22         A       The only information that I asked for

23    that was -- that I was told was not available was dust

24    testing of the aluminum dust prior to the explosion.

Schloss (Morris)

Page 18

1    from witnesses who were present at the time of the

2    event?

3            A       The reports that I see from OSHA are

4    usually at the citation level, not at the

5    investigation level.

6            Q       Would you agree with me that having

7    statements from witnesses who were present at the time

8    of the event is important in a full evaluation of the

9    causes of an event such as this?

10           A       From the information that I have seen

11   and the depositions that I have read, I felt those

12   were the key players in the evaluation of the

13   explosion and didn't require any additional workers or

14   any additional information.

15           Q       Have you ever read any statements from

16   any Federal-Mogul employees who were present at the

17   time of the explosion?

18           A       I am not sure if David Garard was at

19   the -- present at that time or not.

20           Q       And David Garard is the only

21   Federal-Mogul employee whose statements --

22           A       That I can recollect right now.

23           Q       Have you ever had any personal

24   interviews with any of the plaintiffs in this case?

Schloss (Morris)

Page 17

1   provided.

2        Q      Did you have any reports regarding the

3   investigation of the explosion?

4        A      By?

5        Q      By the Blacksburg Fire Department, by

6   OSHA, by any governmental agency.

7        A      I have looked at the -- and this was

8   when we got in to do the site visit and the analysis

9   of the -- of all the information, I looked at the fire

10  department's evaluation.  Did not look at OSHA's

11  evaluation.

12       Q      Is there some reason you have not

13  looked at the OSHA report?

14       A      No.

15       Q      Would that contain information that

16  would be helpful to you in reaching a hypothesis or an

17  opinion in this matter?

18       A      I don't feel that OSHA would have

19  anything in their report that would be more than what

20  was provided by the other information that I got.

21       Q      Are you familiar with OSHA reports that

22  are done in situations such as this?

23       A      Yes.

24       Q      Do those reports contain statements

Schloss (Morris)

Page 16

1    first time?

2              A       I think August, early August.

3              Q       Of this year?

4              A       Of this year.

5              Q       So between November of 2011 and August

6    of 2013, there was a continuous stream of information

7    being provided to you by the plaintiffs' counsel?

8              A       Yes.  I mean, not every day did I

9    receive something on it, but it may go two or three

10   months and I would review something, and then maybe a

11   month later I'd end up reviewing something.

12             Q       Okay.  Prior to your first visit to the

13   site in August of 2013, at that point -- prior to that

14   time, what written information or documentation did

15   you have other than what we have already discussed,

16   which is the video, the deposition transcripts of the

17   plaintiffs and the Federal-Mogul employees, and the

18   design --

19             A       Design information.

20             Q       -- information and the exhibits from

21   the depositions?

22             A       The order information from -- for

23   Dustex, the order information for Kirk & Blum, all

24   relative documents about the equipment of what was

Schloss (Morris)

Page 15

1    in the system, make sure that it was -- met the

2    function required, NFPA requirements, or the safe

3    operating.

4            Q       You said earlier independent review of

5    all the information.  At this point in time, all

6    you've told me that you have received were the

7    depositions of the plaintiffs and the Federal-Mogul

8    employees and the exhibits with those depositions.

9            A       I guess the --

10           Q       Is that correct?

11           A       The initial part of it, the initial

12   contact would be to do that independent review.  As

13   the depositions came in and requested different

14   information that was provided, I reviewed that

15   information.  But the scope of what my direction was

16   was to take a look at the total system and analyze the

17   system and its components.

18           Q       Is it fair to say that in order to

19   analyze the system and its components, then all you

20   needed was the deposition exhibits and the design

21   plans that you referred to?

22           A       And also to visit the site, look at the

23   equipment.

24           Q       When did you visit the site for the

Schloss  (Morris)

Page 14

1   specific aspect of the incident?

2          A       No.

3          Q       Were you asked the question like we'd

4   like to hear your opinion on what the cause of the

5   explosion was or some other aspect of this?

6          A       No.  What I was asked for was an

7   independent review of all the information with really

8   no pressure to say here is what your answer needs to

9   be in the end of it.  A big part of my business is

10  providing that for manufacturing companies, is review

11  what they have to see if it's in compliance or where

12  they are deficient.

13         Q       And that's where I was going, whether

14  they were asking you to evaluate, for example, the

15  ventilation system that was in place to determine

16  whether or not it was in compliance, if that was the

17  request, or if the request was can you provide us your

18  opinion on the function of the various components of

19  the system in the explosion that occurred.

20         A       In both of those.  In our business when

21  we do an analysis, we look at each piece of equipment.

22  If I was called into a plant to look at their dust

23  collection system to see if it was in compliance, we

24  would look at the total system and then each component

Schloss (Morris)

Page 13

1   when I received any of the information.  It's just

2   been ongoing.

3          Q      Other than the deposition transcripts,

4   in terms of your initial review of the case, was there

5   anything else that you referred to when you first were

6   retained?

7          A      No.

8          Q      Did there come a point in time that you

9   requested additional documents from plaintiffs'

10  counsel for your review?

11         A      Yes.

12         Q      What documents did you request?

13         A      Just design information from Dustex,

14  and I think it's more of the -- along the line of

15  exhibits that were in -- or information that was in

16  the depositions.

17         Q      And again referring to the depositions

18  of the plaintiffs and the Federal-Mogul employees?

19         A      Yes.  Again, the exact timeline of when

20  I received what, I could go back and reconstruct it

21  maybe from e-mails or telephone conversations, but I

22  don't really recollect when that was -- happened.

23         Q      When you were first retained to review

24  the case, were you asked to focus your review on any

Schloss (Morris)

Page 12

1    you found news reports about the explosion that

2    occurred at the Federal-Mogul plant as part of your

3    ongoing professional duties?

4           A     Yes.

5           Q     Did there come a point in time that

6    plaintiffs' counsel provided you with a factual

7    background regarding their clients and/or the

8    incident?

9           A     Yes.  At what time or the dates, I am

10   not sure.

11          Q     I'm more interested in what -- what

12   information was provided to you.

13          A     Started -- the best of my memory, it

14   started with depositions.

15          Q     Okay.  And depositions of?

16          A     Depositions of the employees that were

17   injured, depositions from Federal-Mogul's employees.

18          Q     Did you receive those -- were they

19   transcripts of the depositions?

20          A     Yes.

21          Q     And did you receive those before you

22   received any other written materials relating to this

23   incident?

24          A     I really don't have a good timeline on

Schloss (Morris)

Page 11

1    for this case?

2           A      No.

3           Q      Was that done by another meeting, a

4    phone call, a letter?

5           A      Best I can remember, another phone

6    call.

7           Q      Were you given any additional

8    information about the case through that phone call?

9           A      No, just to discuss the -- whether I

10   was interested in working with them on the case.

11          Q      And was there a general discussion of

12   what the case was about at that time?

13          A      Yes.

14          Q      Can you tell me what you recall about

15   that conversation?

16          A      I also knew from news reports what the

17   case was about as well.

18          Q      And had you looked at the news reports

19   on your own or at the request of Mr. Brown and

20   Mr. Johnson?

21          A      On my own in that I do a lot on web

22   sites and with the chemical safety board.  I am not

23   sure where it would have come up at.

24          Q      Okay.  And again so that I am clear,

Schloss (Morris)

Page 10

1    case that you were working on?

2            A       Uh-huh.

3            Q       And while you were having that meeting,

4    there was a discussion about this case?

5            A       Yes.

6            Q       And after viewing the video, did you

7    offer any opinions or information on what further

8    documents or data you would need?

9            A       No, not at that time.

10           Q       All right.  Did there come a point in

11   time that you were retained to review additional

12   documents in this case?

13           A       Yes.

14           Q       When was that?

15           A       I am not real sure of the dates, but

16   would have been within the last year.

17           Q       You said the case was first mentioned

18   to you in November 2011?

19           A       Yes.

20           Q       So sometime during 2012 was when you

21   were contacted, or was it in 2013?

22           A       I don't recollect.

23           Q       Do you have any documents that would

24   refresh your recollection as to when you were retained

Schloss (Morris)

Page 9

1          A       I think November of 2011.

2          Q       Who was it that contacted you?

3          A       Mr. Brown and Mr. Johnson.

4          Q       Was that in person or by phone?

5          A       In person.

6          Q       And was that here in Roanoke or at your

7    offices in South Carolina?

8          A       It was in Hilton Head while I was on

9    vacation.

10               MR. ALEXANDER:  Only you?

11

12   BY MR. MORRIS:

13         Q       Prior to that meeting, had you received

14   any contact, any documents, any information about the

15   case?

16         A       No.

17         Q       Can you tell me what information you

18   were provided about the case at that first meeting.

19         A       We were -- just reviewed video of the

20   explosion, discussed just the video, and that was the

21   extent of it.  The main part of the meeting was for a

22   different case I was working with Mr. Brown on.

23         Q       I see, okay.  And just so that I am

24   clear, so the meeting was set up to discuss another

Schloss (Morris)

Page 8

1    today, did you bring any written materials with you?

2           A       Other than the report and just really

3    what's been issued, no.  Nothing else in writing.  No

4    notes.

5           Q       When you say issued, what -- what are

6    you referring to?

7           A       The report that I issued.

8           Q       Okay.  Do you have any documents that

9    have been provided to you by plaintiffs' counsel?

10          A       Yes.

11          Q       What documents do you have that were

12   provided to you by plaintiffs' counsel?

13          A       They were detailed in the report.

14          Q       Okay.  So in the report there is a

15   listing of all the references in terms of documents

16   related --

17          A       Yes.

18          Q       -- to this case.  And other than those,

19   you have no other documents?

20          A       At this time I cannot think of any

21   other documents that I was provided since then.

22          Q       Can you tell me when you were first

23   contacted by plaintiffs' counsel with respect to this

24   matter?

Schloss (Morris)

Page 7

1    Doug Edwards?

2              A      Yes.

3              Q      Who is Doug Edwards?

4              A      Doug Edwards was my counterpart in

5    Cincinnati.  He was the director of engineering and

6    was responsible for the engineering portions of

7    Kbd/Technic in Cincinnati.

8              Q      And during the time that you worked at

9    Kbd/Technic, did you ever work on any projects

10   together with Mr. Edwards?

11             A      Yes.

12             Q      And can you tell me what each of your

13   roles were in those projects?

14             A      I would either be lead designer and he

15   would be a support or the other way around, and I

16   would provide engineering support for -- on his

17   projects.

18             Q      Okay.  So it's a collaborative effort

19   for --

20             A      Collaborative effort.

21             Q      And that would be for a client of

22   Kbd/Technic?

23             A      Yes.

24             Q      With respect to your deposition here

Schloss (Morris)

Page 96

1        A       He is a good engineer.

2        Q       Are you familiar with his reputation in

3    the industry?

4        A       He is, again, a good engineer.

5        Q       And did you read the report from

6    Richard Roby?

7        A       Yes.  I reviewed it as well.

8        Q       Do you know Richard Roby?

9        A       No.

10        Q       Are you aware that he is a member of

11    the committee for NFPA 921?

12        A       No, but I also know other members of

13    the committee.  That may not make them an expert in

14    anything more than being on the committee.

15        Q       Absolutely.  I just didn't know --

16        A       I don't really think that buys you much

17    credentials on that.

18        Q       So can you explain to me, what is

19    confirmational bias?

20        A       I am not familiar with the term.  I

21    know it's in 921 in the definitions.  I know there is

22    a section on confirmational bias, but to sit here and

23    quote it -- if you want to get out 921, I can show you

24    where it is and tell you what it says.

Schloss (Morris)

Page 119

1    into the plant.  Imagine that the fireball is like a

2    big balloon.  Anyplace that you put a hole in that

3    balloon, you are going to get equal flow out of.  It's

4    looking for the least -- it's looking for the easiest

5    way out.  If you build a enclosure that can withstand

6    the explosive forces without any problem and don't do

7    it and don't put anything on the inlet, that fireball

8    and all those gasses is going back into your process

9    where it's going to pick up fresh fuel.  You are going

10   to have secondary explosions and, in this case, a

11   tragic incident.

12            Q       Now, in this particular case, one of

13   the parts that we are referring to is my clients'

14   backblast damper.  Within the ventilation field, okay,

15   what does blast mean?

16            A       Blast means that it's going to stop a

17   blast.

18            Q       And does it distinguish between what

19   that is a blast, whether it's a blast of air or an

20   explosion?  Is there a difference?

21            A       A blast -- it could be the pressure

22   wave ahead of the blast.  The difference is a backflow

23   preventer is something that closes when the fan shuts

24   off to prevent air from going back into the building

Schloss (Morris)

Page 120

1    based on that you have denser colder air on the

2    outside of it, less dense air on the inside of it, and

3    it's going to find equilibrium.  So there are two

4    different types of devices.  One is a backflow

5    preventer.  The one is a backblast preventer.

6              Q      In 2002 was that a distinguishing

7    description of those parts?

8              A      In my -- in my view and my expectations

9    as a designer, of an engineer of those systems, I

10   would know the differentiation between those two

11   systems.

12             Q      Okay.  So if someone orders a backblast

13   damper, okay, from a catalog --

14             A      It better -- if they are advertising it

15   as a backblast damper, then it better meet the

16   requirements that are required to withstand a

17   explosion that's inside that dust collector.  All the

18   components of the dust collection system need to be

19   capable of withstanding that explosive pressure.

20             Q      In your report, there is a couple --

21   couple places where you define the purpose of a

22   backblast damper as a device to prevent an explosion

23   from propagating through dust; is that correct?

24             A      That could -- I am sure it says that in

Schloss (Morris)

Page 148

1    determine what the rate of propagation for the flame

2    was?

3              A       No, not on this specific case, no.

4              Q       Okay.  Is there a set formula that you

5    would use for that?

6              A       Deflagration is a flame front moving at

7    less than the speed of sound.  The speed of sound is

8    quite high, so it's going to move very quickly through

9    that ductwork.

10             Q       So between the time that Mr. Hodges

11   says he sees the fireball and the time that it reaches

12   the open end of the duct where he is standing, can

13   you --

14             A       Milliseconds.

15             Q       Well, okay.  Based on your experience

16   and to a reasonable degree of engineering probability,

17   can you tell us how long it would take for the

18   fireball to get to Mr. Hodges --

19             A       I can calculate it, but I don't have it

20   with me here.

21             Q       Okay.

22             A       But I can calculate you -- calculate

23   that.  Again, the rate of the fireball is also

24   dependent on the chemical characteristics of the dust.

Schloss  (Hudgins)

Page 158

1    accumulation at any particular point in that hopper?

2          A      I didn't investigate exactly where that

3    point would be in the hopper or in that dust

4    collector, no.

5          Q      And you didn't do any test to determine

6    how the angle of the hopper might affect the

7    particular material that was --

8          A      Without having the -- without having

9    the material and the characteristics of the material

10   -- you can run a test where you can test what the

11   angle of repose is, when it will start to become

12   free-flowing.  Without the material available, it's

13   not possible to do that test.

14         Q      The bag house is designed so that the

15   material collects and goes down the slopes of the

16   hopper into a steel drum?

17         A      Yes.

18         Q      Now, the explosion didn't start in the

19   steel drum, did it?

20         A      Again, I didn't -- I didn't pinpoint

21   where it could have started.  You have a lot of fuel

22   into it.  My understanding from the information was

23   that in the time it was -- at the time that they ran

24   the dust collector, they never emptied the 55-gallon

Schloss (Hudgins)

Page 161

1    have been in this bag house with the particular

2    material that was in place there?

3            A       I would know -- I would know if they

4    had had it tested.

5            Q       But you didn't get a sample, so you

6    don't know?

7            A       And it was never tested prior to the

8    explosion.

9            Q       So you do agree that you don't know?

10           A       I agree that I don't know, but it's

11   information that if you did have it, you would use it

12   in your evaluation.

13           Q       All right.  Now, in your scenario, the

14   explosion began in the bag house, and there were --

15   was a shock wave and then followed by a fireball that

16   traveled back through the ductwork and back through

17   the -- and pushed open the backblast damper and went

18   through the ductwork and burned the plaintiffs?

19           A       Well, it took many paths.  The same

20   fireball could have went -- the same fireball would

21   have went down into the 55-gallon drum.  The same

22   fireball would have went out through the fan.

23   Anyplace -- the same fireball -- when the vent did

24   open up, the fireball went out it.  When the side of

Schloss (Hudgins)

Page 163

1                    That's why NFPA requires that you have

2    minimum conveying velocities in your ductwork so you

3    do not have a buildup of dust anywhere in those

4    systems.

5          Q      So what I was getting to is:  Do you

6    have an opinion as to whether or not there was any

7    combustion of material that was in the ductwork

8    between the backblast damper that we have talked about

9    today and the open end where the two plaintiffs were

10   standing?

11         A      In my opinion, yes, there would be

12   combustion because you have fresh fuel and you have --

13   but it wouldn't be dependent -- dependent on them

14   stirring it up.  You are looking at a pressure wave

15   that's moving at the speed of sound is a lot -- is

16   going to generate a lot more turbulence and a lot more

17   dust pickup than anything they could do with that

18   lance.

19         Q      All right.  Now, as I understand your

20   expert opinion with regard to Dustex, you believe that

21   the blast doors were too small for this application?

22         A      My calculations show they were.

23         Q      All right.  Had the blast doors been of

24   the size that you specify in your report, which were I

Schloss (Alexander)

Page 202

1        Q       -- to explain how it ended up where it

2   did?

3        A       No.  Just that the -- that the

4   explosive forces were greater than the P-ultimate of

5   the bag house due to the observations of the failure.

6        Q       Did you make any attempt to calculate

7   the duration of the explosion from the point of

8   ignition --

9        A       No.

10       Q       -- to the point where the pressure --

11       A       No.

12       Q       Let me finish.  -- from the point of

13  ignition, the point in time of ignition, to the point

14  in time when the pressure had returned to basically

15  atmospheric.

16       A       No.  Without knowing the dust

17  characteristics of how fast that would go, how fast it

18  would take to explode, you can't calculate it.

19       Q       Looking at the Exhibit 15 and 16 that

20  refer to a backblast damper, is it your testimony that

21  the term "blast" in -- as was used for the description

22  of that K&B device refers to as a synonym of an

23  explosion?

24       A       I would say that if it says blast, that

Schloss (Alexander)

Page 208

1          A      Other than I saw this is what Dustex

2   recommends as the correct solution for what their

3   problem is.  It was part of their proposal was a

4   statement in there saying that was the right -- you

5   know, this is the right equipment for your

6   application.

7          Q      So proposal --

8          A      So I'm assuming -- I am assuming --

9          Q      Proposal and Garard's testimony?

10          A      Yeah.

11                 MR. BROWN:  That's been asked --

12                 THE WITNESS:  And specifications.  I

13          mean, there is -- I guess I don't understand

14          the breadth of the question.

15

16   BY MR. ALEXANDER:

17          Q      Did you make any attempt to quantify

18   the duration of time or the amount of heat that would

19   be required under the weather conditions that morning

20   to precipitate an explosive reaction?

21          A      No.

22          Q      Minimum energy ignition --

23          A      Without the chemical composition of the

24   dust, you can't calculate it.

Schloss (Brown)

Page 235

1   BY MR. BROWN:

2           Q       Maybe you didn't understand.

3           A       I'm losing my train of --

4                   MR. HARBERT:  Let's start tomorrow

5           morning, gentlemen.  My time is up.

6                   MR. BROWN:  I don't want to leave this

7           question hanging right here.

8                   THE WITNESS:  Let's do it one more

9           time.

10

11  BY MR. BROWN:

12          Q       Okay.  My question is:  Not absolutely

13  100 percent certainty, but to a reasonable degree of

14  probability, are you still able to tell us where the

15  most likely portion of the origin of the explosion is?

16          A       I can still -- the origin of the

17  explosion was based on exothermic reaction, not the

18  size of the particulate.

19          Q       So does the -- not having the size,

20  precise size, of the particulate, does that in any way

21  impair the opinions that you have got --

22          A       No.

23          Q       -- in your report?

24          A       No, it does not.

Schloss  (Brown)

Page 234

1    impossible for you to come up with an opinion to a

2    reasonable degree of engineering probability as to the

3    origin of this fire?

4            A       Start over again.

5            Q       You testified earlier that there was no

6    testing done before the fire of the material, right?

7            A       Yes.

8            Q       And my question is:  Is that -- and you

9    answered a number of questions with that you didn't

10   know what different values were.  Does that mean that

11   you cannot come up with a good engineering opinion as

12   to the origin of the fire?  Are you still able to do

13   that?

14           A       Without knowing all the chemistry side

15   of it and the chemical parts, to have a hundred

16   percent certainty of what caused the fire, you would

17   need to have all that information.

18           Q       That wasn't my question.

19           A       At what point --

20                   MR. HUDGINS:  Wait a minute.  Let

21           him -- I am liking it so far.

22                   THE WITNESS:  No.  But that doesn't

23           mean that -- you know, it -- let's start

24           over.  I still --

Schloss (Brown)

Page 233

1    build up is the heavier particulate.  The fine

2    particulate would continue on into the bag house.

3    Eventually --

4              Q      What -- go ahead.

5              A      Eventually, if the duct got choked up

6    enough and the velocity got high enough, it may start

7    picking up the larger stuff and moving it as well.

8              Q      What does that tell you about the

9    likelihood of a fire -- you know, as a factor, the

10   likelihood of the explosion being in the bag house as

11   opposed to the duct?

12             A      The likelihood is that the -- again,

13   the bag house is a very good classifier of material.

14   First, if it fell out into the duct, the heavier part

15   didn't even get to the hopper.  The next separation

16   would be in the hopper with -- heavier particles would

17   end up in the hopper.  The light dust would end up on

18   the filter media as part of the dust cake, which then

19   is more explosive.  The smaller the particle, the more

20   explosive the particle.

21             Q      The fact that there was no testing done

22   of the material before the explosion, and you are not

23   able to give some precise values, and you have talked

24   about that, does that make it -- does that make it

Schloss  (Brown)

Page 232

1    4500 feet per minute.  It was not tested, but most

2    materials of that size and that particulate will

3    convey at 3500 feet per minute.  That comes out of the

4    ACGIH guide, industrial ventilation guide.  So they

5    gave you a higher rate to make sure that the ductwork

6    stays clean.

7            Q     So -- and what evidence do you have

8    that there was not sufficient conveying velocity?

9            A     There probably was sufficient conveying

10   velocity when the ductwork filled up to three or four

11   inches high.  Eventually, it will convey.  Once you

12   have built up enough dust in there to reduce the area,

13   then it will convey.  But you shouldn't have three or

14   four inches or five inches of dust in the bottom of

15   the -- that's not acceptable.

16           Q     What effect does the failure to have

17   conveying velocity have on the concentration -- if

18   any, on the concentration of the more dangerous

19   smaller particles in the bag house as opposed to

20   what's happening in the ductwork itself?

21           A     Again, in the smaller -- the lighter

22   the particle, the smaller the particle is conveyed at

23   a lower velocity than what the heavier parts are.  So

24   what would stay in the ductwork first and start to

Schloss (Brown)

Page 231

1  safe for its intended use?

2          A      No, it was not reasonably safe for its

3  intended use.

4          Q      So you have an opinion, yes, but the

5  opinion is no, that it is not?

6          A      Yes, I have an opinion, and the opinion

7  is --

8                  MR. HUDGINS:  Objection, leading.

9                  MR. ALEXANDER:  Yes.  Let him testify,

10         not you.

11                 THE WITNESS:  Yes.  And it's

12         available -- the information is available.

13         And having the information and doing that is

14         that the unit should have either been

15         provided with additional vents or different

16         types of vents, something that was going to

17         make it handle the case of the 415 Kst.

18

19  BY MR. BROWN:

20         Q      Did the system that was put in the

21  Federal-Mogul plant have sufficient conveying

22  velocity?

23         A      No.  And that is given is that the

24  conveying velocity of -- that's required by NFPA is

Schloss (Brown)

Page 230

1          A       That would be -- that would be the

2     place I would go to in making that determination.

3          Q       Well, we are not so concerned about

4     what we would do.  What about a reasonably prudent

5     engineer?

6          A       Reasonably prudent engineer would use

7     that information.

8          Q       To come up -- all right.

9          A       I would base it on something that's a

10    standard, not something pulled out of the air.

11         Q       All right.  And, again, we are not

12    asking you what you would do so much as we are asking

13    what a reasonable and prudent manufacturer would do.

14         A       Okay.

15         Q       Would a reasonably prudent manufacturer

16    then look to NFPA 68 with this information, that is,

17    the information in Exhibit Number 17, to be able to

18    design a reasonably safe dust bag house for this --

19    for this application?  And the answer is?

20         A       Yes.

21         Q       All right.  And so do you have an

22    opinion to a reasonable degree of engineering

23    probability as to whether or not the Dustex bag house,

24    as sold and delivered to Federal-Mogul, was reasonably

Schloss  (Brown)

Page 229

1   bag house for this application?

2          A       Yes.  That was included in my report.

3          Q       And what was the result of that?

4          A       The resulting pressures were -- or

5   resulting size was roughly half of the required

6   amount.  I can go back through the --

7          Q       Okay.  And that's been made an exhibit?

8          A       Yeah.

9          Q       So you are looking at the calculations

10  that you did.  So when you were talking about not

11  having the Kst or the values for the particular

12  aluminum dust on -- you know, before -- you know,

13  before the manufacturer, did that prevent you from

14  coming up with a reliable opinion onto whether or not

15  those --

16         A       No.

17         Q       Why not?

18         A       Because I based it on information that

19  was provided by NFPA in their standard for explosion

20  protection and utilized those numbers in doing the

21  calculations.

22         Q       And if that information was indeed not

23  available to Dustex, is that where Dustex would go --

24  could have gone in order to get the information?

Central Virginia Reporters (540) 380-5017

Schloss  (Brown)

Page 228

1          A       No.

2          Q       Okay.  Is there a way that a

3    manufacturer -- in the absence of the material actual

4    testing, because the unit hasn't been built yet, is

5    there a way that's provided under NFPA 68 to make a

6    determination of how to safely design the unit?

7          A       In NFPA 68 they have representative

8    dust Kst's and Pmax's for different materials.

9    Aluminum dust was one of those.

10         Q       And what was the Kst?

11         A       Kst was 415.

12         Q       All right.  And with that information

13   that they had then, was Dustex in a position to

14   manufacture a bag house then with the information that

15   would be reasonably safe by taking into account the

16   Kst value that's contained in the NFPA 68?

17         A       Yes.

18         Q       Okay.

19         A       They would have an obligation to make

20   sure that the design of their explosion vents met the

21   requirements of the dust that they were producing.

22         Q       All right.  And have you made

23   calculations using the NFPA 68 to determine the

24   venting that should have been used for this particular

Schloss  (Brown)

Page 227

1    in this case was two to three grains per standard

2    cubic foot.

3              The second sentence says -- first under

4    A, it says, System conditions as we understand those.

5    That's what the understanding of what they are

6    designing it against.  B is Proposed Dustex Equipment

7    For This Application.  It goes down to quantity of it,

8    the model of it, the type of bags, the length of the

9    bags, the bag material --

10         Q    For time, let me interrupt.

11         A    All of the design.

12         Q    If somebody wants to object to my

13   interrupting, I will stop interrupting, but I want to

14   try and get through here.  What was the material that

15   Dustex was advised by that document was going to be

16   removed?  What kind of dust was it?

17         A    Filtration contaminated dust from

18   aluminum sanding operations.

19         Q    All right.  And does that information

20   contain -- give us any testing of the particular

21   material that was going to be removed?

22         A    No.

23         Q    And, indeed, it had not been built at

24   that point, right?

Schloss (Brown)

                                                        Page 226

1            unless he has personal knowledge.

2                    MR. BROWN:  He can --

3

4    BY MR. BROWN:

5            Q      What information did this document,

6    that is, Number 17, give to Dustex that relates to the

7    design requirements for the bag house if they were

8    going to sell?  You got that?

9            A      Yeah.

10           Q      Give me an answer.

11           A      Yeah, I will answer it.  In the

12   industry of dust collection, the -- because this is

13   specialized equipment -- and this held true if it was

14   at Pneumafil or Donaldson or Dustex or Flex-Kleen.

15   There is information that you provide them so that

16   they can select the equipment, the appropriate

17   equipment, to do it.

18           Q      And the they is who?

19           A      The manufacturer.

20           Q      In this case, Dustex?

21           A      In this case, Dustex.  And some of the

22   information that you provide, you know, includes the

23   type of dust that it's going to be, your airflow of

24   it, what your inlet pressure is.  Your inlet loading

Schloss (Brown)

Page 225

1    pressures.  Somebody had to engineer the system.

2             Q       And based on your experience, what --

3    and what -- then based on this document, what was your

4    understanding -- that is Number 17 -- of what Dustex

5    knew about the type of material that was being --

6                     MR. ALEXANDER:  Object to the form of

7             that question.

8                     MR. BROWN:  I understand.

9

10   BY MR. BROWN:

11            Q       What was your understanding of what

12   they would know?

13                    MR. HUDGINS:  Objection.  You are

14            asking him to speculate as to what somebody

15            else --

16

17   BY MR. BROWN:

18            Q       What information did they have that was

19   relevant to the design requirements of a person who is

20   going to be selling a bag house for industrial dust?

21                    MR. HUDGINS:  The document speaks for

22            it itself.

23                    MR. ALEXANDER:  Same objection about

24            what they had.  He can't know what they had

Schloss  (Brown)

Page 224

1    industry and the trade?

2              A       I am familiar, yeah.

3              Q       Okay.  Go ahead.  So what does 17 tell

4    us?

5              A       17 tells us the size of the equipment,

6    what the model numbers were, hopper sizes,

7    air-to-cloth ratios, which would be -- an air-to-cloth

8    ratio is important in determining if the application

9    of the filter -- different materials or different

10   dusts require different air-to-cloth ratios.

11             Q       Is any of that information,

12   air-to-cloth ratio and all that information, is that

13   included in the specification --

14             A       No.

15             Q       -- document?

16             MR. HUDGINS:  Objection to the extent

17         those documents speak for themselves.

18

19   BY MR. BROWN:

20             Q       So where does that information come

21   from then?

22             A       Whoever designed the system and

23   selected the equipment came up with those model

24   numbers, equipment sizes, fan, horsepower, static

Schloss (Brown)

Page 223

1    system, including estimated airflow requirements,

2    static pressure, et cetera, should be provided with

3    the proposal.  Two copies of operating procedures,

4    troubleshooting guides, and spare parts should be

5    included with the equipment.

6              Q      And that was what was sent to --

7              A      This is what was sent.

8              Q      And who was it sent to, Carrington?

9              A      It was sent to Carrington.

10             Q      Okay.

11             A      So it gave them the general

12   requirements, but the actual design requirements and

13   selection of equipment requirements rested with

14   Carrington.  Whether they passed that on to Dustex or

15   anybody else, that would really be up to Carrington.

16             Q      So let's take a look at that.  Then we

17   will take a look at Exhibit Number 17.  Does that give

18   us information about what information was passed

19   along?

20                    MR. HUDGINS:  Objection to the extent

21             that the document speaks for itself.

22

23   BY MR. BROWN:

24             Q      All right.  You are familiar with the

Schloss (Brown)

Page 222

1              (Deposition Exhibit Schloss 19 was

2         marked and entered into the Record.)

3

4   BY MR. BROWN:

5         Q     Okay.  I am going to show you Garard --

6   what's now marked as Deposition Exhibit 19.  Tell us

7   what that is.

8         A     That was the collection system

9   equipment specifications provided by Federal-Mogul to

10  Carrington Engineering.

11        Q     All right.  And what do we mean by --

12  what is meant by the term "performance specification"?

13        A     Performance specification is here are

14  the requirements of the system to perform to.  The

15  actual design selection and -- of all the equipment is

16  up to the bidder.  And he had asked for both

17  individual costing on each one of the pieces of

18  equipment as well as the sizes, the -- some of the

19  things that they are looking for with the proposal,

20  general arrangement drawings showing overall

21  dimensions, location of operator controls, location of

22  required utilities provided with each collection

23  system with the proposal.

24              Complete description of each collection

Schloss (Brown)

Page 221

1          sequence from the three plaintiffs, or did I

2          miss a meeting?  I guess it's -- where are

3          the first 16?  You are marking that 17.  What

4          was 1 through 15?

5                    THE WITNESS:  Oh, a lot of those were

6          pictures.

7                    MR. HUDGINS:  Oh, okay.  These were

8          just his premarked numbers that we are using.

9                    MR. BROWN:  No, these are the court

10          reporter's markings.

11                    MR. HUDGINS:  Have we talked about 17

12          exhibits today?

13                    MR. JOHNSON:  Yeah, we had all these

14          photo --

15                    MR. HUDGINS:  Oh, that's right, all of

16          these photographs.  I'm sorry.

17

18  BY MR. BROWN:

19          Q     All right.  I'm going to show you --

20                    MR. BROWN:  18, madam court reporter?

21                    THE WITNESS:  That was also someone

22          else's exhibit.

23                    MR. BROWN:  19.  It was also Garard

24          Exhibit Number 3 on the deposition.

Schloss  (Brown)

Page 220

1              MR. BROWN:  We will see where we are at

2          the end of 15 minutes, and we will see if we

3          are -- could stand on that.

4

5    BY MR. BROWN:

6          Q     Did any of the questions that were

7    asked by the defense counsel up until now change any

8    of the opinions contained in Deposition Exhibit 18?

9          A     No.  I still stand by all those.

10         Q     All right.  Now, do you have the

11   proposal that was made by Mr. Garard to -- and

12   forwarded to Carrington Industries with you?

13         A     I have the specifications.

14         Q     The specifications.  Let's call them

15   what they are, the specifications.  Would you pull

16   that out, please, and may we mark that.

17         A     I also have Dustex's order

18   acknowledgement.

19         Q     I am going to ask you about that, but

20   let's start with the -- with the specifications.

21              MR. HUDGINS:  What did we mark that

22          Dustex proposal?

23              MR. BROWN:  That was Number 17.

24              MR. HUDGINS:  Is this running in

Schloss (Brown)

Page 219

1        the form?

2              THE WITNESS:  Everything that was

3        written in the proposal is based on my

4        professional opinion of the facts and is the

5        analysis that I went through in making my

6        determinations.

7

8   BY MR. BROWN:

9        Q     When you say proposal, you mean the --

10       A     I'm sorry, report.

11       Q     The report, okay.

12             MR. BROWN:  Is there still an

13       objection?  Because I want to be able to meet

14       the objection.

15             MR. MORRIS:  The objection to the form

16       is that it's improper to -- as to a general

17       overall statement for all of the opinions.

18             MR. BROWN:  Okay.  Then we might be

19       here a little while.  Okay.

20             MR. HARBERT:  Then I move we come back

21       tomorrow morning, guys.  I told you I have

22       got family commitments in about 15 minutes.

23       If you want to go through each one of those

24       opinions one at a time --

Schloss (Brown)

Page 218

1          Q      Now, does that report contain your

2   opinions and the basis of your opinions regarding this

3   case?

4          A      Yes.

5          Q      And are all those opinions to a

6   reasonable degree of engineering probability or

7   certainty?

8          A      Yes.

9                 MR. MORRIS:  Note my objection to the

10          form.

11                MR. HUDGINS:  Object to the form.

12

13  BY MR. BROWN:

14         Q      Were all of those opinions to a

15  reasonable degree of engineering probability?

16                MR. MORRIS:  Objection.

17                MR. HUDGINS:  Same objection.

18

19  BY MR. BROWN:

20         Q      Okay.  You can go ahead and answer.

21         A      Both.

22                MR. BROWN:  And if it's a form

23          question, can you tell me what your problem

24          with the form is?  What's the problem with

Schloss (Brown)

Page 217

1                          EXAMINATION

2

3    BY MR. BROWN:

4            Q       I have in my hand Deposition Exhibit

5    Number 17, Dustex, contains the language, Enclosed is

6    our quotation for equipment we feel best -- will best

7    suit your needs based on the application data outlined

8    to us.  Is that what you had just been talking about

9    earlier in answer to Dustex counsel's questions --

10           A       Yes.

11           Q       -- for identification?

12           A       Yes.

13           Q       We are going to come back to that.

14                   MR. BROWN:  May I have another sticker

15           please, madam court reporter.

16

17                   (Deposition Exhibit Schloss 18 was

18           marked and entered into the Record.)

19

20   BY MR. BROWN:

21           Q       I am going to show you Deposition

22   Exhibit Number 18.  Can you tell us what that is?

23           A       That's a report that I prepared for

24   yourself and for the court.

Schloss  (Brown)

Page 216

1    Federal-Mogul and my client, Dustex, or, you know,

2    through the Carrington agency?

3            A       There is a couple e-mails between them.

4    One was talking about the limited liability on the

5    terms and conditions side of it.  I see on the

6    reference here is the reference to Dustex on a

7    proposal was a telephone conversation, so they must

8    have discussed what the application was in between it

9    on the phone, but I didn't see a phone record of what

10   was discussed at that point.

11           Q       Besides the e-mails and that document,

12   that's the only information exchange that you are

13   aware of?

14           A       No, I mean, unless -- unless it's in

15   the information that I reviewed in that list, no.  I

16   would just say what's on that list is what I reviewed.

17                   MR. HUDGINS:  All right.  Thank you.

18           You have the floor, sir.

19                   MR. BROWN:  All right.  Let me have --

20           for the Record, let's mark this as an

21           exhibit.

22

23                   (Deposition Exhibit Schloss 17 was

24           marked and entered into the Record.)

Schloss (Hudgins)

Page 215

1   BY MR. HUDGINS:

2          Q       The piece of paper that you are holding

3   does not have any Bates numbers on it, but it's the

4   Federal -- excuse me, the Dustex proposal to

5   Federal-Mogul.  What's the date of that?

6          A       3/19/02.

7          Q       And that's what you were referring to

8   earlier in your testimony?

9          A       Yeah, the whole proposal, but that one

10  part of it says that, you know, enclosed are --

11  enclosed is our quotation for the equipment we feel

12  best suits your needs based on the application data.

13  And below that, the application filtration of

14  contaminated dust from aluminum sanding operation,

15  type of dust aluminum/metallic, 4000 CFM.  It gives

16  inlet loadings.  And there was also proposals for

17  antistatic bags on the filter bags to make sure that

18  you didn't have sparking in the dust collector.  You

19  have Brixon latches, explosion relief vents.  All that

20  is detailed in their proposal.

21         Q       That document obviously speaks for

22  itself.  Besides the information that is referenced in

23  that document, are you aware of any other

24  communications or information exchange between

Schloss (Hudgins)

Page 214

1    proposal out.

2              MR. BROWN:  Why don't we real quick

3         make a couple copies of that.

4              THE WITNESS:  Let me just do -- it

5         says, Enclosed is our quotation for equipment

6         we feel will best suit your needs based on

7         the application data outlined to us.  That's

8         in the first paragraph right below the

9         header.

10

11   BY MR. HUDGINS:

12        Q    And that's what you were referring to

13   in your testimony earlier?

14        A    Yeah, the two -- that Dustex reviewed

15   the information and provided equipment that was the

16   best -- suit their needs.

17        Q    All right.  And that's --

18        A    I took that at face value.

19        Q    That's as specific as it got?

20             THE VIDEOGRAPHER:  Counsel, we had gone

21        off, and now we are back on.  I'm sorry.  The

22        last question and answer, if you could

23        repeat, please.

24

Schloss (Hudgins)

Page 213

1          witness say that there was a piece of paper

2          that my client stated that the bag house that

3          was sold to Federal-Mogul was the equipment

4          that was specific to their request.  I

5          don't --

6                  MR. BROWN:  I was going to ask him

7          about that.

8

9                      EXAMINATION

10

11   BY MR. HUDGINS:

12          Q     I'd like to just -- what piece of paper

13   are we --

14          A     It's on the proposal itself.

15          Q     Can you find that in your materials so

16   that I will know what your testimony is based upon?

17                  MR. BROWN:  Pull that out, and we will

18          make that an exhibit.  I was going to ask you

19          about that.

20

21   BY MR. HUDGINS:

22          Q     Is there a Bates number on that that

23   you can direct me to?

24          A     No, but let me -- let me pull the

Schloss (Harbert)

Page 212

1          Q       The duct, all right.  So that situation

2    is always going to exist when the machinery is not

3    operating?

4          A       No.  It has to be cold outside.

5          Q       Okay.  That situation is always going

6    to exist in the cold weather months when the machinery

7    is not operating?

8          A       That risk is going to be there during

9    that time.

10         Q       You --

11         A       Whether it turns into a hazard, I don't

12   know, but the risk is there.

13         Q       You have provided in your report a list

14   of cases in which you have testified in the past four

15   or five years.  What I'd like to know is:  Has your

16   expert opinion as to the origin and cause of a fire

17   ever been accepted by any court?

18         A       I have never been to court.  I have

19   been deposed, but never to court.

20              MR. HARBERT:  That's all the questions

21         I have.

22              MR. HUDGINS:  I need to ask one real

23         quick question because it came as a complete

24         shock and surprise to me when I heard the

Schloss (Harbert)

Page 211

1    vent that and would reduce the exothermic.  But,

2    again, exothermic could be in the bottom of a pile

3    that isn't -- you know, that's covered up.  So it

4    doesn't prevent it.

5              Q      But the risk of an exothermic reaction

6    goes up when you turn the equipment off?

7              A      Yeah, because you are not -- you have

8    no chance of dissipating the heat away from it at that

9    point.

10             Q      Until the heat inside the bag house is

11   reduced to be the equivalent of the heat outside the

12   bag house and the condensation process stops?

13             A      Condensation process is going to keep

14   going as long as you have vapor coming from the plant

15   going out into that bag house.

16             Q      Okay.  But if the air --

17             A      Air can travel one way.  Vapor can

18   travel against the airflow.  So even if you had

19   airflow the other way, water vapor can travel based on

20   vapor pressure, not on humidity.  But it would have

21   kept -- it would have kept on building up if it had a

22   source of access to the inside air.

23             Q      The source of access being?

24             A      The ductwork.

Schloss (Harbert)

Page 210

1          Q       I couldn't find it anyplace.

2          A       No, because it wasn't -- I didn't get

3    into what actually caused the, you know, humidity in

4    it.

5          Q       Is it your opinion that it was improper

6    for Federal-Mogul to have both wet filtering and dry

7    filtering apparatuses?

8          A       No.  Each of them have their own

9    application.  In the sanding side of it, which has the

10   wet, you are going to end up with more hot embers

11   going into it, very small particulate, very explosive,

12   and a wet collector is the right selection.  I didn't

13   have any problem with the specifications as they

14   were -- as put forward.

15         Q       As I understand your theory as to the

16   cause of this fire, the warm air from inside the plant

17   is drawn into the bag house by the operation of the

18   bag house, correct?

19         A       Yeah.

20         Q       And, normally, the operation of the bag

21   house provides sufficient ventilation to prevent the

22   exothermic reaction?

23         A       It would prevent the buildup of -- it

24   would -- buildup of any hydrogen in there.  It would

Schloss (Harbert)

Page 209

1        Q      So --

2        A      You could speculate it.

3        Q      Right.  But it would have to be

4   speculative to do that?

5        A      And I saw in some of the other

6   testimonies or some of the experts speculated to what

7   it would be.

8               MR. ALEXANDER:  I have no further

9            questions.  Thank you.

10

11                    EXAMINATION

12

13  BY MR. HARBERT:

14       Q      Just very briefly, Mr. Schloss.  My

15  name is Guy Harbert.  I represent Federal-Mogul.  I

16  apologize for my voice.  It's actually better than it

17  was last week.  I just have a very few questions for

18  you.

19       A      Uh-huh.

20       Q      The water vapor-producing machinery

21  that you alluded to earlier today, is that referenced

22  in your report?

23       A      No.  I think in the report I just said

24  water -- condensation.

Schloss (Alexander)

Page 208

1          A      Other than I saw this is what Dustex

2    recommends as the correct solution for what their

3    problem is.  It was part of their proposal was a

4    statement in there saying that was the right -- you

5    know, this is the right equipment for your

6    application.

7          Q      So proposal --

8          A      So I'm assuming -- I am assuming --

9          Q      Proposal and Garard's testimony?

10         A      Yeah.

11                MR. BROWN:  That's been asked --

12                THE WITNESS:  And specifications.  I

13         mean, there is -- I guess I don't understand

14         the breadth of the question.

15

16   BY MR. ALEXANDER:

17         Q      Did you make any attempt to quantify

18   the duration of time or the amount of heat that would

19   be required under the weather conditions that morning

20   to precipitate an explosive reaction?

21         A      No.

22         Q      Minimum energy ignition --

23         A      Without the chemical composition of the

24   dust, you can't calculate it.

Schloss (Alexander)

Page 207

1    that type of dust, that airflow, and that application.

2    You might end up with a bag house for aluminum dust

3    that is half the size of something that's for chicken

4    feathers.  So, again, it's based on -- their selection

5    is based on the application of the dust that's there.

6              Q       Is there any other information other

7    than Dave Garard's testimony and the information that

8    went from -- from Federal-Mogul through Carrington to

9    Dustex, which is the basis of your conclusion that

10   there was collaborative design?

11             A       Off the top of my head, I can't

12   remember.  I mean, it's late in the day.  There might

13   be something else that's in there, and I can look

14   through the books and see.  But that's what comes as

15   the major part of my decision was is based on the

16   testimony and the deposition of David Garard and my --

17   and my experience in the dust collection industry as a

18   manufacturer, as an engineer, and actually purchasing.

19             Q       But you -- without regard to your own

20   prior experience, you do not know what occurred on

21   this particular design or transaction other than those

22   two pieces of information we have --

23             A       Other than I saw --

24             Q       -- presently identified?

Schloss (Alexander)

Page 206

1    that they collaborated with Federal-Mogul and others?

2            A       Because in the information that was

3    provided, David Garard's testimony said it was a

4    collaborative effort between the group.

5            Q       And that's the sole basis of your

6    conclusion?

7            A       He gave them the specifications -- he

8    gave them performance specifications that said here is

9    what it needs to perform.  Someone at that point had

10   to decide the ductwork layouts, the -- the selection

11   of the dust collector, selection of the backdraft

12   backblast damper.  Would have had to do the system

13   design at that point.  I didn't see design drawings

14   were provided with the specifications.

15           Q       Were you provided with any information

16   that would have enabled you to identify which

17   individual or entity did those specific tasks?

18           A       In the information that I have, it

19   shows that the information was conveyed from

20   Federal-Mogul to Carrington to Dustex.  So Dustex

21   would have been -- Dustex and Carrington would have

22   been involved in the selection of that equipment.

23                   Again, too, the selection of equipment

24   is based on the manufacturer's recommendations for

Schloss (Alexander)

Page 205

1    NFPA requires that you discharge them to the outside

2    and not return them to the building.

3              Q      That's not what I just asked you, was

4    it?

5              A      I thought it was.

6              Q      I asked you about whether the fan would

7    have been damaged.

8                     MR. BROWN:  I think he answered the

9              question.

10

11   BY MR. ALEXANDER:

12             Q      Which failed -- which burst first, the

13   bag house or the backdraft damper?

14             A      I would say they burst within

15   milliseconds of one another.  Which one went first?

16   Again, you are talking about a duration that's less

17   than a tenth of a second.  So what came first, the

18   chicken or the egg?  Typically, the dust collector

19   goes first and the backdraft damper would go second,

20   because if you are going to have the explosion inside

21   the dust collector, it's going to see the rapid rise

22   of pressure first.

23             Q      What design activities by Carrington do

24   you include as the basis of your prior testimony today

Schloss (Alexander)

Page 204

1    system?

2              A       No.  Draft is.  Backdraft damper --

3              Q       But your --

4              A       -- comes back as a backdraft.

5              Q       Your testimony is that blast is not

6    used to refer to the direction of air movement?

7              A       Not in my professional opinion, no.

8              Q       Did you -- you testified that the

9    fan -- that the blast would have gone through the fan?

10             A       Yes.

11             Q       And the fan would have been damaged as

12   a result of that?

13             A       No.

14             Q       Why not?

15             A       The fan is built out of heavy material

16   handling equipment gauges.  It could have been damaged

17   in the -- in the thing, but -- in the explosion, but

18   it wouldn't necessarily have to be.  And, again, that

19   was a -- the explosion going through the fan was just

20   going to relieve that explosion to the outside.  If

21   that duct was tied back into the inside of the plant,

22   then it would require an isolation device be put

23   between the fan and the building to return that air

24   back into the building.  On aluminum dust collectors,

Schloss (Alexander)

Page 203

1    that was part of a explosion protection device, that

2    it was installed as an explosion protection device,

3    and that factory -- I mean, Federal-Mogul, David

4    Garard, said he bought it as a isolation device, that

5    that's what his assumption of what that device was

6    for.

7              Q      Let me ask the question again.  Does

8    blast on that name, is that a synonym for explosion?

9              A      Those dampers that are doing it, they

10   are called backblast dampers, backblast preventers.

11   There is numerous names for it.

12             Q      Is it your testimony that the term

13   "blast" used with this product is not the historic

14   term "blast" meaning air movement as in the air

15   movement industry?  Is that your testimony?

16             A      Yeah, because blast and the air moving,

17   you are talking about air coming -- rotation of a fan

18   doesn't equal explosion protection.  In the explosion

19   protection business, blast means a explosion.  If you

20   are putting a device in as an explosion protection

21   thing, blast means the blast from an explosion.

22             Q      Is it not so that the term "blast" is

23   commonly used in the air moving, air design industry

24   to refer to the direction which air moves within that

Schloss (Alexander)

Page 202

1          Q        -- to explain how it ended up where it

2     did?

3          A        No.  Just that the -- that the

4     explosive forces were greater than the P-ultimate of

5     the bag house due to the observations of the failure.

6          Q        Did you make any attempt to calculate

7     the duration of the explosion from the point of

8     ignition --

9          A        No.

10         Q        -- to the point where the pressure --

11         A        No.

12         Q        Let me finish.  -- from the point of

13    ignition, the point in time of ignition, to the point

14    in time when the pressure had returned to basically

15    atmospheric.

16         A        No.  Without knowing the dust

17    characteristics of how fast that would go, how fast it

18    would take to explode, you can't calculate it.

19         Q        Looking at the Exhibit 15 and 16 that

20    refer to a backblast damper, is it your testimony that

21    the term "blast" in -- as was used for the description

22    of that K&B device refers to as a synonym of an

23    explosion?

24         A        I would say that if it says blast, that

Schloss (Alexander)

Page 201

1           Q       -- like that may have occurred -- I

2     need to be able to finish my question.

3           A       Okay.

4           Q       On the possibility that there may have

5     been some event that caused a dispersion, right?

6           A       Start over.

7           Q       Your -- you have drawn the conclusion

8     that you have had based upon the assumption that there

9     was a dispersal event, dispersion event, in the bag

10    house, but we have no evidence that such an event, in

11    fact, occurred?

12          A       There is no evidence that it didn't

13    occur.  I mean, it's -- it's based on the -- all the

14    perfect storm coming together at the same point.  And

15    you are doing the same thing internally in that

16    ductwork in the plant.  You are assuming that you have

17    a MEC level, minimum explosive concentration level, at

18    the same time you have enough energy to set the

19    aluminum dust off that you don't have any idea how

20    much energy that takes.  So if you add all those

21    together, you are in the same boat.

22          Q       Did you attempt to quantify the forces

23    of the explosion in the bag house --

24          A       No.

Schloss (Alexander)

Page 200

1   how they were doing it, were they taking it and

2   jamming it in two feet and stirring it around?  I

3   didn't see any information like that.  So to know that

4   it created -- if you were vacuuming it passively and

5   getting it close to it and allowing it to suck it up,

6   there would be no dispersion.  If you are in there

7   twirling something around trying to get it to break

8   up, then you are going to have more dispersion with

9   it.

10                   But, again, without knowing what the

11  minimum explosive concentration -- and, again, these

12  explosive concentrations are pretty thick.  Explosive

13  concentration on coal dust, you can't see a 25-watt

14  light bulb through a six-foot coal dust thing.  So

15  it's not like a little puff of powder when you empty a

16  flour.  It's -- you can't see through it.

17         Q       Okay.  And we have no information or

18  evidence at all whether there was any dispersion of

19  dust at all within the bag house at this time, do we?

20         A       There are ways you can have dispersion

21  in the bag house when it's sitting inoperable, and

22  that's what I base my opinions on.

23         Q       On the possibility that some event --

24         A       Because -- because they are --

Schloss (Alexander)

Page 199

1          A        No.

2          Q        Okay.

3          A        In a design that -- in the case of
4     this, if there is no Kst value that's been determined,
5     many times they will have a similar process that has a
6     Kst value.  And, you know, after -- really, at that
7     point then, you are going to available data, but you
8     are going to look for the worst possible case in the
9     available data.  You don't want to be too small in the
10    explosion protection.  And then once it's run, then we
11    have the manufacturer, the customer, go do the test to
12    validate our conclusions, or validate our assumptions.

13         Q        But with respect to the dust in this
14    individual case, all of that would be speculative,
15    correct?

16         A        Without having that test, no, I mean,
17    there is no way of knowing now.

18         Q        With respect to the dispersal of the
19    dust, which is required for an explosion, what degree
20    of dispersal occurs, in your opinion, with the
21    vacuuming in the duct?

22         A        It would be hard to speculate that.
23    Again, on the -- you are actually sucking in and
24    having it under a negative pressure.  The method of

Schloss (Alexander)

Page 198

1          Q     Right.  You can't really correlate this

2    dust to what --

3          A     No.

4          Q     -- was the aluminum dust in this plant

5    without actually testing it?

6          A     Yeah.  What that showed was the

7    characteristic of the dust, that it wasn't aluminum

8    turnings, it wasn't large particulate, that it was a

9    fine particulate that was coming off with the brushing

10   operations.

11         Q     So you --

12         A     It was more just for an informational

13   thing to look at, what did a similar process -- but,

14   again, on steel, which is going to have different

15   requirements than aluminum is going to have.  But what

16   did the process produce.

17         Q     But without testing the --

18         A     Without testing it --

19         Q     -- aluminum --

20         A     No.

21         Q     -- you can't really have any basis upon

22   which you would base --

23         A     No.

24         Q     -- a design, right?

Schloss (Alexander)

Page 197

1          Q      Have you made any effort to determine

2    whether you have ever designed a system that contained

3    the same alloy and particle size as involved in this

4    case?

5          A      No.  And, again, that's because I don't

6    know what the particle size of what exploded was and

7    what the chemical characteristics are.

8          Q      When I look at this Deposition Exhibit

9    2 that we have identified here, I see some what looks

10   like dirt on your end of your finger.  It's my

11   understanding that this was steel dust, right?

12         A      That was steel dust.  It was oxidation

13   off the steel.

14         Q      And this was a different material than

15   the aluminum --

16         A      That's different material than

17   aluminum.  And we asked the operator was the aluminum

18   similar to that in construction -- or in dust, and his

19   response was yes.

20         Q      And if that --

21         A      I didn't document that because

22   that's -- in his opinion -- that's his opinion.

23   Whether that's truly what it was, without scientific

24   testing on it, it's not really going to help much.

Schloss (Alexander)

Page 196

1        A       Exothermic.

2        Q       Exothermic what?

3        A       Exothermic reaction with water and

4    humidity getting into it.  They were also handling

5    other materials other than just aluminum.

6        Q       So the exothermic reaction that you are

7    talking about was not exclusively aluminum dust?

8        A       Could have been titanium.  It could

9    have been steel.  You know, that was different things

10   that they processed.  They had a hundred percent --

11   pretty sure they had a hundred percent aluminum

12   product, but I don't know if that product was running

13   when the dust collector burnt down.

14       Q       Were you asked to evaluate the cause of

15   the explosions and fires in that situation?

16       A       No.  I was asked to design a new system

17   that wouldn't catch on fire and wouldn't explode.

18       Q       Have you -- how many exclusively

19   aluminum dust collection systems have you designed in

20   your career?

21       A       Again, a lot of times it's aluminum,

22   aluminum alloys.  It wouldn't -- you know, without

23   going back and looking at what each dust was, I don't

24   know.  I mean, it's --

Schloss (Alexander)

Page 195

1          Q       And what do they manufacture, and where

2     are they?

3          A       They are in Spartanburg, South

4     Carolina, and they -- they manufacture a wire -- a

5     bowl formed steel conduit filled with different types

6     of dust for the steel industry to fine-tune the final

7     batch on a arc furnace.

8          Q       And what kind of aluminum dust do they

9     use?

10         A       They actually have -- it's not the size

11    of a BB, but it's bigger than what the dust is on

12    that -- on my finger there.  It's actually a dust --

13    it's actually more like a pellet, but a small -- small

14    BB.  Probably a fifth the diameter of a BB.

15         Q       And do you know what the minimum

16    ignition energy for that is?

17         A       I have it in a -- in some testing, but

18    not off the top of my head, no.

19         Q       And they had had an -- several

20    explosions before, I understand?

21         A       They had fires, four fires, and two of

22    them resulted in explosions.

23         Q       And what was determined to be the cause

24    of the explosions?

Schloss (Alexander)

Page 194

1    opposed to sucking up --

2          A      They have different -- they have

3    different properties of actually releasing those

4    charges or conducting them away.

5          Q      And you don't know whether or not the

6    hose they were using was grounded or not?

7          A      No.

8                 MR. HUDGINS:  That's all the questions

9          I have got.

10

11                       EXAMINATION

12

13   BY MR. ALEXANDER:

14         Q      I am Bevin Alexander --

15                MR. HUDGINS:  And thank you, by the

16         way, for your cooperation.

17

18   BY MR. ALEXANDER:

19         Q      I am Bevin Alexander, and I have got a

20   few.  You indicated to me that the design that you

21   performed for the company that had had multiple

22   explosions that we have heard about several times

23   today was -- the company's name was Odermath?

24         A      Odermath, O-D-E-R-M-A-T-H.

Schloss (Hudgins)

Page 193

1    ignition energy of the aluminum dust would be, no.

2              Q      Well, for instance, does aluminum dust

3    carry a positive or a negative charge?

4              A      It will conduct electricity.

5              Q      All right.  And PVC, do you know

6    whether that's a positive or a negative charge

7    substance?

8              A      No, it won't conduct electricity.  It's

9    usually plus on the inside, minus on the outside.

10             Q      Did you do any studies of the

11   interaction between specifically aluminum dust and

12   PVC?

13             A      No.

14             Q      So you don't know whether that

15   combination was more or less likely to create sparks?

16             A      Without knowing what the ignition

17   energies of the dust, you could calculate it all day

18   long and it's not going to mean anything.

19             Q      So that's just not part of your

20   opinion, that aluminum dust and PVC might have had a

21   different --

22             A      No.  Aluminum dust --

23             Q      -- capacity -- let me finish.  --

24   different capacity for creating electric charges as

Schloss (Hudgins)

Page 192

1    should narrow it considerably.

2              A       Well, I can give you a list of hundreds

3    of bag houses.

4              Q       All right.

5              A       If we -- if we show up at trial, I will

6    have the list for you.

7              Q       Did it factor into your opinion at all

8    that the three plaintiffs in this case testified about

9    the vacuum apparatus they were using was biting them

10   through their heavy leather gloves?

11             A       Anytime that you are going to use a

12   vacuum, even in a small vacuum in your house, you

13   could end up having static electricity onto it.

14   Whether -- it doesn't have to be combustible dust to

15   have -- to be generating a static.  It's anytime that

16   you are going to have material flowing through it.

17             Q       Did you consider the electrostatic

18   qualities of aluminum versus PVC in developing your

19   opinion in this case?  And that might not be the

20   proper --

21             A       That's not --

22             Q       -- term, but the -- the molecular

23   qualities in terms of charges of aluminum versus PVC.

24             A       Without knowing what the minimum

Schloss (Hudgins)

Page 191

1          Q       I would be real interested in seeing

2     projects specifically related to aluminum dust that

3     you worked on either as a private engineer, consulting

4     engineer, or --

5          A       That would take me a while to put

6     together without going back through, especially after

7     selling my business.

8               MR. BROWN:  And if he is going to do

9               that, you need to be prepared to pay him for

10              the time of doing that.

11              MR. HUDGINS:  Well, no.  That's all

12              part of my asking him questions here.  If he

13              is going to show up at trial, I am going to

14              ask him again because he has got a statement

15              here that he is responsible for hundreds of

16              bag houses.  So if you don't want to give me

17              anything, that's fine, but you might be asked

18              that question again.

19              THE WITNESS:  I can give you a list of

20              hundreds of bag houses that I manufactured.

21

22    BY MR. HUDGINS:

23         Q       I am making it easy.  I am saying

24    specifically just related to aluminum dust, and that

Schloss (Hudgins)

Page 190

1          A      A private consulting engineer.  Lipton

2     Tea.  I am doing a project right now that's got six --

3     eight bag -- eight cartridge filters on it with

4     explosion protection for the tea.  I have done --

5          Q      Any aluminum -- any aluminum dust

6     systems?

7          A      Yep.  Did the one for Odermath, which

8     was the one that had the explosions.  We did the

9     recommendations and the design for those.  I don't

10    think they ever put it in, but we designed it.

11         Q      Any other -- any other jobs

12    specifically related to the design of systems for

13    aluminum dust as either working in private industry or

14    as a consulting engineer?

15         A      I deal in a lot of different dusts.

16    Metal -- I am trying to think.  It would be just

17    primarily aluminum.  It's usually aluminum and other

18    components of aluminum.  It's hard to say, I mean,

19    because I have done -- I have done a lot, and it's

20    been a lot of years of doing it.

21         Q      I know it's late in the afternoon, but

22    nothing comes to mind here as you sit here today?

23         A      No, but I can get you a list.  If you

24    require a list, I can get you a list of projects.

Schloss (Hudgins)

Page 189

1    remember if I did aluminum, but I did work on

2    explosive designs.  I did both the manufacturing as

3    well as being responsible for engineering in our

4    design-build business, so I still did a lot of design

5    work as well.

6              Q      What was your job title?

7              A      Operations manager.

8              Q      And who did you report to in that job?

9              A      Wayne Cuthbertson was vice president.

10             Q      What were the years you were there?

11             A      I was there from 1981 to 1999, I think.

12             Q      Any other experience that goes into

13   this statement that you have designed and been

14   responsible for the manufacture of hundreds of bag

15   houses?

16             A      I mean, I have designed systems, total

17   dust collection systems.

18             Q      Who, when, and where?

19             A      Who, when, and where?  A lot of them

20   would have had your competitor's equipment on it.

21   That would have been Torit, Nucor Steel, Pontiac

22   Foods.

23             Q      And this is as a private consulting

24   engineer?

Schloss (Hudgins)

Page 188

1    dust systems.  Could you give me a bit of explanation

2    of that or expand on that?

3           A       When I worked for Pneumafil

4    Corporation, we built reverse air bag houses, the

5    pulse-jet bag houses, and I was responsible for

6    manufacturing of those.  For about six years, I ran

7    the manufacturing for it.  That would have been a

8    competitor of Dustex.  We built cartridge filters.  We

9    built big reverse airs.  Primarily, those were going

10   in the coal industry, wood industry, furniture.  And

11   just about everything that we sent out the door had

12   explosion venting on it.

13          Q       Any aluminum dust applications while

14   you were in that position?

15          A       Any aluminum dust?

16          Q       Yes, sir.

17          A       We built bag houses.  We built

18   cartridges that were on aluminum dust.

19          Q       Were you ever involved in any specific

20   design of a system that was to handle aluminum dust

21   while you were at that job?

22          A       At Pneumafil?

23          Q       Yes, sir.

24          A       I did other metal dusts.  I don't

Schloss (Hudgins)

Page 187

1          Q      All right.  Can you explain how he

2     could have seen through a blade that was --

3          A      The blade may not have been down.  The

4     blade may have been -- there may have been enough dust

5     holding it up or the blade may have had the hinge fail

6     prior to it and not allow it to close.  I mean, there

7     is different explanations, but they are all --

8          Q      That would be a matter of speculation,

9     wouldn't it?

10         A      Yeah, speculation.

11                THE VIDEOGRAPHER:  Need to change the

12         disk within the next ten minutes.

13                MR. HUDGINS:  You want to do that now?

14                THE VIDEOGRAPHER:  Sure, that's fine.

15         Off the Record.

16

17                (A recess was taken.)

18

19     BY MR. HUDGINS:

20         Q      Mr. Schloss, I just have a couple more

21     questions about your experience.  Pages 1 and 2 of

22     your report say that you have designed and been

23     responsible for the manufacture of hundreds of bag

24     houses as well as conveyance equipment for combustible

Schloss (Hudgins)

Page 186

1   available.

2          Q      So would your opinion change in terms

3   of where this fire originated?

4          A      Again, part of what I -- what I based

5   it on was Hodges' eyewitness testimony.

6          Q      You haven't tried to recreate the

7   conditions in that vent looking down to --

8          A      I try not to create fireballs.

9          Q      No, I am not --

10         A      Or explosions.

11         Q      I am not suggesting that.  I am talking

12  about the ability to see down through that blast

13  damper.  You haven't tried to recreate that --

14         A      No.

15         Q      -- those conditions, have you?

16         A      No.

17         Q      And so you are accepting Hodges'

18  testimony that he could see through the backblast

19  damper all the way to where the duct took a right-hand

20  turn?

21         A      Yeah, because that was -- again, that

22  was prior to the explosion, you know, which is going

23  to be more reliable than after the explosion side of

24  it.

Schloss (Hudgins)

Page 185

1    vacuum apparatus, that heat energy would travel in

2    both -- opposite directions simultaneously?

3            A       In an explosion it's going to go equal

4    direction.  It's going to find the path of least

5    resistance.

6            Q       So that there would have been fire

7    coming out the end where the two plaintiffs were

8    standing on the --

9            A       You would have seen a fireball -- you

10   would have seen a fireball coming out at the workers.

11   The fireball would have subsequently went the other

12   way into the dust collector.  You would have seen the

13   explosion on the dust collector with a very intense

14   light on the outside of the building.

15                   And, again, if you turned them around

16   and you said, okay, if you had the minor flash to

17   start with and the major flash was second, then I

18   would say it was inside the building and moved

19   outside.

20           Q       Would your opinion be any different if

21   Hodges was looking and saw the fireball, but the video

22   system was inoperable so we didn't have that evidence?

23           A       Again, you would have to use the

24   best -- the best evidence that you have that's

Schloss (Hudgins)

Page 184

1    originating where the vacuum apparatus was creating a

2    spark and traveled in and then caused the explosion,

3    what would have been different about the video that

4    you observed?

5            A      The initial -- the -- in the case of

6    that, the initial flash that would have been in the

7    building would have been larger and would have been

8    first prior to the bag house collapsing.  Because the

9    fire would have went the same direction either way in

10   that duct coming back out, you would have seen the

11   inside light up.  Then you would have seen the outside

12   light up and the intensity of the explosion again.

13   What I was looking at, the intensity of the fireball

14   was outside the plant, and the intensity of the

15   fireball that would have been inside the plant is what

16   I was comparing on the videos.

17           Q      All right.  If you accept --

18           A      Because the other way around I would

19   say -- if it was the other way around, that the inside

20   lit up not to the brightness that it did, the outside

21   would have lit up later, then I would have said it

22   would have been the other way around.

23           Q      Would you agree with me that had the

24   source of ignition been the spark created by that

Schloss (Hudgins)

Page 183

1    out through a vent.  I have calculated the forces that

2    come out from the vent that go against the wall that

3    would -- you know, in this case I didn't calculate

4    those, but it calculated as how much force was it

5    going to have against the wall, not blow the panels

6    off.

7              Q      Wouldn't it be fair to say that you

8    looked at the video, and it reinforced what you

9    believed based on --

10             A      No.

11             Q      -- your accepting Hodges' testimony?

12             A      No, because I looked at it as two

13   things, as that was taking Hodges' testimony and the

14   video was one part of it.  Taking the -- the -- having

15   the fire on the inside of it versus that video didn't

16   make sense.

17             Q      Now, if the fire had originated in the

18   ductwork and --

19             A      We are talking hypothetically now,

20   right?

21             Q      Hypothetically, if you choose to use

22   that word.  -- and heat energy had traveled in the

23   direction of the normal flow of the system into the

24   bag house and caused the explosion with the fire

Schloss (Hudgins)

Page 182

1    explosions and fireballs that travel from explosions

2    and, I mean, just the experience that I have in the

3    business.  I am not a video expert on it.  It's based

4    on what the flashes would be and what the sequence, in

5    my professional opinion, was.

6              Q       But have you made a study at any time

7    in your career of thermodynamics or the nature of

8    explosions and such?

9              A       I have read them.  I don't -- I don't

10   sit down and do intense thermodynamics.

11             Q       I mean, when you are looking at the

12   video, you are looking at it just like one of these

13   lawyers could look at it and come up with an opinion.

14   That doesn't require any special expertise, does it?

15             A       No, because the opinion that I'm coming

16   up with is is based on what the intensity of the

17   explosion would look like in those two -- and what the

18   fireballs would look like in those two different

19   instances.

20             Q       Have you ever observed that type of

21   explosion firsthand?

22             A       Not firsthand.  I have seen videos of

23   explosions in bag houses.  I have calculated the flame

24   ball or the fireball dimensions that are going to come

Schloss (Hudgins)

Page 181

1    the building, and the secondary flash was on the

2    inside of the building, you know, which would

3    represent the fire coming down the ductwork.

4            Q       Now, did you attempt to break down that

5    video into segments of seconds in terms of what you

6    could observe?

7            A       I watched it frame by frame.

8            Q       Did you attempt to break it down into

9    actual seconds, tenths of seconds?

10           A       I don't know what -- frame by frame was

11   pretty -- I looked at frame by frame and looked at the

12   sequence in the frames.

13           Q       So your opinion was based on a frame by

14   frame, and that gave you some sense of sequence and

15   time?

16           A       Gave me sequence of explosions.  You

17   know, whether that was a hundredth of a second per

18   frame or a thousandth of a second per frame, I don't

19   know.

20           Q       What about your particular engineering

21   training gives you the ability to look at that video

22   differently from some layperson and draw conclusions

23   from it?

24           A       Just in the training I have had on

Schloss (Hudgins)

Page 180

1    BY MR. HUDGINS:

2           Q      Those were the two that you were

3    principally concerned with.  You ruled out the

4    explosion originating in the duct based upon

5    Mr. Hodges' testimony and the video.  Is that fair to

6    say?

7           A      Yes.

8           Q      All right.  Now, I want you to assume a

9    hypothetical.  I want you to assume that Hodges was

10   looking the other way, didn't see any fireball.  So

11   now you have got all the facts that you have

12   considered, including just the video instead of

13   Hodges' testimony.  Would that change your opinion?

14          A      Just the video?

15          Q      Just the video.  That's all you got.

16          A      Yes.  I mean, just the video without

17   his eyewitness thing, I would still say that the

18   explosion started in the bag house.

19          Q      And tell me exactly why.  How do you

20   believe -- what about that video makes --

21          A      Well, because of the intensity of the

22   flash on the outside.  The intensity of the flash and

23   the sequence of flashes, that the major flash was on

24   the -- was the initial one that was on the outside of

Schloss (Hudgins)

Page 179

1          Q       Or a blast door.

2          A       To fail?

3          Q       Yes, sir.

4          A       I mean, that's -- you are talking about

5     apples and oranges.  You say, well --

6          Q       In other words, could pressure piling

7     have explained why the seams burst apart, but the --

8          A       No, because there is no pressure

9     piling.  There is no pressure piling involved in a

10    single unit.  Pressure piling involves multiple units

11    that are connected together.

12         Q       So you don't think there was any

13    possibility of pressure piling?

14         A       There was no pressure -- in my opinion,

15    there are no possibility of pressure piling.

16         Q       All right.  You investigated two

17    possible causes for this explosion, one being the use

18    of the PVC attached to the flexible hose and creating

19    static electricity up in the duct versus the

20    exothermic reaction in the bag house itself?

21              MR. BROWN:  I think he said he narrowed

22         it down to two.  He went through a number of

23         them, and then came down to two.

24              THE WITNESS:  Yeah.

Central Virginia Reporters (540) 380-5017

Schloss (Hudgins)

Page 178

1   pressure.

2          Q      Are you familiar with the term

3   "pressure piling"?

4          A      Yes.

5          Q      And can you explain that for me,

6   please.

7          A      Pressure piling is is if you have an

8   explosion in one vessel that's located adjacent to a

9   second vessel, that the explosive pressure in the

10  first one is going to go into the second one.  If the

11  second one has any subsequent explosion, instead of

12  starting out at atmospheric pressure or slightly above

13  it, you are going to be starting out at that point

14  four bars.  You will see pressure piling typically

15  where you have a cyclone ahead of a dust collector

16  where you will have an explosion either in the cyclone

17  going into the dust collector or a dust collector

18  going back into a cyclone.  But pressure piling -- in

19  this case with one device and one unit, there wouldn't

20  be pressure piling would not come into play.

21         Q      In general, if there is pressure

22  piling, can that cause a correctly designed relief

23  valve to fail?

24         A      What relief valve?

Schloss (Hudgins)

Page 177

1    size of the vent that you recommend?

2            A       No.  It is really based on the Kst of

3    the -- more on the Kst value than it is on anything

4    else.  Because what you are looking for is you want

5    the vent to open up and relieve the pressure prior to

6    getting to the P-reduced.  So the -- you want to size

7    it say at four-tenths of a bar for the closure to rip

8    apart.  The explosion vents or the explosion doors

9    would typically be set at .1 bars so that it would

10   relieve that pressure.  And the generation of the

11   pressure over time would give it adequate time to vent

12   prior to ripping the dust collector open.

13           Q       If the P-reduced figure was greater,

14   wouldn't that justify a smaller vent area?

15           A       If the P-reduced area was greater than

16   .4 or .3, that would reduce it, but I didn't see

17   anything that -- in terms of additional reinforcing or

18   additional -- versus what I am used to in a Dustex

19   bag -- Dustex bag collector has reinforcing on the

20   outside of it.  When you are increasing it, you are

21   going to see reinforcing space twice as often, thicker

22   gauges.  I didn't see any of that.  Nor would they

23   sell.  That would have been noted, I am sure, on the

24   order saying that it was designed at a higher

Schloss (Hudgins)

Page 176

1    collector to withstand the Pmax.  Typically, it's done

2    in the pharmaceutical industry, but you are taking a

3    dust collector that costs $25,000 to a industrial

4    plant to, you know, half a million dollars in a

5    pharmaceutical plant.  It will actually -- you design

6    the dust collector to withstand those pressures.

7                Q        Where did you get your Pmax figure?

8                A        I got it out of NFPA 68.

9                Q        And how did you determine that the

10   figure you chose should be applied in this case?

11               A        Because that was -- in the NFPA 68,

12   that was applicable at the time for sizing explosion

13   vents.

14               Q        For dust?

15               A        For aluminum dust.

16               Q        For aluminum?

17               A        Dust.

18               Q        Dust.  And is that powder or dust?

19               A        It says aluminum dust, so I would

20   assume that's dust.

21               Q        Any dust?

22               A        Assume that's dust.

23               Q        Now, if the Pmax figure was smaller,

24   would that affect your calculations in terms of the

Schloss (Hudgins)

Page 175

1    it was designed to --

2            A       Well, if you call knocking the panels

3    off the wall of the building and endangering people on

4    the other side of it, if you say that's the function

5    that you designed it for, then probably so.  But --

6            Q       But it contained --

7            A       It wasn't in a safe -- it was not a

8    safe operation, and the explosion on it -- you do not

9    design it to have structural failure.  It will be a

10   little bit different if a guy would have been standing

11   out there next to it when it fell down.  Then the

12   discussion would be a little bit different.  You need

13   to take safety into consideration of --

14           Q       Well, you wouldn't want to have

15   somebody standing next to one of those blast doors

16   when they came sailing off there --

17           A       And that's why NFPA tells you that you

18   have to put up chains around your blast door saying

19   don't stand here.

20           Q       Right.  Now, Pmax, what is that?

21           A       Pmax is the maximum pressure that was

22   generated during the dust test, and that determines

23   how strong the explosion could be.  You use it in

24   designing dust collectors in that you can build a dust

Schloss (Hudgins)

Page 174

1    properly.

2              A       I mean, they were calibrated at the --

3    I think 30 pounds, and that's what -- when they were

4    taken out and all the experts got around in a circle

5    and decided that was the value that those latches were

6    going to open up at.

7              Q       All right.  But, again, the quality and

8    maintenance of those latches is not part of --

9              A       Well, again, for the amount of

10   destruction that you see in it, it wouldn't be that --

11   if the latches would have almost never had to open to

12   get the destruction forces in the tearing that dust

13   collector apart.

14             So if you had a dust collector of 200,

15   the Kst was 200, and it proved that the doors were the

16   right size and the latches were the right size, I

17   still would expect the latches to open at some point,

18   but that fail the size -- the side of the ductwork --

19   or fail the side of the enclosure of the dust

20   collector takes a lot of pressure.  Actually rip the

21   metal, not ripping the wells.

22             Q       Didn't this bag house -- even though

23   the seams split, didn't it basically perform its

24   function of containing the explosion to the area where

Schloss (Hudgins)

Page 173

1    getting and where are you seeing that dust.

2            Q       All right.  Kst 415, would you agree

3    that that's a relatively high value?

4            A       Aluminum is a very explosive dust.

5            Q       But even for aluminum, that's on the

6    high end?

7            A       No.  I have seen aluminum that's higher

8    than that.

9            Q       If it turned out that the actual Kst

10   was 200, would that impact your opinion in terms of

11   the suitability of this equipment?

12           A       If I could find a test that showed that

13   it was 200, then I would make that determination.

14           Q       And that would impact your opinion in

15   terms of the suitability of this bag plant --

16           A       I would raise the question is why did

17   it rip -- even if the -- if that calculation showed

18   that was the right size door, then at that point then

19   I would be wondering why did it rip the whole unit

20   apart instead of the door just opening up.

21           Q       Perhaps the failure of the latches

22   could be one explanation?

23           A       Failure of the latches?

24           Q       Yeah, the Brixon latches not operating

Schloss (Hudgins)

Page 172

1    time it was shaved or created in the mechanical

2    process to the point where it reached the bag house,

3    would that offset the Kst value some?  It would,

4    wouldn't it?

5            A       It's going to change over time.  How

6    fast it degrades again would have to be based on what

7    you were testing.

8            Q       Isn't it prudent to do the Kst testing

9    at the point of creation as a safety feature?

10           A       Yeah.  Well, what you want to do is you

11   want to test it at the point of what you are going to

12   do something with it.  If it's created and goes into a

13   wet dust collector, it doesn't really matter because

14   you are -- it's not going into a dry dust collector.

15   If you are collecting it at that point and it's going

16   out into a dust collector, you want to have the

17   collection out of the dust collector.  When they run

18   the test, if you send them a 5-pound sample, they will

19   sift the 5-pound sample down to get only the

20   particulate that's 75 microns and smaller, which is

21   going to give you the best chance of having an

22   explosion, and it's going to simulate what you are

23   going to have in the bag house.  So where you get it

24   doesn't really factor in as much as what are you

Schloss (Hudgins)

Page 171

1    it was was insufficient for any applications involving

2    aluminum dust?

3              A     Again, it depends on what the values of

4    aluminum dust are, what the design values or the

5    combustion values.  Again, in the worst possible case

6    is what you would design it about.  In NFPA 68 in 2002

7    they gave a value for aluminum dust at a Kst of 415.

8    When I did my calculations, that's what I based it on.

9    I based it on the worst case that -- the worst case of

10   available information.  Again, without knowing what

11   the dust is, the most conservative way of doing it is

12   to size it at that value.

13             Q     So Kst of 415, would that be more like

14   the baby powder dust that we talked about earlier?

15             A     No, because you can be on -- some of

16   that dust and the powders can be up in the five and

17   six hundreds.

18             Q     But Ks 415 would be a real powdery

19   material?

20             A     It wouldn't have to be powdery.  It

21   wouldn't have to be aluminum powder.  It really

22   depends on -- you can -- it depends on the material

23   and the dust characteristics.

24             Q     If the aluminum dust oxidized from the

Schloss (Hudgins)

Page 170

1    handle the explosion of aluminum dust.

2         Q       Do you know if they got any information

3    at all regarding Kst value?

4         A       No, because I -- there was no testing

5    that I know of on the dust itself.

6         Q       Do you know if they asked for it?

7         A       I have -- have not seen that in the

8    documents if they have asked for that.

9         Q       Do you know anything about any

10   disclaimers by Dustex based upon their inability to

11   get information regarding the Kst value?

12        A       There is a disclaimer in their terms

13   and conditions that were in a letter, but that

14   didn't -- there was no -- there was no disclaimer on

15   their proposal saying that they didn't have that

16   information.  That was only after the fact when it was

17   terms and conditions.

18        Q       So that's the only disclaimer that you

19   are aware of?

20        A       That's the only disclaimer that I saw.

21   I mean, I can look.

22        Q       Now, would it be your opinion that the

23   bag house that was sold and ultimately installed at

24   Federal-Mogul with its blast door being the size that

Schloss (Hudgins)

Page 169

1          Q      And when you are talking about dust, is

2     there a way to quantify properties of dust with a --

3                 MR. BROWN:  Are you trying to find

4          something?

5                 THE WITNESS:  No.

6

7     BY MR. HUDGINS:

8          Q      What is a Kst value?

9          A      Kst is a -- Kst is actually a German

10    word that I am not sure exactly what it means, but

11    it's a calculated value.  And it's -- when you run a

12    test on the explosive characteristics of dust, the

13    values that you will get is change in pressure over

14    change in time.  Based on that times a cube root of

15    the volume of the enclosure will then tell you what

16    the Kst is.  It's a relative number.  The higher the

17    number, the more explosive the dust is.

18         Q      Do you know whether or not any

19    information regarding the Kst value of the dust at

20    Federal-Mogul was given to Dustex?

21         A      From the information that I saw, I

22    don't -- I don't see that.  But, at the same time, if

23    Dustex knew it was aluminum dust, it was their

24    responsibility to make sure that their equipment would

Schloss (Hudgins)

Page 168

1   were still set at what the factory setting would have

2   been.

3           Q      So the latches on this bag house at

4   Federal-Mogul don't factor into your opinion one way

5   or the other?

6           A      Well, they factor in as in the number

7   of latches and the size of the doors and how well they

8   opened up.  You could have -- you could have opened

9   them up earlier with less pressure, but then you run

10  the risk of the doors just coming open by themselves.

11          Q      Who was responsible for designing this

12  system based on your understanding of the facts in

13  this case?

14          A      Per my understanding of the facts, it

15  was a collaborative effort between Carrington

16  Engineering, FM, or Federal-Mogul.  The information

17  was transmitted to Dustex, so Dustex knew what the

18  dust was going to be in that bag house and, you know,

19  knew what the system was.

20          Q      What did Dustex know precisely about

21  that dust based on your understanding?

22          A      Aluminum dust.

23          Q      And that's all they knew?

24          A      That's right.

Schloss (Hudgins)

Page 167

1    to hold the door closed in operation.  But in terms of

2    an explosion, it releases and opens the latch at a

3    predetermined -- at a field-settable or

4    factory-settable limit.

5            Q       And those latches can be adjusted up or

6    down in terms of --

7            A       Well, you can adjust them up and down.

8    It would change the pressure, but then you would be

9    changing what the -- the Pred on the unit would need

10   to be.

11           Q       All right.  Were you able to inspect

12   the Brixon latches at the plant?

13           A       Yes.  We looked at them as a group of

14   technical experts and removed them from the door.

15           Q       Were you able to determine whether or

16   not those latches had been properly maintained during

17   the term of their use at the Federal-Mogul plant?

18           A       The -- I didn't have any access to

19   maintenance records on the latches or if they had been

20   maintained.  They were not rusted shut.  A lot of

21   times on latches similar to that, you will end up with

22   a rust that they won't open up.  That the adjustment

23   screws turned easily or turned as expected to be in

24   it, and they looked to be in good condition.  And they

Schloss (Hudgins)

Page 166

1   I saw in their specifications it's designed to

2   withstand plus or minus 15 degrees -- 15 inches of

3   water.  So, I mean, it's up to Dustex to design

4   something that's going to meet those requirements.

5          Q      But that's not -- in your opinion, when

6   you say that the Dustex bag house as designed and sold

7   to Federal-Mogul was deficient for its intended

8   purpose, you are not talking about the gauge of the

9   metal.  You are strictly --

10         A      No.

11         Q      -- talking about the size of the blast

12  doors?

13         A      No, I am not talking about the gauge of

14  the metal.  I am talking about the explosion

15  protection on the equipment and the results of that.

16         Q      Which is the size of the blast doors,

17  and that's it?

18         A      Yes.

19         Q      How do the latches on those blast doors

20  factor into your opinion, if at all?

21         A      The latches actually are calibrated to

22  open up at a certain pressure.  So the way the door

23  operates, it's like a -- the Brixon latch is similar

24  to a industrial refrigerator latch where it's designed

Schloss (Hudgins)

Page 165

1   houses.

2          Q       Would you agree that they make a good

3   product?

4          A       They make a product in the industrial

5   market that's equal to other competitors in that

6   market.

7          Q       So, as far as Dustex is concerned, you

8   only fault the size of the blast doors that were on

9   this particular bag house at this particular plant?

10         A       I felt that it contributed in part of

11  the total system as in the doors being too small would

12  have increased the explosion -- would increase the

13  total explosion pressure in it that would have caused

14  the bag house to fail, rip the ductwork down, and

15  possibly contribute somewhat to the failure of the

16  Kirk & Blum backdraft damper due to mechanical means,

17  not pressure means.  I don't think that -- that the

18  damage that I saw again to the Kirk & Blum was

19  designed by mechanical or was mechanical ripping.  It

20  was by pressure.

21         Q       You don't fault the gauge of metal that

22  was used in this particular bag house at the

23  Federal-Mogul plant, do you?

24         A       That's up to Dustex to design a system.

Central Virginia Reporters (540) 380-5017

Schloss (Hudgins)

Page 164

1  think approximately double in size, do you have an

2  opinion as to whether or not there would have been any

3  heat energy that would have traveled in a reverse flow

4  back up the ductwork in any event?

5          A       It's an explosion.  It's going to go up

6  that duct.  It doesn't -- it doesn't look at it and

7  say, well, oh, here is a door that I can blow open.

8  Let me wait until the door opens up, and then we will

9  all go out there.

10                 It still went through the fan.  It went

11  back through that duct, went down into the 55-gallon

12  drum.  And that's why NFPA requires that you isolate

13  all those to eliminate a future problem.

14         Q       So there would have been a fireball

15  going back toward those two plaintiffs on the scissor

16  lift in any event?

17         A       In any event, you would have had a

18  fireball going back through there because you had an

19  explosion in the bag house, yes.

20         Q       Now, as far as the bag house that was

21  manufactured and sold by Dustex, you are not here to

22  say that that bag house was -- was a bad product for

23  all applications, are you?

24         A       No.  I have installed Dustex bag

Central Virginia Reporters (540) 380-5017

Schloss (Hudgins)

Page 163

1              That's why NFPA requires that you have

2     minimum conveying velocities in your ductwork so you

3     do not have a buildup of dust anywhere in those

4     systems.

5              Q     So what I was getting to is:  Do you

6     have an opinion as to whether or not there was any

7     combustion of material that was in the ductwork

8     between the backblast damper that we have talked about

9     today and the open end where the two plaintiffs were

10    standing?

11             A     In my opinion, yes, there would be

12    combustion because you have fresh fuel and you have --

13    but it wouldn't be dependent -- dependent on them

14    stirring it up.  You are looking at a pressure wave

15    that's moving at the speed of sound is a lot -- is

16    going to generate a lot more turbulence and a lot more

17    dust pickup than anything they could do with that

18    lance.

19             Q     All right.  Now, as I understand your

20    expert opinion with regard to Dustex, you believe that

21    the blast doors were too small for this application?

22             A     My calculations show they were.

23             Q     All right.  Had the blast doors been of

24    the size that you specify in your report, which were I

Schloss (Hudgins)

Page 162

1    the unit ripped open, the fireball went out the side

2    of it.  So all these places that relieved as well as

3    when the backdraft -- backblast damper blew apart,

4    that was another source of relieving that pressure.

5              Q     All right.  In your scenario, in the

6    process that you have described, heat energy traveled

7    back up and back out the ductwork to where the -- two

8    of the plaintiffs were on a scissor lift?

9              A     Uh-huh.

10             Q     And that's where they were injured?

11             A     Plus, you had fresh fuel in that line

12    as well.

13             Q     And that was my next question.  Do you

14    have an opinion as to whether the fresh fuel in that

15    ductwork where they were pushing around a vacuum and

16    stirring up dust, presumably, whether that dust

17    combusted when the heat energy traveled back up and

18    through the ductway in a reverse direction?

19             A     Whether they were stirring it up at

20    that time or if the ductwork was connected, the energy

21    would have went along that and picked up the surface

22    dust and had the same result of a fireball going down

23    the duct.  Instead of coming out into people's faces,

24    it would have came out into the production equipment.

Schloss (Hudgins)

Page 161

1    have been in this bag house with the particular

2    material that was in place there?

3            A      I would know -- I would know if they

4    had had it tested.

5            Q      But you didn't get a sample, so you

6    don't know?

7            A      And it was never tested prior to the

8    explosion.

9            Q      So you do agree that you don't know?

10           A      I agree that I don't know, but it's

11   information that if you did have it, you would use it

12   in your evaluation.

13           Q      All right.  Now, in your scenario, the

14   explosion began in the bag house, and there were --

15   was a shock wave and then followed by a fireball that

16   traveled back through the ductwork and back through

17   the -- and pushed open the backblast damper and went

18   through the ductwork and burned the plaintiffs?

19           A      Well, it took many paths.  The same

20   fireball could have went -- the same fireball would

21   have went down into the 55-gallon drum.  The same

22   fireball would have went out through the fan.

23   Anyplace -- the same fireball -- when the vent did

24   open up, the fireball went out it.  When the side of

Schloss (Hudgins)

Page 160

1          Q      And given the type of material, this

2    aluminum dust and shavings from the Federal-Mogul

3    industrial process, what temperature would have to be

4    reached for that material to combust?

5          A      Again, that's -- would be the chemical.

6    It's part of the chemical test with the minimum

7    ignition temperatures.  Again, if you had the material

8    tested prior to the explosion, that would be available

9    and you could do it, but that changes by each type of

10   dust.  Aluminum could have a range of minimum ignition

11   temperatures based on the particle size.  Again,

12   without having the dust, you wouldn't know.

13         Q      So is the answer --

14         A      I guess -- let me finish.  The other

15   thing, when you were talking about shavings, shavings

16   typically refer to a larger -- a larger particulate.

17                If you look at -- on the exhibit I had

18   on Number 2, I asked the guy who ran the machine at

19   the time if that was typical of the dust that they

20   saw, and he agreed it was.  I think Doug Edwards was

21   with me at the time.  And that's not shavings.  That's

22   dust.

23         Q      All right.  But is it fair to say that

24   you don't know what the combustion temperature would

Schloss (Hudgins)

Page 159

1    drum.  I don't know if the 55-gallon drum was full and

2    backed up into the hopper or if the 55-gallon drum was

3    half empty.

4            Q       Did you see a drum as part of your

5    investigation?

6            A       I did not take pictures of the drum.  I

7    don't remember if the drum was available.  I don't

8    think it was.

9            Q       Now, in an exothermic reaction,

10   hydrogen gas is produced.  And an explosion can occur

11   either with the hydrogen reaching a sufficient

12   temperature to combust, or the material can get hot

13   enough to combust; is that --

14           A       Yes.

15           Q       And, again, I am a lawyer.  I am not a

16   chemist or a fire expert.

17           A       Yes.

18           Q       But is that -- am I correct in that --

19           A       You are correct.

20           Q       -- belief?  And it's your opinion that

21   it was not hydrogen gas that combusted here, but it

22   was the material itself that got hot enough to

23   combust?

24           A       Yes.

Schloss (Hudgins)

Page 158

1    accumulation at any particular point in that hopper?

2           A       I didn't investigate exactly where that

3    point would be in the hopper or in that dust

4    collector, no.

5           Q       And you didn't do any test to determine

6    how the angle of the hopper might affect the

7    particular material that was --

8           A       Without having the -- without having

9    the material and the characteristics of the material

10   -- you can run a test where you can test what the

11   angle of repose is, when it will start to become

12   free-flowing.  Without the material available, it's

13   not possible to do that test.

14          Q       The bag house is designed so that the

15   material collects and goes down the slopes of the

16   hopper into a steel drum?

17          A       Yes.

18          Q       Now, the explosion didn't start in the

19   steel drum, did it?

20          A       Again, I didn't -- I didn't pinpoint

21   where it could have started.  You have a lot of fuel

22   into it.  My understanding from the information was

23   that in the time it was -- at the time that they ran

24   the dust collector, they never emptied the 55-gallon

Schloss (Hudgins)

Page 157

1       Q       You haven't --

2       A       I mean, other than looking at the

3    damage and the -- the damage to the bag house and the

4    position of the cages on the bags.  I would -- my

5    assumption was or my opinion was it was in the hopper,

6    but to say that it was in a hopper in four inches of

7    dust, no.

8       Q       All right.  Now, for an exothermic

9    reaction to occur, there has to be sufficient

10   accumulation of the material that then combines with

11   H2O to cause the reaction?

12      A       Yes.

13      Q       Where in the hopper, according to your

14   experience, would there be --

15      A       Anywhere.

16      Q       -- a place where there would be

17   sufficient accumulation?

18      A       Anywhere in that hopper.  Depends on

19   whether the material falls down.  If the angle of

20   repose of the material doesn't slide, you may end up

21   with two or three inches of material around the entire

22   hopper.

23      Q       In this case, in this particular case,

24   you don't have any idea that there was sufficient

Schloss (Hudgins)

Page 156

1          A       I mean, that's past my area of

2    expertise in that I understand how they -- you know,

3    the -- I understand dust collectors and explosions and

4    exothermic reactions.  I am not a trained fire

5    investigator that says here is an acceleration mark

6    and here is where it moved up the side of the hopper.

7    That's not what -- my expertise.

8          Q       That would take a cause and origin

9    expert?

10         A       Which I am not, other than the cause

11   side of -- cause and origin as in general location,

12   but not specific that it started three feet up the

13   hopper right here.

14         Q       So it's your opinion that there was an

15   exothermic reaction that caused an explosion somewhere

16   in the bag house, but you don't have an opinion as to

17   where that might have been?

18         A       Where the point of origin is or the

19   explosion?

20         Q       Where it started, where the actual

21   reaction occurred that --

22         A       No.

23         Q       -- caused this explosion.

24         A       No.

Schloss (Hudgins)

Page 155

1           questions for now.  Thank you for your time.

2

3                          EXAMINATION

4

5    BY MR. HUDGINS:

6           Q      Mr. Schloss, I am next.  I am David

7    Hudgins, one of the lawyers for Dustex Corporation.

8    Did you make a determination as to the precise point

9    of origin for the fire that started the explosion in

10   the bag house?

11          A      Define precise.

12          Q      Where exactly was the source of

13   combustion in the explosion that you believe started

14   this chain of events?

15          A      As in -- no, not into the context of it

16   was in the hopper two feet up and three feet over.  I

17   didn't do a, you know, analysis of where the fire was

18   or where the fire originated into it.

19          Q      All right.  You had a chance to look at

20   the bag house itself, albeit some time after the

21   explosion?

22          A      Yes.

23          Q      You didn't try to determine where

24   inside that bag house the point of origin of this --

Schloss (Morris)

Page 154

1    was based on, the depositions and, you know, invoices,

2    design information, specs like that, but nothing that

3    says here is what your findings need to be.

4            Q      Oh, no.  And so you are clear on what

5    my question is about, I understand that they provided

6    you with documents, including deposition transcripts,

7    the exhibits to the depositions, and other materials.

8            What I am asking about is:  During your

9    conversations with them, did they provide you any

10   information from them to you orally that you used to

11   rely upon in your report?

12           A      I think the only thing, and we have

13   already discussed it, is just the operation hours of

14   the plant, was a question I asked about it.  But other

15   than that, no.

16           Q      Okay.  And just to be clear, because I

17   may not remember when we went over that --

18           A      It was a half hour to an hour and a

19   half that it was shut down prior to the incident.

20           Q      That's information that you received

21   from them?

22           A      That's the only thing I can think of

23   that I received in an oral basis.

24                  MR. MORRIS:  Okay.  That's all my

Schloss (Morris)

Page 153

1              MR. MORRIS:  I think it's the same as

2         whether or not your client has had a

3         conference with an attorney.  You can ask

4         whether it occurred, not what the contents of

5         it was.  But it's not that crucial to me.  I

6         will move on.

7              MR. BROWN:  Okay.

8

9    BY MR. MORRIS:

10        Q    Okay.  You indicated that you did not

11   bring with you today any notes or other documents

12   other than your report and the documents that you

13   reviewed.  Do you have a separate file regarding this

14   matter which you keep in your office?

15        A    Everything I have if I got information

16   from Mr. Brown or Mr. Johnson was all electronic, so

17   it's all reading.  Reading a .pdf, don't print much,

18   so -- I mean, I don't print it because I can't keep up

19   with it, so...

20        Q    Were Mr. Brown or Mr. Johnson the

21   source of any specific information that you relied

22   upon in reaching your opinions as expressed in your

23   report?

24        A    Just the information that the report

Schloss (Morris)

Page 152

1           A      I don't know what -- I guess -- I don't

2     know what information he had.

3           Q      Did he provide you with any information

4     during that conference call?

5           A      No.  No.

6           Q      Have you consulted with anyone to

7     assist you in the preparation of your report?

8           A      No.

9           Q      Did you prepare any drafts of your

10    report before producing the final report that was

11    provided to the defendants?

12                 MR. BROWN:  Don't answer that question.

13                 MR. MORRIS:  Based on?

14                 MR. BROWN:  Based on the Federal Rules.

15                 Federal Rules were changed about two years

16                 ago, and that's not a proper subject of

17                 inquiry.  Any draft reports are privileged

18                 and are attorney work product specifically by

19                 the Rules.

20                 MR. MORRIS:  I understand we are not

21                 entitled to get them.  I am asking whether or

22                 not he prepared any before his final report.

23                 MR. BROWN:  I don't think you get to

24                 inquire into that.

Schloss (Morris)

Page 151

1          A      No.  It was Mr. Johnson and Mr. Brown

2    as well.

3          Q      When was that?

4          A      I'd have to look.  Somewhere around the

5    beginning of September.  I don't know if they -- they

6    probably have better dates and better ideas, but...

7          Q      Within the last three months?

8          A      Yes.

9          Q      And did Mr. McGinley provide you any

10   information that you used in preparing your report?

11         A      No.

12         Q      Did you express any disagreements with

13   Mr. McGinley regarding any opinions that he expressed

14   during that conference?

15         A      No.  I mean, it wasn't a conference

16   where we were discussing opinions.

17         Q      What was the conference about?

18         A      It was more logistical, making sure

19   that we had all the information.

20         Q      Okay.  Was there any information that

21   you had that Mr. McGinley did not?

22         A      I don't recall.  I don't -- I don't

23   think so.  I think we had similar information.

24         Q      Any information --

Schloss (Morris)

Page 150

1          Q       In your expert disclosure, you provided

2     us with a copy of your CV?

3          A       Uh-huh.

4          Q       Is that current, or are there any

5     additions you need to make?

6          A       I am now a licensed engineer in the

7     state of Arizona as well, and I sold my business to a

8     firm in Greenville called Synterra, S-Y-N-T-E-R-R-A.

9     Now I am an employee of Synterra in the middle of a

10    working transition from one business to the next.

11         Q       Okay.  And as I am sure you know, the

12    trial for this case is scheduled in February of 2014.

13         A       Yes.

14         Q       And do you plan on attending in person

15    for that trial?

16         A       Yes.

17         Q       Have you had any contact with Patrick

18    McGinley regarding his opinions in this case?

19         A       No.  I have not seen his final report.

20    We had a meeting on Skype, but I think he was at the

21    point of putting his opinions together.  I have not

22    seen what his final report was.

23         Q       Was it just you and Mr. McGinley during

24    that conference?

Schloss (Morris)

Page 149

1    So without having that --

2              Q      Which we don't have.

3              A      Which you don't know, so again you are

4    guessing and using an assumption in doing it.  But the

5    difference between, you know, 15 milliseconds and 20

6    milliseconds isn't a lot of difference.

7                     MR. MORRIS:  I want to take a quick

8              break.

9                     THE WITNESS:  Okay.

10                    THE VIDEOGRAPHER:  Off the Record.

11

12                    (A recess was taken.)

13

14   BY MR. MORRIS:

15             Q      Mr. Schloss, we are back after a short

16   break.  And usually when I ask for that break, that

17   means I am getting very close to the end of my

18   questions, but there is three other attorneys that

19   will come after me.

20                    I want to ask you, have you been asked

21   by plaintiffs' counsel to prepare a report addressing

22   the opinions that were provided by the defense experts

23   in this case?

24             A      No, I have not.

Schloss (Morris)

Page 148

1    determine what the rate of propagation for the flame

2    was?

3              A       No, not on this specific case, no.

4              Q       Okay.  Is there a set formula that you

5    would use for that?

6              A       Deflagration is a flame front moving at

7    less than the speed of sound.  The speed of sound is

8    quite high, so it's going to move very quickly through

9    that ductwork.

10             Q       So between the time that Mr. Hodges

11   says he sees the fireball and the time that it reaches

12   the open end of the duct where he is standing, can

13   you --

14             A       Milliseconds.

15             Q       Well, okay.  Based on your experience

16   and to a reasonable degree of engineering probability,

17   can you tell us how long it would take for the

18   fireball to get to Mr. Hodges --

19             A       I can calculate it, but I don't have it

20   with me here.

21             Q       Okay.

22             A       But I can calculate you -- calculate

23   that.  Again, the rate of the fireball is also

24   dependent on the chemical characteristics of the dust.

Schloss (Morris)

Page 147

1    already done.  The whole explosion is going to take --

2    and NFPA shows this.  Chilworth shows this.  In

3    three-tenths of a second -- from the time it starts

4    until the time a building could come down is about

5    three-tenths of a second.

6            Q       Now, assuming for the purposes of this

7    question that the alternative theory that you

8    considered, that the explosion started in the ductwork

9    as a result of sparks from the static electricity, the

10   explosion there would create a pressure wave as well,

11   correct?

12           A       If you had an explosion in the

13   ductwork?  If you have an explosion anywhere, you are

14   going to get a pressure wave and you are going to get

15   a fireball.

16           Q       Okay.  Would that pressure be

17   sufficient to force open the backblast damper flap?

18           A       It would lift it up because the

19   ductwork that you are talking about having the

20   explosion in is prior to that damper.  So it would

21   open up -- it would force it open.  It's not going to

22   stop an explosion in the ductwork.

23           Q       Now, you just referred to how quickly

24   this explosion occurred.  So can you tell us, did you

Schloss (Morris)

Page 146

1    fails, what's the impact on the other one failing.

2                        So when I looked at both of these, I

3    looked at did the failure -- did the failure of the

4    bag house cause the backdraft damper to fail?  And in

5    my conclusion, it did not, that they failed equally

6    during the explosion.

7            Q       And so that I am clear, the presence of

8    the 4 to 5 inches of dust is not relevant to that

9    opinion?

10           A       It would have -- again, passing the --

11   passing a flame front and withstanding an explosion

12   are two different things.  Closing against 4 and 5

13   inches of dust is going to isolate an -- is going to

14   isolate a flame front.  In the isolation of having the

15   construction of the damper be able to withstand that

16   pressure doesn't really involve passing that flame

17   front or not.

18           Q       If that flap is partially open, it will

19   withstand some of the pressure, correct?  It would --

20           A       Well, no.  It would still withstand a

21   very, very small portion of it, but you are talking

22   about an explosion that's taking place in less than a

23   tenth of a second.  This isn't a gradual looking at it

24   and saying, oh, I think it's going to explode.  It's

Schloss (Morris)

Page 145

1    BY MR. MORRIS:

2             Q       -- as this one did?

3                     MR. BROWN:  Before you answer that

4             question, I'd like to interpose an objection.

5             The appropriate standard is engineering

6             probability and not certainty.  You can --

7

8    BY MR. MORRIS:

9             Q       I apologize again, and I adopt

10   probability.

11            A       Engineering probability of it is that

12   it would withstand that.  Because it's designed at .4

13   bars of pressure, it has a factor of safety built into

14   it the same way the bag house does.  The bag house may

15   have .4 bars of pressure, has a reduced pressure, but

16   the ultimate pressure before things start tearing

17   apart is 33 percent greater than that.  So it would

18   have withstood a larger -- a -- it would have

19   withstood a larger explosion or more intense explosion

20   than the existing backdraft damper.

21                    So my opinion, more than likely, in

22   engineering certainty, is it would have withstood that

23   pressure.  The bag house and the backdraft damper

24   again need to be looked at as a system, because if one

Schloss (Morris)

Page 144

1    That's called for in NFPA.  It says all components

2    shall be designed at the anticipated pressure.

3    Anticipated pressure in a dust collection system like

4    this would be at what pressure is the bag house

5    selected to actually work at, so...

6            Q       And now -- so my question to you here

7    is:  As you sit here, I think, as I understand it, you

8    can't say specifically what the construction of the

9    backblast damper should have been for this system

10   because you don't have the sufficient information to

11   make that determination; is that correct?

12           A       I could design you a backdraft damper

13   that would withstand that pressure, and it would be

14   much heavier gauge than what you -- than what was

15   furnished by Kirk & Blum.

16           Q       And as you sit here, however, based on

17   the circumstances that occurred in this explosion, can

18   you say to a reasonable degree of engineering

19   certainty that a -- that a backblast damper that was

20   constructed to the same pressure point as the bag

21   house, if that's a fair way of stating it, would have

22   not blown out on the side --

23                   MR. BROWN:  Before you answer that --

24

Schloss (Morris)

Page 143

1          A      The configuration of it?

2          Q      Well, the makeup, the construction,

3    the --

4          A      The makeup and the construction in a

5    dust collection system at an industrial plant similar

6    to what we are talking about right here, not

7    somebody's air-conditioning ductwork system that's got

8    a filter in it or something, but a filter that would

9    be manufactured by a company like Dustex would

10   typically be designed between .3 and .4 bars of

11   pressure.  And that is Pred, or the reduced pressure,

12   is what can the closure withstand.

13              Once that value is set, then all the

14   components of the system would then have to be capable

15   of withstanding that.  Because when the bag house

16   explodes and it sees .4 bars of pressure before the

17   relief for the chemical suppression goes off, all the

18   components are going to see .4 bars.  That's why when

19   you design these things, everything has got to be

20   designed as one total system.

21              So the pressure should have been -- the

22   pressure of the components other than the bag house,

23   even the ductwork between the isolation damper and the

24   bag house, need to be designed at that pressure.

Schloss (Morris)

Page 142

1    the bag house walls?

2          A       That was used as an example.  It's not

3    a hard and fast rule that it's got to have the same --

4    it's got to be designed at the same pressures.  Bag

5    houses typically are designed 11- and 12-gauge.  These

6    dampers are typically designed 11- and 12-gauge.

7          Q       Based on the fact that we see the bag

8    house here blew apart in its wall, do you have an

9    opinion as to whether or not a heavier gauge in the

10   backblast damper would have also blown apart under the

11   pressure of this explosion?

12         A       Without knowing what the pressure on

13   the explosion would have been at that point, other

14   than it was greater than what the design pressure of

15   both the relief vents and the explosion vent, I

16   couldn't answer that.

17               It may have been at what the correct

18   design should have been, and it would have worked.  It

19   may have been higher than that.  It may have been

20   lower than that.

21         Q       So, based on your experience, can you

22   say based on your evaluation of this system what the

23   configuration of the backblast damper should have

24   been, in your opinion?

Schloss (Morris)

Page 141

1    context, in talking about a fan, means a blast of air.

2    But in terms of a backblast damper in 2002, it refers

3    to explosion.  Is that --

4            A      Yes.

5            Q      -- what you are testifying to?

6            A      Yes.

7            Q      Okay.

8            A      It's what's the device used for in that

9    -- in the position that it was in was to isolate the

10   explosion from coming back into the plant --

11           Q      I'm sorry, Mr. Schloss.  You answered

12   my question.  I didn't ask for an explanation as to

13   why you answered yes.

14           A      I'd like to give you an explanation.

15           Q      Well, your counsel can ask you that

16   question.  I have got my answer, so I am going to move

17   on.  Going back to again the fact that the ordered

18   part was delivered by Kirk & Blum to Federal Mogul as

19   ordered, in your report you indicate again that a

20   heavier gauge backblast damper would have been

21   appropriate for this system, correct?

22           A      Yes.

23           Q      And in your report you indicate that

24   the backblast damper should have the same thickness as

Schloss (Morris)

Page 140

1    BY MR. MORRIS:

2             Q      What should it be called?

3             A      Blast -- backblast damper.

4             Q      Okay.  And are you aware that an

5    air-control damper or a cut-off or balancing damper is

6    sometimes called a blast gate?

7             A      Yes.  And if you look in Kirk & Blum's

8    catalog, that's what they are called.

9             Q      And -- and that's not an explosion

10   containment device, is it?

11            A      No.

12            Q      And can you define what the blast

13   positions of a fan outlet are?

14            A      Sure.  You have up blast, down blast,

15   top horizontal discharge, top angular up, bottom

16   angular down.  There is a lot of -- definitions are

17   all in AMCA.  And the blast positions on fans really

18   have nothing to do with a blast coming off an

19   explosion vent.

20            Q      That refers to just a blast of air?

21            A      That's a nomenclature used to identify

22   the rotation of a fan, nothing to do with explosion

23   protection.

24            Q      So when you use -- so blast in that

Schloss (Morris)

Page 139

1                    (Deposition Exhibit Schloss 16 was

2              marked and entered into the Record.)

3

4                    MR. BROWN:  Let the Record show that

5              the invoice that was referred to by the

6              witness was Deposition Exhibit Number 16, and

7              the diagram that was referred to by the

8              witness was Deposition -- now marked as

9              Deposition Exhibit Number 15.

10

11   BY MR. MORRIS:

12            Q     In your report, do you state that the

13   Kirk & Blum backblast damper contains a blast gate?

14                   MR. BROWN:  Can you give me a page

15              number, please.

16                   MR. MORRIS:  19, four sentences from

17              the bottom.

18                   THE WITNESS:  That's an error on my

19              part.  That should say blast back -- a blast

20              gate is a different device.  A blast gate is

21              a balancing device used in balancing the

22              airflow in a system.  That's just a error on

23              my part in calling it that.

24

Schloss (Morris)

Page 138

1    damper.  This is a Kirk & Blum backblast damper, in

2    line, from 4 to 18 inches.  It's 18-gauge.  This

3    damper, as I see it here, was the damper that I looked

4    at, similar construction, similar dimensions.  I did

5    not check plus or minus, you know, quarter of an inch

6    whether it was still the same size, but...

7              Q      So a straight line --

8                     MR. BROWN:  Time out because you

9              referred to this, and I would ask that it be

10             marked so we have a clean record, can be

11             followed.

12

13                    (Deposition Exhibit Schloss 15 was

14             marked and entered into the Record.)

15

16                    MR. ALEXANDER:  Brent, he also referred

17             to that invoice.

18                    MR. BROWN:  Pull out the invoice too,

19             please.

20                    THE WITNESS:  Want the full invoice?

21                    MR. BROWN:  Sure.

22                    MR. ALEXANDER:  The page you referred

23             to.

24                    THE WITNESS:  Do you need to see that?

Schloss (Morris)

Page 137

1          Q     And based on the order form, is the

2    part that was installed or delivered to Federal-Mogul,

3    is that what was on the order sheet?

4          A     Again, I didn't work for Kirk & Blum or

5    have the information of what Kirk & Blum's -- other

6    than what was provided --

7                MR. BROWN:  You can look at that.

8                THE WITNESS:  Which was a sketch at the

9          -- that was provided on in-line backdraft --

10         backblast damper.

11

12   BY MR. MORRIS:

13         Q     We don't have to mark that as an

14   exhibit unless you need to.

15         A     Do you want to see it?

16         Q     No.

17         A     But if looking at this, looking at

18   their invoice -- let me find the invoice.  It said

19   14-inch KB backblast damper, which I am assuming --

20   again making an assumption based on the information

21   that it matches the drawing that says Kirk & Blum

22   backdraft damper.

23                This is -- that's Kirk & Blum's invoice

24   to Carrington Engineering calling for a backblast

Schloss (Morris)

Page 136

1          A      Yes, and it needed to withstand the

2    anticipated pressure of the explosion.

3          Q      And do you know whether or not in 2002

4    whether or not Kirk & Blum manufactured such a

5    product?

6          A      To my knowledge, I wasn't employed by

7    Kirk & Blum in 2002, but when I dealt with that damper

8    design was later --

9          Q      Again, I am asking do you know --

10         A      Not in 2002.

11         Q      Do you know whether or not --

12         A      I do not know in 2002 if they made a

13   heavier damper.

14         Q      Okay.  Based on your review of the

15   documents involving the purchase order for the parts

16   from Kirk & Blum, was there a -- an order for a

17   heavier gauge backblast damper than the one that was

18   installed at Federal-Mogul?

19         A      To know what that description was

20   versus what was furnished, I don't know.

21         Q      Okay.  Well, you said that you had

22   reviewed the invoice or the purchase order, the

23   documents of Kirk & Blum?

24         A      Yeah.

Schloss (Morris)

Page 135

1    it -- well, withdrawn.

2                    With respect to the hinge itself, okay,

3    do you have any information as to whether -- what the

4    condition of that hinge was prior to the explosion?

5          A      Prior to the explosion, no.  After the

6    explosion was on the ground, this picture shows it.

7    Do you want to put this into evidence?

8                    MR. BROWN:  Yes.

9                    THE WITNESS:  Exhibit?

10

11                   (Deposition Exhibit Schloss 14 was

12           marked and entered into the Record.)

13

14   BY MR. MORRIS:

15         Q      As part of your opinion, you stated

16   that it is your opinion that a backblast damper of

17   heavier construction should have been used in this

18   system; is that correct?

19         A      There are backdraft dampers --

20   backblast dampers that are commercially available that

21   are heavier construction that will meet NFPA

22   requirements.

23         Q      When you refer to NFPA requirements,

24   was there a requirement in 2002, a --

Schloss (Morris)

Page 134

1    materials that you previously reviewed.  Were you able

2    to find any pictures that indicated that the backblast

3    damper remained in its position subsequent to the

4    explosion and the collapse of the bag house?

5             A      From the pictures, the backdraft damper

6    was not still up in the air.  But there is a picture

7    of the backdraft damper on the ground, and it shows

8    the same damage as the pictures we took during the

9    visit where you can see where the blade does not match

10   up with the hole and that the side is ripped.

11                   So I think if there was any mishandling

12   between the time of the explosion and, quote, being in

13   the dumpster, it would have shown up on those pictures

14   there.

15            Q      Well, my question is:  Just from it

16   falling to the ground --

17            A      By falling to the ground --

18            Q      -- could that cause -- could that cause

19   any damage to the backblast damper?

20            A      Not to the extent that the backdraft

21   damper experienced.

22            Q      Is there any indication that you have

23   as to whether or not the condition of that backblast

24   damper was different than it appears when you saw

Schloss (Morris)

Page 133

1    results of the explosion, and I don't think -- again,

2    in my opinion, that was not the result of mishandling

3    of that equipment.  When it's in two or three pieces

4    and bent all up, that's not mishandling.  That's a

5    result of an explosion.  That's based on my

6    experience.

7            Q     Well, the location of the backblast

8    damper was approximately 20 feet above the ground?

9            A     Yes.

10           Q     Okay.  And during the explosion, that

11   ductwork all fell to the ground, correct?

12           A     I think part of that ductwork fell to

13   the ground based on the pictures.  Let me review.

14                 MR. BROWN:  Can I see the exhibits?

15                 MR. MORRIS:  Sure.

16                 MR. BROWN:  Take a minute.  I want to

17        make copies.

18                 THE VIDEOGRAPHER:  Off the Record.

19

20                 (A recess was taken.)

21

22   BY MR. MORRIS:

23           Q     Mr. Schloss, you have had an

24   opportunity to look through the pictures and the

Schloss (Morris)

Page 132

1    BY MR. MORRIS:

2           Q       Okay.  Now, the pictures that you are

3    referring to here were ones that you took you said in

4    August 2013 on your first visit to --

5           A       Yes.

6           Q       -- Federal-Mogul.  And the backblast

7    damper at that time was kept in a dumpster, correct?

8           A       Yes.

9           Q       Okay.  And that was some two years and

10   nine months after the explosion occurred, correct?

11          A       Yes.

12          Q       Based on your examination of the

13   backblast damper in August of 2013, can you state with

14   a reasonable degree of engineering probability that

15   the condition of the backblast damper as you have

16   described it was the result of the explosion compared

17   to any other possible causes for damage?

18          A       In my opinion without a doubt, what's

19   shown in those pictures is indicative of what it

20   looked like during the explosion.  Again, it wasn't

21   handled to the point of being able to rip the top off

22   of it or rip a blade out of the side of it.  Those --

23   my review of the information or of the backblast

24   damper at the time when I was there was looking at the

Schloss (Morris)

Page 131

1            A      I'm sorry, Number 4.   Number 5 you can

2     see that it's offset and that the hinge -- the hinge

3     has released, and this is out of the way.   You can see

4     the gaps around the blades.   This is again -- Picture

5     Number 6 is a picture of the unit.

6            Q      Do you want to hold it up for the

7     camera as you do that?

8            A      (Witness complies.)   Picture Number 7

9     again shows the general construction of the damper and

10    the location of the blade.   Picture Number 8 shows the

11    damper as well and where the side of the unit in this

12    case has become separated.

13                  THE VIDEOGRAPHER:   It didn't show that

14            well.

15                  THE WITNESS:   I'm sorry.   Picture

16            Number 9 again shows the alignment of the

17            blade versus the hole.   Picture Number 10

18            shows the blade itself and the alignment.

19            Picture Number 11 again is the blade with the

20            alignment, same as -- similar -- all these

21            pictures are just a little bit different

22            views.   Picture Number 12.   And Picture

23            Number 13 is the damper with the blade lifted

24            up to show the condition of the seat on it.

Schloss (Morris)

Page 130

1          Q      And then you can refer to them by

2     exhibit number.

3          A      All right.

4

5                 (Deposition Exhibits Schloss 3 through

6          13 were marked and entered into the Record.)

7

8     BY MR. MORRIS:

9          Q      Mr. Schloss, back on the Record.  After

10    my last question, you indicated that you wanted to use

11    some pictures in order to be able to discuss the

12    backblast damper and specifically the condition of the

13    hinge; is that correct?

14         A      Yes.

15         Q      And we have now marked as Exhibits 3

16    through 13 photographs that you took?

17         A      These are photographs that I took in

18    August.  That's the hinge in question.  You can see

19    that it's not intact.  You can also see it in this

20    one --

21                MR. BROWN:  Say which one is this one.

22

23    BY MR. MORRIS:

24         Q      That's why we have numbers.

Schloss (Morris)

Page 129

1   talking about putting a light piece of ductwork or

2   something to make an explosion panel out of a piece of

3   ductwork.  That's not talking about that you can build

4   a flimsy dust collector and say, well, it blew apart

5   and that's how we kept the explosion.

6          Q      Was the blowing of the side -- not the

7   flap, but the side blowing out on the backblast

8   damper, was that a means of ventilation for this fire

9   as well?

10         A      Yeah.  Whenever the pressure built up,

11  it both tore the bag house apart and blew the

12  backdraft damper apart.

13         Q      So it pushed out the side, but it did

14  not -- but that same pressure did not have the effect

15  of destroying the flap?

16         A      It knocked the flap off the hinges at

17  one point in the --

18         Q      Where?

19         A      Hinges were not fastened all the way

20  across the top of it.  I think I have got a -- in this

21  group of pictures.

22         Q      Let's do this:  If there is pictures

23  you want to refer to, let's mark them first.

24         A      Okay.

Schloss (Morris)

Page 128

1          A      Well, I mean, those are my -- throw out

2    all the assumptions and change it to my professional

3    opinion is just --

4          Q      No, I understand.  But to reach your

5    opinion, you made the assumption that, regardless of

6    whether or not the flap was propped open or closed,

7    that the backblast damper allowed fire to pass into

8    the ductwork beyond it and into the building?

9          A      Yeah.

10         Q      That's your opinion?

11         A      And even in quoting Doug Edwards, in

12   his report I think it mentioned that it was better

13   than having nothing there.  Could have been a lot

14   worse if nothing was there in that damper.

15         Q      A little out of context, but yes.

16         A      Not really out of context, I don't

17   think.

18         Q      Well, I will ask it -- I will go to a

19   different area for that then too.  Are you aware that

20   NFPA 484, as it was at least in 2002, allows the use

21   of lightweight construction as a deflagration device

22   for aluminum dust systems?

23         A      As long as it doesn't impact -- as long

24   as it doesn't impact the safety of the system.  That's

Schloss (Morris)

Page 127

1    hinge wasn't a hundred percent intact.  Whether that

2    was damaged during the explosion or handling or

3    whatever else, I don't know.

4            Q     Fair to say, though, the flap itself

5    was in -- was intact?

6            A     It was intact.  Whether it stopped the

7    explosion, I could not guarantee that.

8            Q     Well, based on your prior testimony of

9    how this works, that it's the pressure wave coming

10   from the explosion before the fireball that would

11   force that closed and that, in your opinion, that the

12   dust pile wouldn't affect that ability because the

13   pressure would be enough to force it closed --

14           A     I think --

15           Q     -- anyway --

16           A     Yes, it would press it closed.  Again,

17   whether that's -- whether that pressure -- you

18   wouldn't need much of a crack around that damper to

19   allow it to go -- the fireball to go around it.  When

20   I looked at it, in my opinion, even if it did close,

21   it didn't close to the point that it stopped the fire

22   from going past that and down the ductwork.

23           Q     Okay.  Well, I hear a lot of

24   assumptions in there, okay?

Schloss (Morris)

Page 126

1   question that will get a more direct answer, okay?  Do

2   you think that the pile of dust and debris that was

3   present as described by Mr. Hodges hampered or reduced

4   the operation of the backblast damper?

5           A       In my professional opinion, it didn't

6   hamper it.  It didn't -- the pile of dust -- again,

7   you are talking about the pressure wave pushing a

8   piece of quarter-inch plate against it.  That --

9   whether that would move it out of the way so that it

10  was a hundred percent sealed, I couldn't guarantee

11  that.

12          Q       If it didn't hamper it and it was

13  pressed completely closed as you have described -- we

14  know that it was blown out on the side, okay? -- then

15  what's your explanation for why the flap wasn't

16  damaged?

17          A       Again, the flap is made out of much

18  heavier steel than what the casing is.  The flap I

19  think is -- the gauge is 18 gauge, and I think the

20  blade was quarter-inch, so you are talking about quite

21  a bit of difference in terms of what it was.

22                  The hinge was torn at the top, wasn't

23  closing back against it and making that seal.  That

24  was when I did the inspection side of it, that the

Schloss (Morris)

Page 125

1    to take it and slam it shut prior to the fireball

2    getting there.  Because what will happen is is the

3    pressure will go -- there will be some pressure that

4    went by it.  You don't want fire going by it.

5                    In the construction in that unit, you

6    have two concerns.  One is the strength of the blade

7    to be able to stop against that, and the other is the

8    strength of the housing to be able to contain it while

9    it's doing it.  The strength of the blade would be

10   adequate to force the dust out of the way and get it

11   to seep.  I mean that it may -- it may seep 100

12   percent.  It may seep 95 percent.  You know, the

13   housing is what came ripping apart whether -- and, in

14   my opinion, when the housing comes ripping apart, it

15   also would allow additional fire to go past that

16   backdraft damper just due to the stresses on the

17   inside of the -- of the -- on the inside of the blade.

18                    So to answer your question onto it is

19   that the dust is in the -- in the damper and the --

20   due to the size and the consistency of the dust, there

21   is more than likely chance that it moved all that dust

22   out of the way because you are talking about a force

23   against it that's quite high to get that to seal.

24            Q       So let's see if I can ask a more direct

Schloss (Morris)

Page 124

1    accumulation of dust and debris.  Do you have an

2    opinion as to whether or not that affected the work of

3    that part during this explosion?

4              A       Rephrase it.

5              Q       Sure, okay.  At the time -- based on

6    your report, at the time that the explosion occurred

7    in the bag house, the flap of that damper was kept

8    propped open by an accumulation of dust, correct?

9              A       That's the -- his observation, yeah,

10   and that was my -- that was my basis as well.

11             Q       In that situation, okay, is it capable

12   of closing completely in order to prevent that blast

13   from going into the ducts?

14             A       A backblast damper operates in two

15   ways.  First, you actually size it or install it in

16   the ductwork based on what the chemical

17   characteristics of the dust is.

18                     What you want to do is is when the

19   explosion would take place in the dust collector, it's

20   going to take a certain amount of time for the

21   pressure wave to radiate out from the -- from the dust

22   collector.  The pressure wave's role is to take the

23   damper blade and slam it shut.  If it's open, I mean,

24   if the system is running or anything else like that,

Schloss (Morris)

Page 123

1    options that you have to pick from at that point.

2            Q       With a backblast damper, is one of --

3    one of the functions that that performs is to prevent

4    the flow back from the dust collection system into the

5    building when the system is not operating?

6            A       That's a -- that's a secondary use of

7    it.  It just happens to work that way.  But there are

8    backflow preventers that don't do that.  That

9    particular design gives you that function if it's not

10   in operation -- if it's not in operation as an

11   explosion device.  But if you are selling it as a --

12   if you buy a backflow preventer, you don't get a

13   backblast damper and the other way around.

14           Q       Okay.  In your -- in the designs of the

15   systems that you have done, have you used both a

16   backblast damper and a backflow damper?

17           A       I have used backdraft dampers on

18   systems that are not combustible dust, and I have used

19   backblast dampers on systems that are combustible

20   dust, but not the -- not to the design that's there

21   would I use it for a backblast damper.

22           Q       And in -- in this particular case,

23   okay, you have indicated that Mr. Hodges has said that

24   the flap for the damper was kept open by the

Schloss (Morris)

Page 122

1    understand.  You referred to two different

2    descriptions here, backflow damper and a backblast

3    damper.  And you have mentioned NFPA --

4           A      Yep.

5           Q      -- as designating those two two

6    different things.

7           A      To say that -- if you look, probably,

8    in the ASHRAE handbook, it probably talks about

9    backdraft dampers.  It probably doesn't talk about

10   backblast dampers because they don't deal with

11   explosions.

12                 But it is a industry-accepted term that

13   if you look at it and you are saying you are buying a

14   backdraft damper, the expectation is it's going to

15   stop the draft of air once the system is down.  It's

16   not going to stop the explosion.

17          Q      Is there any other term that is used

18   for an explosion isolation damper?

19          A      Well, there is different -- there is

20   passive flame front arresters.  There is different

21   NFPA names for it, but the function is still the same,

22   to stop that blast from going backwards.  They are not

23   all designed like with a flap into it.  It could be

24   change of direction.  There is a lot of different

Schloss (Morris)

Page 121

1    some shape or form.

2            Q       Is that an industry definition, or

3    where does that come from?

4            A       That's more of a -- from my experience

5    side of it, there is a industry definition on a

6    backblast damper or a backflow preventer.  There are

7    requirements at NFPA 69 for what those need to be and

8    what pressures they need to withstand.

9            Q       Well, again, in determining -- you are

10   putting forth that that's the purpose of a backblast

11   damper?

12           A       Yes.

13           Q       Is there a specific industry standard

14   or definition that you can refer to for that

15   description?

16           A       If you look at NFPA, 69 is going to

17   talk about a backflow -- you know, backblast damper or

18   backblast preventer.

19           Q       I'm sorry.  NFPA distinguishes between

20   backblast damper and backflow damper?

21           A       Well, in the backflow -- in NFPA, the

22   backflow damper really -- or backflow damper isn't

23   going to provide you the protection that you need.

24           Q       And, again, I am just trying to

Schloss (Morris)

Page 120

1    based on that you have denser colder air on the

2    outside of it, less dense air on the inside of it, and

3    it's going to find equilibrium.  So there are two

4    different types of devices.  One is a backflow

5    preventer.  The one is a backblast preventer.

6            Q      In 2002 was that a distinguishing

7    description of those parts?

8            A      In my -- in my view and my expectations

9    as a designer, of an engineer of those systems, I

10   would know the differentiation between those two

11   systems.

12           Q      Okay.  So if someone orders a backblast

13   damper, okay, from a catalog --

14           A      It better -- if they are advertising it

15   as a backblast damper, then it better meet the

16   requirements that are required to withstand a

17   explosion that's inside that dust collector.  All the

18   components of the dust collection system need to be

19   capable of withstanding that explosive pressure.

20           Q      In your report, there is a couple --

21   couple places where you define the purpose of a

22   backblast damper as a device to prevent an explosion

23   from propagating through dust; is that correct?

24           A      That could -- I am sure it says that in

Schloss (Morris)

Page 119

1    into the plant.  Imagine that the fireball is like a

2    big balloon.  Anyplace that you put a hole in that

3    balloon, you are going to get equal flow out of.  It's

4    looking for the least -- it's looking for the easiest

5    way out.  If you build a enclosure that can withstand

6    the explosive forces without any problem and don't do

7    it and don't put anything on the inlet, that fireball

8    and all those gasses is going back into your process

9    where it's going to pick up fresh fuel.  You are going

10   to have secondary explosions and, in this case, a

11   tragic incident.

12          Q      Now, in this particular case, one of

13   the parts that we are referring to is my clients'

14   backblast damper.  Within the ventilation field, okay,

15   what does blast mean?

16          A      Blast means that it's going to stop a

17   blast.

18          Q      And does it distinguish between what

19   that is a blast, whether it's a blast of air or an

20   explosion?  Is there a difference?

21          A      A blast -- it could be the pressure

22   wave ahead of the blast.  The difference is a backflow

23   preventer is something that closes when the fan shuts

24   off to prevent air from going back into the building

Schloss (Morris)

Page 118

1          Q     Okay.  Well, would you agree that the

2    requirement to use the NFPA 69 standards is explicit

3    for powder plants, but not mentioned in the sections

4    regarding processing and finishing of aluminum?

5          A     It's incorporated into all parts of

6    that chapter.  Powder plants have specific things that

7    are in addition to the aluminum standard.  Just

8    because you have aluminum -- just because you have a

9    combustible dust, it requires that you have explosion

10   protection for it.  Whether it's spelled out and says

11   if the combustible dust looks like this and is painted

12   this color, you don't have to have explosion

13   protection, if it's combustible, you have to have

14   explosion protection.

15         Q     And in the system at Federal-Mogul, the

16   bag house was part of that explosion --

17         A     The bag house -- the bag house -- the

18   entire system is going to be explosion protection.

19   You would have to have explosion protection because

20   it's a combustible dust, which the explosion proved

21   that it was a combustible dust.  That you would have

22   to have a explosion protection on the bag house.  You

23   would have to have inlet isolation.  The inlet

24   isolation keeps that fireball from going backwards

Schloss (Morris)

Page 117

1   with aluminum.  Some are specific to aluminum powder,

2   but the rest of the chapter is specific to aluminum

3   dust.  The requirements and the safety requirements or

4   explosion protection requirements don't change just

5   because it's not aluminum powder.

6           Q      In 2002-2003 when this system was being

7   installed, was an explosion isolation device required

8   by the codes or standards that were in place at that

9   time?

10          A      Yes.

11          Q      And, specifically, what code or

12  standard was applicable to this system?

13          A      484, 68, 69.  And if you look in the

14  beginning of any of the NFPA codes, they incorporate

15  by reference every other standard that they write.

16          Q      And is -- NFPA 69 in the code

17  applicable at that time, was that explicit as to 484

18  for powder plants?

19          A      69 -- NFPA 69 was for explosion

20  protection systems.  NFPA 484 required that you

21  provide explosion protection for equipment that's

22  handling aluminum dust.  Whether it's powder or if

23  it's machined aluminum, anything that's combustible

24  aluminum falls under that section.

Schloss (Morris)

Page 116

1    explosive.  It's awful hard to get ten of those up

2    into the air and get them to explode.  You grind it

3    down into hundred micron parts or into a combustible

4    dust side of it, it's extremely combustible.

5                    MR. MORRIS:  Just so our record is

6            complete, if we can mark that as Schloss 2.

7

8                    (Deposition Exhibit Schloss 2 was

9            marked and entered into the Record.)

10

11                   THE WITNESS:  Again, that's why the

12           chemical characteristics of the dust is

13           important to have in making that

14           determination.

15

16   BY MR. MORRIS:

17           Q      And where I was going with that

18   question is that, in terms of the requirements, in

19   particular, for explosion isolations or explosion

20   containment equipment, NFPA distinguishes between an

21   aluminum powder plant and other plants that have

22   aluminum as a byproduct, correct?

23           A      Yes.  There is a section -- in 484

24   there is a chapter that handles aluminum, that deals

Schloss (Morris)

Page 115

1   fine.  I haven't -- I have an example on the end of my

2   finger of how powdery the -- small the dust was.

3   Again, this was on a different machine that's

4   representative of the type of dust that's onto it.  Do

5   you want to add it as an exhibit?  But that was -- the

6   dust that was being captured off of the steel brushers

7   was that.

8                    MR. HARBERT:  Can we show that to the

9             camera?

10                   MR. HUDGINS:  Somebody just voted in

11            Afghanistan.

12                   THE WITNESS:  That's it.  They got a

13            purple thumb or whatever they got.

14

15   BY MR MORRIS:

16            Q     And based on that observation, you

17   extrapolated from that that the dust created on the

18   aluminum line was similar?

19            A     From that and looking at the dust that

20   was inside the piping.  A lot of it was caked up due

21   to the moisture, but you could find fine particulate

22   down in there, down in the material that was inside

23   the ductwork as well.  So -- but, again, aluminum

24   could be explosive.  You know, that aluminum can isn't

Schloss (Morris)

Page 114

1    times the diameter of a human hair, extremely small.

2    At one time NFPA stopped at that point saying it was

3    over 500 microns.  Now they changed the definition so

4    that it says anything that's got a high surface area

5    versus mass.  The hundred microns is -- below a

6    hundred microns is where they do the testing,

7    combustion testing, to get out the fine particles, and

8    it's tested at 75 microns and below.  The dust

9    collector is a wonderful product classifier in that

10   the really fine dust ends up on the bags.  It ends up

11   not falling down into the dust collector.  If the

12   heavier particles that are greater than 100 microns or

13   150 or 200 microns probably fall into the -- well,

14   will fall into the hopper by themselves.  The fine

15   dust has got to glomerate on the bags until it's large

16   enough and weighs enough that it will fall down

17   through the air stream.

18              So by knowing the chemical

19   characteristics and the particle distribution of the

20   dust that's there determines how combustible it is.

21              When we were doing the site visit, I

22   looked at the same piece of equipment, but handling

23   steel.  And -- I may have taken a picture of that.  I

24   am not sure if I did.  But the -- the dust was very

Schloss (Morris)

Page 113

1    an aluminum powder-producing plant?

2            A       Aluminum powder is where they take

3    aluminum, melt it down, atomize it into a fine

4    particulate probably with the consistency of baby

5    powder, and it is extremely explosive and extremely

6    susceptible to exothermic reactions.

7            Q       That's not what we had here, correct?

8            A       No.  But if you look at the type of

9    dust is aluminum powder is a separate issue and is

10   handled in NFPA 484 as a separate section of aluminum.

11   It has specific requirements just for aluminum powder

12   because it does have such a chance of having

13   exothermic reaction.  But in the dust that was in the

14   dust collector, it's still aluminum.  The thing that

15   makes a dust particle explosive or having a better

16   chance of being explosive is the size of the particle.

17   So what you want is a particle that has a low mass,

18   but yet high surface area.  At one time NFPA said less

19   than 500 microns, human hairs, a hundred microns, so

20   you are talking about stuff that's pretty small.

21           Q       The width of a dime?

22           A       No, not close.

23           Q       Less than that?

24           A       No.  Human hair is a hundred to five

Schloss (Morris)

Page 112

1   melt to have certain characteristics.

2          Q      Is there a -- is there a difference in

3   the ventilation system that you would have for an

4   aluminum powder plant versus a plant that has aluminum

5   dust as a byproduct of the manufacturing system?

6          A      Do you know what a -- let me ask you

7   this:  Do you know what an aluminum powder plant is or

8   the difference between aluminum powder and aluminum?

9          Q      Aluminum powder, as I understand it, is

10  produced for use in explosives --

11                THE VIDEOGRAPHER:  Off the Record,

12          please.  We got a breakdown, got a technical

13          difficulty here.

14

15                (Discussion off the Record.)

16

17                MR. MORRIS:  If the court reporter can

18          read back where we were.

19

20                (The court reporter read the requested

21          portion of the record.)

22

23  BY MR. MORRIS:

24          Q      Mr. Schloss, can you tell us, what is

Schloss (Morris)

Page 111

1    involved on the fourth time it burned down.  I didn't

2    investigate the first three times.  It was just after

3    the fourth one.  And I know they had had it tested

4    each time between it.  And, again, each one of those

5    was a fire that was in the bag house that originated

6    in the bag house by exothermic reactions.

7              Q      Okay.  And in that case were you able

8    to determine the length of time that the exothermic

9    reaction had been ongoing?

10             A      No.  No.  And, again, by the time I was

11   involved into it, they had already switched out --

12   they actually had two bag houses, so they could switch

13   them out fast enough when they burn them down.  So the

14   one that had actually burnt down was already being

15   repaired and refurbished and brought back to the site.

16             Q      And then -- and that aluminum dust, was

17   that at a aluminum powder-producing plant or --

18             A      No.

19             Q      It was a byproduct of another --

20             A      No.  It was aluminum and the process

21   roll forms of steel sheath around metal dust,

22   aluminum.  It could be aluminum, it could be steel, it

23   could be copper that's used in the steel industry to

24   fine-tune their electric arc furnaces to get the batch

Schloss (Morris)

Page 110

1          A       Yes.

2          Q       How many times?

3          A       Once in explosions and probably four or

4   five that had pulses that we talked about before where

5   they had minor explosions that didn't cause any

6   structural damage or use the -- and I have also

7   designed and been the design engineer on systems that

8   didn't explode for combust -- for metals in bag

9   houses.

10         Q       Now, in your --

11         A       So far I have got it right every time.

12         Q       So, with respect to the one explosion

13  that you were part of that investigation, your role in

14  that is not as a explosion cause and origin expert, is

15  it?

16         A       My expertise is in combustible dust

17  side of it, yes.  If you want your house fire

18  investigated, no.

19         Q       All right.  With respect to that

20  explosion, were you able to test the dust that was

21  involved in that explosion?

22         A       We had -- we had the dust tested prior

23  to it, and it was dust coming off of a process, so it

24  was repeatable.  And after -- after the -- I got

Schloss (Morris)

Page 109

1    that's actually doing the process.

2            Q        Well, and I guess the question I go to

3    here is:  With respect to facts that you are working

4    with, again, observation of Mr. Hodges and your

5    interpretation of the video, those are the two facts

6    you rely on?

7            A        And experience.

8            Q        I understand based on that, but if we

9    take those out, just as a hypothetical, if you do not

10   have the video, okay, and you don't have a direct

11   observation from Mr. Hodges, okay, based on your

12   experience, can you still come to the same conclusion?

13           A        It would still -- exothermic reaction

14   would be something that I would investigate as part of

15   that and would be a cause of it the same way I did it

16   here where I determined it was two causes, or two

17   possible causes, one in the ductwork, one in the dust

18   collector, and use the eyewitness report and the video

19   to decide where the origin was.

20           Q        Okay.  Now, based -- you keep referring

21   to your experience, so I guess two questions come to

22   mind for me, is, one, have you investigated aluminum

23   dust ventilation systems for explosions in bag houses

24   before this one?

Schloss (Morris)

Page 108

1    large amounts of dust.

2          Q      Okay.  So is it fair to say that the

3    principal basis for your opinion that it was an

4    exothermic reaction that ignited aluminum dust

5    particles in the bag house is, one, the witness

6    statement of Mr. Hodges that he saw the explosion

7    beyond the damper and, two, your interpretation of the

8    video?

9          A      And my knowledge of dust collectors and

10   collecting dust -- collecting metal dust in dust

11   collectors.

12         Q      I understand it's your training and

13   experience.

14         A      That's my training and experience.

15         Q      But in order to come to that

16   conclusion, you needed -- you need certain facts

17   before you?

18         A      I need certain facts, and that's when

19   you asked before about the dust characteristics.

20   Would that have been helpful?  That would have been

21   helpful.  Again, what you are looking at is you could

22   have two processes similar in two different plants and

23   have two different dust characteristics based on the

24   type of machine or the manufacturer of the machine

Schloss (Morris)

Page 107

1    them for 30 years, I do know how they work.  I do know

2    how they clean.

3              And between those two things is is you

4    are always going to have dust in a dust collector

5    unless you go in and change the bags, wash it down,

6    you know, remove any waste barrels, anything that's

7    there.  You are going to have dust that's capable of

8    being dislodged and coming down through the material.

9         Q    Okay.  And, again, having to go back to

10   the -- I am not sure.  Maybe you told me, maybe you

11   didn't, but what's the temperature that you would have

12   to get from the exothermic reaction that would ignite

13   the dust?

14        A    There is a minimum --  there is a

15   minimum ignition energy for aluminum dust that would

16   also be run at the same time when they are doing the

17   dust characteristics.  It's called MI, and that's how

18   much energy would have to be available to ignite a

19   combustible dust cloud.  If that information was

20   available from the dust that's there, I can calculate

21   and tell you how much it is.

22        Q    We don't have that.

23        A    You don't have that.  So what you are

24   looking at is the ability for a dust collector to drop

Schloss (Morris)

Page 106

1    in the air sufficient to fuel the explosion?

2             A       Because they bought a dust collector

3    that for a aluminum dust -- for aluminum dust.  So

4    inside the aluminum dust is going to be -- inside the

5    dust collector is going to be aluminum dust.  Dust

6    collectors not only produce a combustible dust cloud

7    during a pulse.  They can also do it from dust falling

8    off of the bags, dust coming -- falling off of the

9    side of the dust collector in a sheet coming down

10   through it.  All it takes is the interaction between

11   the glowing embers or the glowing heat and the dust.

12   The whole dust collector doesn't need to be full.  But

13   what happened in a case where the whole dust collector

14   wasn't full, you could end up with a smaller poof,

15   which then broke more of it loose, and you would

16   theoretically have a secondary explosion inside the

17   dust collector that tore it apart.

18             Q       Okay.  And, again, I am just trying to

19   find out how you came to the conclusion that there

20   was, one, a sufficient exothermic reaction that got to

21   a temperature that could ignite a sufficient --

22             A       You have aluminum dust.  You have

23   water.  You are going to have exothermic reaction.

24   You have a dust collector.  And after working with

Schloss (Morris)

Page 105

1    the match far enough away from it that you are outside

2    that vapor level, it's not going to burn either.  Now,

3    if you get it just right and you get it between the

4    lower flammable limit and the upper flammable limit,

5    then you have just made a mess and had a large

6    explosion and fire of gasoline.

7                     So, in terms of vapors, you look at

8    those two things.  You could have an environment

9    that's a hundred percent nitrogen -- or a hundred

10   percent hydrogen and you can't explode it.

11           Q     Okay.

12           A     You can have one that's 2 percent

13   nitrogen and not explode it.  But in terms of metals

14   and metal dust or any type of dust, there is a minimum

15   explosive concentration, which means how much dust is

16   suspended in the air at that point.  And it's usually

17   in grams per cubic meter.

18                     But they don't give you an upper level

19   because it's -- it's not -- by the time you reach that

20   upper level, you are at dense phase material handling

21   where you are moving a slug through a pipe.

22           Q     And in this case, though, what

23   assumptions did you have to make in order to come to

24   the conclusion that there was aluminum dust particles

Schloss (Morris)

Page 104

1   hydrogen?

2          A       I would think hydrogen probably

3   explodes at a lower level.  But without looking it up,

4   I mean, that's just an assumption.

5          Q       Okay.  And do you have an opinion as to

6   whether or not there was hydrogen present in the bag

7   house at the time of this explosion?

8          A       There would have been hydrogen present

9   if you had a exothermic reaction, but the hydrogen

10  present I didn't account for.  I assumed it would be

11  less than the lower explosive limit of hydrogen, which

12  I think is around 4 percent.

13         Q       Okay.  And what -- what's the -- well,

14  what's the critical mass for aluminum dust?  If you

15  say it's 4 percent for --

16         A       Well, the minimum explosive

17  concentration --

18         Q       All right.

19         A       -- is a difference between when you are

20  talking about a gas and when you are talking about a

21  solid.  If you take gasoline, you take a 1-gallon can

22  of gasoline, if you could get the match down into the

23  gasoline without going through the vapor barrier, it

24  wouldn't burn because there is no oxygen.  If you get

Schloss (Morris)

Page 103

1    a hydrogen explosion inside the dust collector.  It

2    was -- I based my opinion that it was on the

3    exothermic reaction generating heat.  The gas would

4    have been lighter than air and would have floated off

5    away from the surface, so it would have been diluted

6    into it and would have been at a level that you

7    wouldn't have had a hydrogen explosion in it.  If you

8    seal up that dust collector and seal everything, you

9    can end up with that.  I have been in a plant that had

10   aluminum -- 55 gallon of aluminum fine similar to

11   this; put it outside; the next morning they came in.,

12   The 55-gallon drum was round in that the top and the

13   bottom were bulged out.  The seal was -- the clamp was

14   on so tight that it held the hydrogen inside -- inside

15   the dust collector -- or inside the 55-gallon drum at

16   the same time.  But I didn't base any of these

17   assumptions on that the hydrogen exploded.  If it did,

18   that would have just been something else, but --

19            Q     Additional fuel along with the aluminum

20   dust?

21            A     That would have been additional fuel

22   along with the aluminum dust.

23            Q     Is the combustion temperature for

24   suspended aluminum dust different than that for

Schloss (Morris)

Page 102

1    you can have the exothermic reaction.  So there is a

2    heat generation of some type, and it also creates a

3    byproduct of hydrogen gas; is that correct?

4              A    Yes.

5              Q    And hydrogen gas is combustible?

6              A    Very combustible.

7              Q    Okay.  And what temperature does

8    hydrogen gas combust at?

9              A    I can look it up in the documents.

10                  MR. HUDGINS:  That's without an

11             external source of ignition?

12                  THE WITNESS:  That's without -- I can

13             go look.  I can look it up in reference data,

14             but I don't have it available to me here.

15

16   BY MR. MORRIS:

17             Q    Well, in reviewing this matter, did you

18   make a determination?

19             A    No, but I didn't look at the hydrogen

20   gas as being part of that issue.

21             Q    Would hydrogen be a fuel for an

22   explosion of this type?

23             A    Hydrogen gas would be a fuel for that

24   explosion, but I didn't base my opinion on that it was

Schloss (Morris)

Page 101

1    reaction would have to be ongoing for it to get to the

2    temperature that would ignite the fuel?

3              A       Without knowing -- without the chemical

4    characteristics of the dust, no.

5              Q       Okay.

6              A       It would be a guess.

7              Q       And fair to say that whatever that rate

8    may be, it would be affected by the temperature inside

9    the --

10             A       Affected by the temperature and the

11   humidity inside the space.  The reaction -- the water

12   vapor could have got out there two days before.  It

13   could have got out there two minutes before, you know.

14   I don't --

15             Q       So two minutes would be a sufficient

16   time --

17             A       No.

18             Q       -- for it to occur?

19             A       Two minutes -- I don't know, because

20   without the chemical characteristics, you wouldn't be

21   able to calculate it.

22             Q       Now, you are free always to correct me

23   when I am wrong.  But I understand that when you have

24   this reaction between water and aluminum dust, that

Schloss (Morris)

Page 100

1    delicate they can't run if its raining outside without

2    catching the bag house on fire, which they did four

3    times in less than a year and blew it up twice.

4            Q      So, in this case, is it your conclusion

5    that the exothermic reaction is the source of ignition

6    based on the occurrence of the event itself?

7            A      Rephrase it.

8            Q      Well, the explosion occurred.

9            A      (Witness nods.)

10           Q      And you have indicated that essentially

11   you eliminated all possible sources of ignition first

12   down to the static electricity charge and an

13   exothermic reaction?

14           A      Yes.  And looking at it between whether

15   the explosion originated outside the plant or inside

16   the plant, by originating on the outside, it

17   disregarded the static that was generated inside the

18   plant and looked at on the outside of the plant what

19   was causing that.

20           Q      Okay.  So now having reached that -- or

21   either eliminating static electricity as the source of

22   ignition and now reaching the exothermic reaction as

23   the likely cause, is there any calculation that you

24   can make that would say how long the exothermic

Schloss (Morris)

Page 99

1           A      Again, we talked about that before.

2    That was provided that it was -- that the system and

3    the plant were operating up to between a half hour and

4    an hour and a half before the accident.

5           Q      And when you say the system, you are

6    referring to the --

7           A      Dust collection system and the wet dust

8    collectors.

9           Q      Okay.  So, now, with respect to the

10   condensation that you testified that would occur in

11   the bag house over -- basically, since it became

12   operational, is there -- what is the rate of reaction

13   for that condensation or the water and its interaction

14   with the aluminum dust that would lead to an

15   exothermic reaction?

16          A      Well, for that specific dust, again,

17   without the dust characteristics, what was in there at

18   that time, it would be very difficult to determine

19   that.  That's why if you had testing that showed what

20   the dust characteristics were, you could calculate

21   that.

22                 I do work in a plant that handles --

23   that part of their manufacturing is aluminum as well

24   as steel, magnesium.  And their systems are so

Schloss (Morris)

Page 98

1    monitoring system or something that would go back that

2    far and monitor those conditions, no.

3            Q       Okay.  And as a result of not having

4    any physical evidence to determine that, is there any

5    assumption that you made with respect to the dew point

6    for the interior air of Federal-Mogul?

7            A       My analysis was that it was going to be

8    higher than what the outside dew point was.  28

9    degrees is pretty low in terms of a dew point.  Just

10   having people in occupied space with forklifts, people

11   moving around, it's going to be higher than that.

12   Typically, in a manufacturing plant that's not even

13   humidified, you are at 45 to 50 percent relative

14   humidity.

15           Q       Do you know how many people were in the

16   plant that day?

17           A       No.

18           Q       Do you know how many -- what part of

19   their operations were ongoing on that day?

20           A       I was told the plant was in operation

21   at that point.  I would assume there was people in the

22   plant.

23           Q       Okay.  And where did you get that

24   information from?

Schloss (Morris)

Page 97

1          Q     I don't.  I don't.  Going back to your

2    testimony relating to the exothermic reaction as your

3    conclusion as the source of ignition in this case,

4    what was the dew point at -- for Blacksburg on

5    December 31, 2010?

6          A     I have got the weather information for

7    that.  Thursday, December 2010, what time?  What time

8    of day would you like to pick?

9          Q     I would assume at or about the time of

10   the explosion.  So that's what, around 10 a.m.?

11         A     At 10 a.m. the dew point was 28.4

12   degrees.

13         Q     What was the outside temperature at

14   that time?

15         A     32.

16         Q     How is that significant?

17         A     It's cold outside.

18         Q     Do you know what the -- what the dew

19   point was for the interior of the Federal-Mogul plant

20   on that date?

21         A     No.  That's not been provided.

22         Q     And is there any way at this point in

23   time that that could be determined?

24         A     Unless Federal-Mogul had a building

Schloss (Morris)

Page 96

1          A       He is a good engineer.

2          Q       Are you familiar with his reputation in

3     the industry?

4          A       He is, again, a good engineer.

5          Q       And did you read the report from

6     Richard Roby?

7          A       Yes.  I reviewed it as well.

8          Q       Do you know Richard Roby?

9          A       No.

10         Q       Are you aware that he is a member of

11    the committee for NFPA 921?

12         A       No, but I also know other members of

13    the committee.  That may not make them an expert in

14    anything more than being on the committee.

15         Q       Absolutely.  I just didn't know --

16         A       I don't really think that buys you much

17    credentials on that.

18         Q       So can you explain to me, what is

19    confirmational bias?

20         A       I am not familiar with the term.  I

21    know it's in 921 in the definitions.  I know there is

22    a section on confirmational bias, but to sit here and

23    quote it -- if you want to get out 921, I can show you

24    where it is and tell you what it says.

Schloss (Morris)

Page 95

1    overall argument what they were arguing, and I still

2    feel that my interpretation is accurate.

3           Q      Okay.  So maybe I can ask it this way:

4    Are the conclusions of the defense experts that you

5    have reviewed wrong or just a difference of opinion

6    based on different interpretations of the same data?

7           A      Given those two choices, I would say

8    difference of opinion on what their data.

9           Q      Okay.

10          A      I think mine is right, and I don't

11   quite agree with theirs, but that's their prerogative

12   to come up with it.

13          Q      Fair enough.  And within your field,

14   that's not unusual that there are differences of

15   opinion?

16          A      Differences of opinion that engineers

17   have from time to time.

18          Q      I know you mentioned earlier that you

19   had worked with Doug Edwards previously at Kb/Tech.

20   And so, generally, are you familiar with the work that

21   he has done in the ventilation system industry?

22          A      Yes.  It's similar to what I do.

23          Q      And do you have any opinion as to his

24   credentials within the industry?

Schloss (Morris)

Page 94

1         A      That didn't change my mind.  Also, part

2    of the investigation I had was to be able to go up in

3    a scissors lift to that camera to get a better view of

4    what was there, looking at both out that door as well

5    as the ductwork and where the -- where the system was

6    installed.

7                So, using those two things, I still

8    think that my original -- or my conclusions are still

9    based on the original side of it where the initial

10   explosion took place outdoors.

11        Q      And I understand your opinion.  What I

12   am asking is:  In having reviewed that and gone

13   through the methodology that was used by those

14   experts, was there anything in those opinions that you

15   read that you felt to be done contrary to scientific

16   methodology as -- before the NFPA 921?

17        A      If there is a part of it that you want

18   to ask about, if there is a section, I will review

19   that section of the report.  Again, I just looked at

20   the overall side of it, not each detailed...

21        Q      So you can't speak to the details in

22   that report as to whether or not you evaluated each of

23   those details as it --

24        A      I looked at in the overall -- in their

Central Virginia Reporters (540) 380-5017

Schloss (Morris)

Page 93

1    at what their major conclusions were.  Maybe not all

2    of the science behind it, but what the major

3    conclusions were.

4           Q      Okay.  And specifically with respect to

5    the video evidence, did you read any of the

6    information that came to different conclusions as to

7    what the video evidence showed in this case?

8           A      I read that.  I still stand by my

9    conclusions of the video.

10          Q      Did you discount it?  Was it a

11   reasonable interpretation of the video, or was it

12   unreasonable?

13          A      It was somebody's interpretation of the

14   video.  It wasn't what I saw in the video.

15          Q      Well, what I am asking is:  Was --

16   based on your experience and in your opinion to a

17   reasonable degree of engineering probability, were --

18   was the opinions expressed with respect to the video

19   evidence in any way scientifically unreliable, in your

20   opinion?

21          A      I looked at what their opinions of the

22   video were and their arguments on the video, and my

23   original opinions on the video still stand.

24          Q      Fair to say that within your field --

Schloss (Morris)

Page 92

1    explosion at its inception, was there any other

2    witness?

3            A       That's the only one that I saw.

4            Q       Since you have completed your report

5    and your conclusions, have you been provided with the

6    reports from the experts that have been retained by

7    the defendants in this case?

8            A       Yes.

9            Q       And have you had an opportunity to

10   review all of those reports?

11           A       I did a quick review, not a detailed

12   review.

13           Q       As part of the scientific methodology

14   as outlined in NFPA, when you are presented with

15   additional facts or other hypotheses, is there a

16   requirement to go back and reevaluate and retest your

17   own hypothesis?

18           A       Yes.  I look at what their opinions

19   were and go back and look at what my evaluation was,

20   what...

21           Q       And based on your answer, you said, I

22   have looked at them briefly.  Have you had the

23   opportunity to do that yet?

24           A       Looked at them briefly, enough to look

Schloss (Morris)

Page 91

1    investigation as to what the cause was for the damper

2    flap to be open such that Mr. Hodges could see past

3    it?

4           A    Based on the testimony, there was three

5    to five inches of dust in the bottom of the ductwork.

6    My conclusion was that the dust was holding the damper

7    open.  I do need to take a break, so --

8           Q    Okay.  Off the Record.  Sure.

9                THE VIDEOGRAPHER:  Off the Record.

10

11               (A recess was taken.)

12

13   BY MR. MORRIS:

14          Q    Mr. Schloss, we are back after a short

15   break, and I guess we were finishing up -- we were

16   still talking about the witness statement of

17   Mr. Hodges.

18               So other than Mr. Hodges' statement

19   regarding his observation of the explosion, are there

20   any other witness statements that you reviewed

21   regarding the explosion?

22          A    Other -- the ones I gave you as the

23   depositions, I reviewed all of those.

24          Q    Well, specific to actually seeing the

Schloss (Morris)

Page 90

1    damper, that you found to be contrary to the

2    information that you had from your investigation?

3              A       Not that I recall at this point.

4              Q       Okay.  With respect to the backblast

5    damper and him being able to see beyond it, do you

6    know what the reason was that he was able to see

7    beyond the damper?

8              A       The reason --

9              Q       Well, withdrawn.  Let me set that up

10   differently.  You indicated that the -- the system was

11   not operating, correct?

12             A       Uh-huh.

13             Q       Okay.  When the system is operating and

14   there is airflow going to the bag house, then the flap

15   of the damper would be pushed open, correct?

16             A       Yes.

17             Q       When that system is not operating, it

18   would be closed?

19             A       It -- the design of it would be closed.

20   Whether it was closed -- there could have been buildup

21   of material, could have been just the damper was bound

22   against the side of it.  Be hard to speculate on that.

23             Q       Based on the information that -- well,

24   did you make a determination as part of your

Schloss (Morris)

Page 89

1    BY MR. MORRIS:

2            Q      All right.  With respect to Mr. Hodges,

3    do you know whether or not he had any prior experience

4    in cleaning out ventilation systems?

5            A      I have no work records on what he has

6    done other than in his statement he said, before when

7    they have had sparking, they have turned the RPM down

8    on the truck, so I assume that he did have experience

9    in that.

10           Q      And --

11                  MR. BROWN:  Excuse me, you are losing

12           your microphone there.  You may want to

13           adjust it.

14

15   BY MR. MORRIS:

16           Q      And, again, did you interview

17   Mr. Hodges to find out --

18           A      No.  I -- I took his -- read his

19   deposition, but had no personal contact with

20   Mr. Hodges.

21           Q      Okay.  Was there anything else in his

22   deposition or -- withdrawn.  Was there anything in his

23   deposition in terms of his testimony of his

24   observations, other than his description of the

Schloss (Morris)

Page 88

1           A      As an engineer that deals in this all

2    the time, I'd understand what I was looking at.  As a

3    layman looking down a duct with a flashlight, I am not

4    a hundred percent sure I would know what a backdraft

5    damper or a backblast damper is going to look like.

6    I'd know what a fireball looks like, but anything that

7    was in the ductwork at that point I wouldn't --

8           Q      Do you think --

9                  MR. BROWN:  Let him finish.

10

11   BY MR. MORRIS:

12          Q      I am going to ask you going forward,

13   although some of my questions may seem open-ended

14   sometimes, they are asking for a very specific

15   response.  And to the extent that I can, I want you to

16   -- or that you can, please confine the answer

17   specifically to the question, and we will move along a

18   little bit quicker.

19          A      Okay.

20                 MR. BROWN:  You can answer -- let me

21                 respond to that.  You can fully answer any

22                 question that he asks in the way that you

23                 believe fully answers that question.

24

Schloss (Morris)

Page 87

1    particular, eyewitness statements, correct?

2                A     Yes.

3                Q     Okay.  And one of the ways that you do

4    that is to evaluate each of the statements that that

5    witness has made about the events, correct?

6                A     Yes.

7                Q     In this case Mr. Hodges' testimony that

8    he could see past the damper through the top, okay,

9    would you agree or disagree that that is incorrect

10   based on the configuration of the damper?

11               A     His description does not match the

12   description of how the damper is actually built.  What

13   he was describing there, I am not real sure of what

14   his interpretation of the top and looking over it.  He

15   could have been looking at the buildup of aluminum

16   that was in the bottom of the ductwork.  So it would

17   be hard to -- without getting a diagram or something

18   from Mr. Hodges, it would be hard to test that

19   statement.

20               Q     And did you do that?

21               A     No.

22               Q     Okay.  So --

23               A     I mean --

24               Q     Okay.

Schloss (Morris)

Page 86

1          prejudiced.

2                    MR. ALEXANDER:  You are right.  Thank

3          you.

4                    MR. HUDGINS:  Without belaboring the

5          whole thing, I think everybody on this side

6          of the table would disagree that his

7          questions are misleading in any respect.  And

8          the witness who has indicated that he

9          reviewed the record is in a position to agree

10         or disagree with the foundation for his

11         opinion.

12                   MR. BROWN:  I hear you.  I made my

13         objection.  Unless you want to continue to

14         make the argument, then why don't we move on.

15                   MR. HUDGINS:  That's all.

16                   THE VIDEOGRAPHER:  Off the Record.

17

18                   (Discussion off the Record.)

19

20    BY MR. MORRIS:

21         Q     Mr. Schloss, thank you for your

22    patience.  Again, now, referring back to Chapter 17 in

23    NFPA 921, one of the obligations that you have as an

24    investigator is to test witness statements and, in

Schloss (Morris)

Page 85

1          know.

2                    So that is what my -- that's what my

3          objection is, is that when you characterize

4          it, you are characterizing him saying that

5          this is the way it is.  That is not an

6          accurate characterization.  With that, then

7          you can go ahead and ask your questions.  I

8          just didn't want to do that in front of the

9          witness.

10                   MR. MORRIS:  I appreciate that.  Thank

11         you.

12                   MR. HUDGINS:  Assuming we were at trial

13         and you had just gone to the bench and made

14         that same objection, wouldn't the response of

15         the court be you're welcome to redirect your

16         witness and bring that out as part of your

17         case?

18                   MR. BROWN:  My duty in a deposition is

19         to, if I have a form of the question

20         objection, then I have to bring that up.  And

21         I view this as being form of the question.  I

22         think it's just misleading and incorrect.  So

23         with that said, it's not being done in front

24         of the witness, so nobody is being

Schloss (Morris)

Page 84

1              MR. BROWN:  I want to make an objection

2          to your question, line of questioning, in

3          that it's mischaracterizing the deposition

4          testimony of Jeffrey Hodges, testimony as to

5          the condition of the -- or the location of

6          the hinge at the top.  The question was on

7          Page 101:  Was it a flap or a hinge at the

8          top?  And the answer was:  I don't know.  I

9          know I could see that the flapper was in

10         there, and to me it looked like it pivoted

11         from the center, but I don't know.  To

12         categorically say that he is testifying

13         affirmatively that, you know, absolutely this

14         is the way it is is a mischaracterization of

15         the evidence.  The evidence is very clear

16         that what he was clear on because what he

17         says is in terms of the location of the -- of

18         the fire.  It says on Page 75, But you are

19         clear in your mind that there was some fire

20         that came from behind the damper apparatus?

21         Answer:  Yes, absolutely.  So you have the

22         location of the fire coming from beyond there

23         absolutely.  And in terms of the structure of

24         what he is seeing, he is saying he doesn't

Schloss (Morris)

Page 83

1          Q       Where it says witness observations, are

2    you familiar with that section?

3          A       Yes.

4          Q       Now, based on our discussion of

5    Mr. Hodges' testimony regarding his observations of

6    the backblast damper in addition to his observations

7    of the fireball, did you do anything to support or

8    refute his observations with respect to the condition

9    of the backblast damper?

10         A       I don't understand the question.

11         Q       Okay.  Having read that and heard his

12   description that it was open at the top and it looked

13   like it was hinged in the center, okay, did you do any

14   follow-up in order to assess the -- to either support

15   that statement or refute that statement?

16                 MR. BROWN:  Before you answer that

17            question, I'd like to make an objection.  It

18            may be a speaking objection.  Let's go off

19            the Record.  Could you leave the room for

20            just a moment?

21                 THE VIDEOGRAPHER:  Off the Record.

22

23                 (Discussion off the Record.)

24

Schloss (Morris)

Page 82

1    any other eyewitnesses to the events.

2           Q       Okay.  And did you ask whether or not

3    there were any other people present?

4           A       I don't remember if I inquired on that

5    or not.

6           Q       Have you read any of the depositions of

7    the LCM employees who are not plaintiffs in this case?

8           A       No.  Well, I did -- versus what's on

9    that list, there is other LCM employees.  Danny

10   Collins -- ones I looked at were David Garard, Tommy

11   Lee Bonds, Jeff Hodges, John Paul Spangler, Danny

12   Collins, and Ed Thompson.

13          Q       Okay.  And was there any information

14   other than from Mr. Hodges that you had in terms of

15   specific facts and observations as to where the

16   explosion occurred?

17          A       Not that I recollect.

18          Q       Now, referring back to Schloss 1 again,

19   if we look to -- let me get to it -- 17.3.3.15, which

20   is on Page 162 at the top.

21          A       17?

22          Q       .3.3.15.  It will be at the bottom

23   right of Page 162.

24          A       Okay.

Schloss (Morris)

Page 81

1          A       Yes.

2          Q       Okay.  And under 17.1.2 we have -- it's

3   that determination of the origin of the fire involves

4   the coordination of information derived from one or

5   more of the following:  1, witness information.  The

6   analysis of observations reported by persons who

7   witnessed the fire or were aware of conditions present

8   at the time of the fire, correct?

9          A       Yes.

10          Q       And you previously told us that the

11   information that you have is from the depositions of

12   the plaintiffs, correct?

13          A       And fact --

14          Q       That's one, first?

15          A       I mean, Federal-Mogul.

16          Q       And the deposition of Federal-Mogul was

17   of David Garard, correct?

18          A       Yes.

19          Q       But Mr. Garard, you are not aware of

20   whether he was at the plant that day or not?

21          A       No.

22          Q       Okay.

23          A       And I am not familiar with if anybody

24   from Federal-Mogul was at the plant or if there was

Schloss (Morris)

Page 80

1    BY MR. MORRIS:

2            Q      Mr. Schloss, we were referring to NFPA

3    921, and we have marked as Schloss 1 for

4    identification today a portion of 921 that starts with

5    Chapter 17, origin determination.  Do you see that?

6            A      Yes.

7            Q      Okay.  And would you agree that that's

8    a applicable standard for your investigation in this

9    case?

10           A      Yes.

11           Q      And do you accept NFPA 921 as

12   authoritative in terms of the investigation of fires

13   and explosions?

14           A      Only in the combustible dust side of

15   it.  I don't know anything about investigating a house

16   fire or a car fire or something along that.

17           Q      Fair enough.  As it relates to --

18           A      As it relates to combustible --

19           Q      -- your field --

20           A      -- dust and what I do, yes, it does.

21           Q      Okay.  And within Chapter 17, origin

22   determination, there is sort of a recap of the

23   methodology and the scientific method for origin

24   determination, correct?

Schloss (Morris)

Page 79

1    that it would be subject to criticism?

2              A      Yes.

3              Q      And within NFPA 921 in I believe it's

4    Chapter 17, there is a section that deals with witness

5    statements, correct?

6              A      To know what chapter and what page and

7    what -- I am not familiar.

8              Q      Let's see if we can get to it.

9                     MR. MORRIS:  Okay.  Let's mark this as

10             Schloss 1.

11

12                    (Deposition Exhibit Schloss 1 was

13             marked and entered into the Record.)

14

15                    MR. BROWN:  Do you have a copy for me?

16                    MR. MORRIS:  I don't.

17                    MR. BROWN:  Let's just take a moment,

18             and I'll make a copy.  Does anybody else want

19             a copy of the exhibit?

20                    THE VIDEOGRAPHER:  Off the Record.

21

22                    (A recess was taken.)

23

24

Schloss (Morris)

Page 78

1    collector.

2            Q      So the only relevant fact that you took

3    in order to rely on his testimony was the fact that he

4    said he could see past the damper.  The details of

5    that description were not important to you?

6            A      No, they were not important to me.  I

7    mean, the bigger thing was is that he could see past

8    the damper and see the elbow, and that's where he saw

9    the fireball generate and come out.

10           Q      Okay.  I saw on your resume that you

11   are a member of NFPA.

12           A      Yes.

13           Q      And I understand that to be a member of

14   NFPA, all you have to do is pay the dues?

15           A      That's right.

16           Q      Okay.  But you are familiar with NFPA

17   921?

18           A      Yes.

19           Q      And you use the scientific methodology

20   as directed by NFPA 921?

21           A      Yes.

22           Q      And if -- is it your opinion that if

23   the scientific methodology as set forth in NFPA 921 is

24   not used in a investigation of a fire or an explosion,

Schloss (Morris)

Page 77

1    top or bottom?

2            A       You couldn't tell where it was hinged.

3            Q       Could you tell whether it was at the

4    top of the duct or at the bottom of the duct where it

5    was open?

6            A       What he saw at that distance, I don't

7    know.

8            Q       Okay.  So --

9            A       I just -- without reading and believing

10   what he described, I used more of the concept that he

11   could see past that and see the elbow.

12           Q       Okay.  Well, you said previously the

13   fact that you had his -- his testimony that he saw a

14   fireball from --

15           A       Yes.

16           Q       -- beyond the damper, that you accepted

17   that as true?

18           A       Yes.

19           Q       Okay.  We have testimony from him

20   indicating that his observations of the damper, which

21   he had been able to see for a period of time prior to

22   the explosion occurring, was incorrect?

23           A       It was incorrect, but he still said you

24   could see past it to see the elbow going to the dust

Schloss (Morris)

Page 76

1   it would make that much of a difference on him looking

2   at it.

3          Q     And do you recall him testifying as

4   follows:  Question:  Where you saw that you could see

5   a gap on the side, the top or the bottom.

6                 MR. BROWN:  What page are you on?

7

8   BY MR. MORRIS:

9          Q     101 Line 5.  The total question is:

10  That's what I am trying to find out, where you saw

11  that you could see a gap on the side, the top or the

12  bottom.  I apologize for the paraphrase.  Answer:  I

13  could see over the top of it from the center up.  Do

14  you recall reading that in his deposition?

15         A     Yes.

16         Q     Okay.

17         A     I don't remember what was just ahead of

18  that.

19         Q     Is that an accurate description of the

20  configuration of the backblast damper?

21         A     No, but looking down 40 feet of

22  ductwork with a flashlight, that may have been what

23  his interpretation of what he saw is.

24         Q     That you couldn't tell whether it was

Schloss (Morris)

Page 75

1    explosion.

2         Q      Okay.  Where is the hinge located for

3    the flap?

4         A      At the top of the flap.

5         Q      Do you recall reading in Mr. Hodges'

6    deposition when he was asked:  Was the flap of the

7    hinge at the top?  And he answered:  I don't know.  I

8    know that I could see the flapper that was in there,

9    and to me it looked like it pivoted from the center,

10   but I don't know.  Do you recall reading that?

11        A      Yes.  Yes, I recall that.

12        Q      Is that an accurate description of the

13   damper?

14        A      From the -- the flap would have been

15   hinged at the top.  He may have been looking at the --

16   I am not sure what his interpretation of the damper

17   and the hinge was.  I used more that he could see past

18   that to see the elbow.

19        Q      Do you recall that he testified that he

20   thought it was a center hinge and that it moved both

21   up and down?  Do you recall that testimony?

22        A      Yes.

23        Q      Okay.

24        A      I don't see where that -- the design of

Schloss (Morris)

Page 74

1    BY MR. MORRIS:

2              Q       For the purposes of my question, okay,

3    can you refer to Page 101?

4                     MR. BROWN:  He would have to have the

5              deposition.  I don't think he has the

6              deposition in there.

7                     THE WITNESS:  I don't think I do.

8                     MR. BROWN:  I think he quotes the

9              deposition in his report.

10                    THE WITNESS:  But I don't think I

11             pulled that out separately.

12

13   BY MR. MORRIS:

14             Q       Mr. Schloss, let me ask you another --

15             A       Uh-huh.

16             Q       Okay.  Can you describe for me the

17   construction of the backblast damper?

18             A       It's a rectangular box with -- in just

19   general terms, rectangular box with round collars on

20   either end to fit the ductwork, a incline blade that

21   seals against a -- one of those collars to stop the

22   transmission of energy back through the ductwork.

23   It's made to be open while the equipment is running

24   and the air is flowing across it and closed during an

Schloss (Morris)

Page 73

1    did that give you any information?

2              A      That the fireball had originated in the

3    bag house.

4              Q      In terms of his description --

5    withdrawn.  Do you recall what his description of the

6    damper was at his deposition?

7              A      No, but I can look at it.

8                     THE WITNESS:  Do you have a copy of his

9              deposition, for Hodges?  I may have a copy,

10             just that page.

11                    MR. BROWN:  No, not without my notes on

12             it, but we can -- we can take a quick break

13             and get a copy of these pages if you like.

14             Want to do that?

15                    MR. HUDGINS:  What were you looking

16             for?

17                    MR. MORRIS:  Let me see if I want --

18                    MR. ALEXANDER:  Does he want it?

19

20   BY MR. MORRIS:

21             Q      If you have his deposition, if you

22   looked at Page 101 --

23                    MR. BROWN:  It's on a number of pages.

24             It starts well before that.

Schloss (Morris)

Page 72

1          Q       Okay.  And what did you do to test that

2    account from Mr. Hodges?

3          A       The other thing I used in doing that

4    was the video and looked at the flashes and where

5    those flashes originated.  And so by using that with

6    his reaction, I determined that the explosion had

7    taken place in the duct -- in the bag house, not in

8    the ductwork, the initial explosion.

9          Q       Did you consider Mr. Hodges' statement

10   to be reliable?

11         A       Yes.

12         Q       Okay.  And what was that based on?

13         A       Based on that he was there and seeing

14   it.  I have talked to other people that have been

15   involved in them, in explosions and in flash fires,

16   and found them to be very reliable in what they

17   remember.  It may be something as easy as they saw,

18   you know, bright orange flash coming out of a

19   55-gallon drum and landing 30 feet or 40 feet away

20   from the -- but they remember where the origin and

21   what they saw.

22         Q       Okay.  And when Mr. Hodges stated that

23   he could see that the fireball originated beyond the

24   damper, or the flue or whatever he called it, okay,

Schloss (Morris)

Page 71

1    the area where the plaintiffs were working.

2              A       That could have been just by the

3    vacuum.  It could have been by the flow.

4              Q       Okay.

5              A       I guess any material flowing through a

6    pipe like that is going to cause a static buildup.

7    Just different materials dissipate it differently.

8              Q       But you indicated previously that

9    that -- that the creation of the static electricity

10   and generation of sparks was a potential source of

11   ignition for combustion and explosion in this case?

12             A       In -- it's a source of sparks and

13   having air going through a PVC pipe, yes, anything

14   that's ungrounded.  Even ungrounded or unbonded steel,

15   you can still have the same issues.

16             Q       Okay.  Now, with respect to the

17   explosion itself, in your report you indicate that the

18   number one fact that you relied upon here was the

19   testimony of Mr. Hodges that he saw an explosion in

20   the bag house; is that correct?

21             A       He saw a fireball coming down the

22   ductwork.  He said he could see past the backdraft --

23   or backblast damper into the elbow, and he saw the

24   fireball originate from that point.

Central Virginia Reporters (540) 380-5017

Schloss (Morris)

Page 70

1          A       No.

2          Q       Are you aware whether or not flexible

3    hose is manufactured so that it does have grounding

4    material in it?

5          A       Yes, it does.

6          Q       In this case there is nothing to

7    suggest that this flexible hose had any grounding

8    material in it, correct?

9          A       I have no information on that.

10         Q       And then we get to the PVC pipe, or the

11   lance as you referred to it.  And was the use of PV --

12   is the use of PVC pipe in cleaning aluminum dust

13   ventilation systems appropriate?

14         A       It's nonconductive.  So in anything

15   that's combustible dust, you need to use conductive

16   materials.  PVC is not conductive, and I don't know of

17   anything that's commercially available like that that

18   is conductive.

19         Q       Is it nonsparking?

20         A       It will -- it will not transfer a

21   spark.  A spark will build up on the surface of the

22   PVC, but it's not going to release a spark.

23         Q       And, in fact, in this case the

24   information we have is that it did generate sparks in

Schloss (Morris)

Page 69

1    be conductive nonsparking material?  Is that --

2              A       Yes.

3              Q       -- part of NFPA requirements?  In this

4    case, we had the vacuum truck, which we have already

5    discussed.  And then from that there was aluminum pipe

6    that was attached to the vacuum truck, correct?

7              A       Yeah, per my understanding and the

8    pictures.

9              Q       Would that aluminum pipe fit those

10   requirements?

11             A       Yes.

12             Q       Okay.  The flexible hose that was used

13   here?

14             A       There are flexible hoses that are

15   conductive.  I don't remember exactly whether the hose

16   that was used at this point was conductive material or

17   nonconductive construction.

18             Q       You had an opportunity to see --

19             A       I saw it.

20             Q       -- that hose?

21             A       I took a picture of it and was more --

22   looked at the lance and the PVC there.

23             Q       The flexible hose that was used, do you

24   know whether or not that was grounded in any way?

Schloss (Morris)

Page 68

1  reporter, please wait until I finish my question

2  completely before you start your answer.  I will do my

3  best to extend you the same courtesy and allow you to

4  finish your answer completely before I move on.  If at

5  any time you feel that you have not finished your

6  answer, please let me know, and we will make sure that

7  we get a complete record and one that we will all be

8  able to read for the benefit of our reporter, okay?

9          A       Thank you.

10          Q       We were discussing the vacuum truck

11  previously and the equipment that was being used by

12  the plaintiffs in their cleaning operation.  You

13  mentioned a few things, so I just want to go through

14  the equipment that was being used in terms of the

15  bonding and grounding of the equipment.

16                  With respect to the cleaning of ducts

17  involving aluminum dust ventilation system, would you

18  agree that you should use grounded and nonconductive

19  equipment?

20          A       Yes.  NFPA requires that all of the

21  ductwork, both in that type of system, a vacuum

22  system, a dust collection system, be grounded and

23  bonded.

24          Q       And that whatever is being used should

Schloss (Morris)

Page 67

1    going across that in that vacuum truck, going in the

2    ductwork, not in the vacuum truck.

3              Q      Okay.  And we do know that there was a

4    fire or some type of explosion within the vacuum truck

5    itself, correct?

6              A      Which -- yes.

7              Q      And that's not revealed on the video as

8    to when that occurred?

9              A      No.

10             Q      And we have no eyewitness information

11   as to when that occurred in relation to any other --

12             A      Not that I am --

13             Q      -- event of the explosion?

14             A      -- familiar with.

15                    MR. MORRIS:  I apologize.  Can we take

16             a quick break?

17                    MR. BROWN:  Sure.

18                    THE VIDEOGRAPHER:  Off the Record.

19

20                    (A recess was taken.)

21

22   BY MR. MORRIS:

23             Q      Mr. Schloss, continuing on -- first,

24   before we go further, at the request of our court

Schloss (Morris)

Page 66

1    you -- are you aware of that?

2            A      No.  It may have been in deposition,

3    but I don't recollect it.

4            Q      Next question:  So the only operating

5    machinery that we have in this closed system is the

6    vacuum truck, correct?

7            A      Yes.

8            Q      Okay.  And in your analysis, you -- you

9    didn't ask for any information or did not find any

10   information as to any safety procedures in terms of

11   grounding the truck and/or the system that were taken

12   with respect to the vacuum truck, correct?

13           A      No.  The vacuum truck -- the vacuum

14   truck itself is intrinsically safe.  The ductwork and

15   everything that's hooked up to it would be hard --

16   would be hard to ground in that you have hose, you

17   have PVC hose, and PVC pipe that you are using as a

18   wand.  So you would not have a continuous bonded path

19   from the time you are collecting it until the time you

20   are getting to the vacuum truck.

21           Q      Does that create --

22           A      It creates --

23           Q      -- any additional risk of --

24           A      It can create a potential of a spark

Schloss (Morris)

Page 65

1                    THE WITNESS:  The system grounded or

2          the vacuum truck grounded?

3

4    BY MR. MORRIS:

5          Q      Well, two things that -- we will go

6    through that.  First of all, there has been testimony

7    that there was no grounding of the truck itself, okay?

8    What grounding of the system are you referring to?

9          A      The grounding of the piping and

10   everything off of the vacuum truck, from the vacuum

11   truck out.

12         Q      And in your investigation, is there any

13   information that you have that any of the equipment

14   that was connected to the vacuum truck was grounded?

15         A      No.

16         Q      Okay.  So we haven't -- so the truck

17   isn't grounded and the system isn't grounded; is that

18   correct?

19         A      Well, if the -- I don't understand the

20   truck not being grounded.

21         Q      There has been testimony that there is

22   a specific method that they use in order to ground the

23   truck, that they can take a ground wire and attach it

24   somewhere.  That was not done in this case.  Were

Schloss (Morris)

Page 64

1    points between the air that's being brought into it

2    and the air outside?

3            A       No, because the friction that you are

4    going to -- the friction of sucking through all those

5    devices is going to heat that air up quite a bit.  You

6    are going to end up with about a 2 degree rise for

7    every horsepower that those vacuums pull.

8                    And the vacuum truck itself are

9    intrinsically safe, which means they are grounded,

10   bonded, everything.  It by itself is a safe operating

11   -- if that wasn't true, you would be blowing up a lot

12   of vacuum trucks.

13           Q       All right.  And did you read in the

14   deposition transcripts in this case that the vacuum

15   truck was not grounded at the time of its operation at

16   Federal-Mogul?

17           A       I did not read that.

18           Q       Okay.  And so --

19           A       But, again, being grounded as the --

20           Q       Mr. Schloss, I am going to --

21           A       -- truck or the system being grounded?

22                   MR. BROWN:  He can answer the question.

23                   MR. MORRIS:  He did answer the

24   question.  He went beyond my question.

Schloss (Morris)

Page 63

1           A      The vacuum truck, in my professional

2    experience, is a very safe device by itself.  It's

3    only when you start hooking things up to it.  So the

4    vacuum truck actually creating and originating the

5    explosion in the vacuum truck I ruled out.

6           Q      Okay.  Well, my first question was:

7    Did you consider it as a potential source of ignition

8    for the explosion that occurred in this case?

9           A      Yes.

10          Q      Okay.  And the vacuum truck,

11   essentially, is similar to a bag house in that you are

12   pulling the dust and debris into a collection system,

13   correct?

14          A      Yes.

15          Q      And as part of this operation, we have

16   a closed system between the bag house, the ductwork,

17   the --

18          A      Yes.

19          Q      -- PVC pipe, the flexible hose, the

20   aluminum pipe, into the vacuum truck, correct?

21          A      Yes.

22          Q      The vacuum truck is outside similar to

23   the bag house.  Would that be subject to the same

24   situation in terms of the difference between dew

Schloss (Morris)

Page 62

1              factor?  Was that the factor that -- of an

2              explosion?  I don't see it.

3

4    BY MR. MORRIS:

5              Q      Is it fair to say that in evaluating

6    all the potential causes of the explosion here that

7    eventually you came down to two possible causes, one

8    being the generation of the static electricity by the

9    use of the PVC pipe by the plaintiffs, or, as you

10   mentioned earlier, an exothermic reaction in the bag

11   house?

12             A      Yes.

13             Q      And you were able to eliminate every

14   other cause at that point?

15             A      I'd have to go back through that list

16   of what I gave you, but, I mean, that was really --

17   really, at that point it came down to the video and my

18   opinion or my interpretation of the video of which

19   flashes were the bag house exploding and what flash

20   was the stuff coming back down the ductwork.

21             Q      Now, did you consider -- just consider

22   as part of your evaluation here whether or not the

23   vacuum truck could have been a potential source of

24   ignition for this explosion?

Schloss (Morris)

Page 61

1          A     No.  I looked at -- you know, looked at

2    the devices, you know, looked at a piece of PVC pipe

3    and the hose and the duct and how they had it all

4    hooked together and, you know, you can generate a

5    spark --

6          Q     Okay.

7          A     -- with the --

8                MR. BROWN:  Excuse me.  Let him finish

9          his answers.  Please don't talk over him.

10               THE WITNESS:  You can generate a spark

11         in it.  Whether every other condition was

12         there at the time of the spark is really --

13         you know, again you are vacuuming something

14         in, so you are not generating a dust cloud.

15         You are sucking the dust cloud into it.  You

16         are vacuuming, you know, the -- you are

17         vacuuming, you know, where the PVC will flow

18         through any type of -- any type or any type

19         of material is going to cause a static

20         buildup.  PVC is not recommended to use for

21         that.  You know, yes, there was things that

22         were not safe that were going to generate

23         sparks or less safe than they could have

24         been, but was that, you know, a contributing

Schloss (Morris)

Page 60

1    your --

2              A      Yeah.

3              Q      -- prior investigations and otherwise,

4    that had they been following proper safety procedures,

5    you could have eliminated that as a cause; is that --

6    is that fair?

7              A      You can never eliminate a hundred

8    percent of the risk of doing something like that even

9    safely, you know, following every safety procedure.

10                   I have a chemical plant that I do work

11   in that had six people clean out a dust collector, a

12   welder strike an arc, and get burned across the faces.

13   You know, they met every one of their safety

14   requirements.  They had everything -- he had the

15   proper PPE on.  Luckily, it didn't burn his eyes, but

16   burned the hair off of his face.

17             Q      And in this case, did you evaluate all

18   of those things as well?

19             A      I was told about it.  I didn't evaluate

20   that.  It was for a customer that I was doing some

21   work with and an --

22             Q      No, no, in this case.

23             A      -- incident they talked about.

24             Q      I understand.

Schloss (Morris)

Page 59

1          A       -- cause that has to be considered in

2    my evaluation.

3          Q       And as part of that analysis, you have

4    to look at what equipment is being used?

5          A       Yes.

6          Q       And what potential there is for that

7    creating a -- an environment in which there could be

8    an explosion, correct?

9          A       Yes.

10         Q       And in this instance, in looking at

11   that and determining whether or not the equipment that

12   was being used for the cleaning of the aluminum duct,

13   did you reach any opinions as to whether or not that

14   was a potential cause?

15         A       It was potential cause of -- what they

16   were doing could cause an explosion, yes.  In terms of

17   if you isolate just that one part of it, yes, that

18   would --

19         Q       But that's part of your analysis?

20         A       Yeah.  If you isolate and say they were

21   taking a piece of PVC and putting it -- hooked to a

22   vacuum truck, putting it into aluminum, there is a

23   cause there that you are going to generate sparks.

24         Q       And based on your experience and

Schloss (Morris)

Page 58

1   was.  And you would agree with me, as we said before,

2   that you have to go through all possible causes and

3   eliminate them through scientific --

4           A       Yeah.

5           Q       -- methodology pursuant to NFPA 921,

6   correct?

7           A       Yes.

8           Q       Okay.  One of those causes could be the

9   actions of the workers in this case.  Could be,

10  correct?

11          A       It was generating sparks and --

12          Q       Okay.  Just -- will you agree with

13  me --

14          A       If you want me to stop right there,

15  that that's as far as you want me to go --

16          Q       I want you to answer my question right

17  now.

18          A       Okay.

19          Q       My question is:  The actions of the

20  plaintiffs, of the LCM employees, that is a potential

21  cause that has to be considered in your evaluation

22  of --

23          A       That is potential --

24          Q       -- this explosion?

Schloss (Morris)

Page 57

1   potential causes for the explosion.

2          Q     And can the failure to follow proper

3   safety procedures be a contributing cause to an

4   explosion?

5          A     How about rephrase the question?

6          Q     Sure.  Do you need to eliminate the

7   improper use of equipment or a failure to follow

8   necessary safety procedures as a cause of an

9   explosion?

10         A     I look at what they were doing as a

11  cause of an explosion.  How they picked them and the

12  decision that they made to pick those types of devices

13  doesn't really matter.  It's -- it's what was

14  physically being done at the time of the explosion.

15         Q     Okay.  And in this particular instance,

16  did you reach any opinion as to whether or not the

17  actions of the plaintiffs could have caused or

18  contributed to the explosion that occurred?

19         A     I don't -- in my professional opinion,

20  it didn't contribute to the explosion in the dust

21  collector.

22         Q     Not my question.

23         A     Okay.

24         Q     I understand what your final opinion

Schloss (Morris)

Page 56

1          Q      Well, in evaluating the potential

2    causes of an explosion, would one of the factors be

3    what the individuals were doing and whether or not

4    they were taking appropriate safety procedures before

5    you reach your final opinion?

6          A      Before -- I looked at what they were

7    doing, not what they were trained to do.  I looked

8    at --

9          Q      Okay.  Well --

10         A      -- devices they were using on the

11   cleaning when we did the field -- looked at it in the

12   field and looked at the devices they used and the hose

13   and tubing and things like that.  I looked at those.

14   I did not look at whether they were trained in -- they

15   may have been trained, and that's the decision they

16   made to use those equipment.  It doesn't necessarily

17   mean training equals results.

18         Q      And for the purpose of this question, I

19   am not asking about their training.  I am asking about

20   actually what they were doing and whether or not they

21   followed proper safety procedures, if that's a factor

22   that you would consider in evaluating the potential

23   causes for this explosion.

24         A      I evaluated what they were doing as

Schloss (Morris)

Page 55

1          Q       I understand.  But based on your

2    experience where you have evaluated explosions and you

3    have trained people on how to work around these types

4    of systems --

5          A       If I was contracted with LCM, I

6    would -- I would have evaluated their systems.  And if

7    they were deficient, I would have made the

8    recommendations to do the training.

9          Q       Did you read in the deposition

10   transcripts that the supervisor of the job was aware

11   that aluminum dust was the product in the system they

12   were cleaning?  Do you recall that?

13         A       Yes, that it was -- aluminum dust was

14   the product.  Whether he realized that aluminum dust

15   was combustible, I didn't see that.

16         Q       Okay.  And if he testified that he was

17   not aware that aluminum dust was combustible, do you

18   have an opinion as to whether or not that is a safe

19   procedure for LCM to proceed in cleaning the ducts at

20   Federal-Mogul?

21         A       Well, really, I am not here to evaluate

22   what LCM did, you know, and -- you know, and whether

23   they trained their people onto it.  I can only look at

24   the results of what that was.

Schloss (Morris)

Page 54

1    very strong about teaching of -- training of your

2    employees.

3              Q       And have you evaluated Federal-Mogul's

4    training procedures for its employees relating to the

5    aluminum dust ventilation system?

6              A       I have seen in Federal-Mogul's

7    combustible dust management guidance and the

8    management program where they talk about that.  I have

9    looked at what -- what's available at that point, but

10   no farther than that.

11             Q       Okay.  And what about LCM?  Did you

12   evaluate their --

13             A       No.

14             Q       -- procedures with respect to working

15   on an aluminum dust ventilation system?

16             A       No.

17             Q       And why not?

18             A       My understanding from reading the

19   depositions, I guess, was is that they were not

20   advised of the risk of aluminum combustible dust.  The

21   actual workers that were on the platforms were not

22   advised of combustible dust.  Again, whether LCM is,

23   you know, negligent at that point or liable for that

24   point, I am not here to talk about that.

Schloss (Morris)

Page 53

1          A        More likely than not.

2          Q        -- the function of the system, it was

3     able to handle those small explosions if it did occur?

4          A        But you don't design for small

5     explosions.

6          Q        That's not my question at this point.

7     I understand --

8          A        That's my answer.  That's my answer at

9     this point is is you can have explosions in anything

10    that's not going to result in the damage or even

11    triggering any, you know, explosion protection device.

12    It depends on what the dust is at that moment, what

13    the ignition source is at that moment, how much

14    dispersion you have at that moment, how much volume of

15    material you have.  All those things together are

16    going to determine how strong of an explosion do you

17    get.

18         Q        And would you agree with me that when

19    you are working with an aluminum dust ventilation

20    system, that whoever is working on that should be

21    aware of the risk of explosion in a system of that

22    type?

23         A        Federal-Mogul is required to teach

24    their people the risks around that.  I mean, NFPA is

Schloss (Morris)

Page 52

1   going to burn anything.  You can get exothermic

2   reaction of a bigger pile of dust, and it may catch it

3   on fire.

4        Q     I understand that.  I understand that,

5   but what -- if I understand what you have told me is

6   that there could have been prior exothermic

7   reactions --

8        A     There could have.

9        Q     -- in the bag house that resulted in

10  smoldering and then, for whatever reason, fizzled out

11  or stopped.

12       A     Yes.

13       Q     Because if it continued, we would have

14  seen something else occur.  There could have been

15  exothermic reactions that led to a small explosion

16  that went undetected because no one was in the area to

17  see it, hear it, or --

18       A     And not be --

19       Q     -- know it happened?

20       A     And not be strong enough to activate

21  the explosion vents.

22       Q     Right, okay.  So all I am saying is

23  that if that occurred, and you say that's a

24  possibility that it did occur, that in terms of --

Schloss (Morris)

Page 51

1    BY MR. MORRIS:

2              Q      I will adopt probability.

3              A      I have been in a plant that did shot

4    blasting, and I asked and said, Have you ever had an

5    explosion?  They said, No, but every now and then our

6    dust collector goes plump and the sides pulse out.

7    You know, have they been having explosions?  Yes.

8    They just didn't have one at a high enough degree that

9    was going to cause the thing to rip apart or, you

10   know, the vents to actuate.  You could have had

11   exothermic reactions for all those seven years that

12   would have went undetected and not cause an explosion.

13   It could have been the first time in seven years there

14   was an exothermic reaction.

15             Q      So based on that then, in terms of the

16   explosion containment of that, if that did occur, then

17   the system operated properly on those prior occasions,

18   correct?

19             A      No.  I mean, no, because it may not

20   have met -- it may not have resulted in an explosion.

21   It may not have resulted in a fire.

22             Q      Well --

23             A      You can have exothermic reaction of a

24   small pile of dust that's sitting there, and it's not

Schloss (Morris)

Page 50

1           things line up that's going to happen.  A lot

2           of bag houses explode for no apparent reason.

3           Why did they explode that day versus 40 years

4           prior to it?  You know, a lot of times there

5           is no real definite answer and say, well, it

6           blew up this day because of this and it blew

7           up this day -- you know, why didn't it do for

8           the last 40 years?  So it -- all those things

9           have got to come together at one time.

10

11   BY MR. MORRIS:

12           Q     And I understand that.  That's why I am

13   asking you -- you can't say to a reasonable degree of

14   engineering certainty as to why it did not occur on

15   any other prior day, even though the same conditions

16   may have been present?

17           A     It may have --

18           MR. BROWN:  Before you answer, form of

19           the question objection.  You asked about

20           engineering certainty, and that's certainly

21           not what the standard is.  It's probability.

22           MR. ALEXANDER:  Reasonable degree of

23           engineering probability.

24

Central Virginia Reporters (540) 380-5017

Schloss (Morris)

Page 49

1   opinion that the conditions for an exothermic reaction

2   and the other -- as an ignition source and the other

3   elements that would lead to an explosion were present

4   in that bag house?

5           A       Yes.

6           Q       All right.  And as you sit here today,

7   you cannot give an opinion with a reasonable degree of

8   engineering certainty as to why an explosion would not

9   have occurred on any day prior to this?

10          A       Well, it really depends on if the

11  equipment -- if the dust collector itself is running,

12  is operating.  You are moving warm air across the

13  steel, so you have less condensation.  If it's

14  running, you know, it's -- an explosion is a perfect

15  storm.  All those things have got to come together.

16          Q       Well, let me --

17                  MR. BROWN:  Excuse me, he is not

18          finished answering yet.

19                  MR. MORRIS:  I think he is going beyond

20          the question.  That's why -- so --

21                  MR. BROWN:  He is entitled to finish

22          his answer.

23                  THE WITNESS:  I think an explosion is a

24          perfect storm.  You have to have all these

Schloss (Morris)

Page 48

1   exothermic reaction then isn't dependent on additional

2   water.  Once it starts that reaction, it's going to

3   keep heating itself.  It's all self-contained.

4           Q       Okay.  Well, then, based on what you

5   have told us so far, when this ventilation system

6   started operating back in 2003 or so and you had those

7   conditions, are you saying that an exothermic reaction

8   very likely would have started back in 2003?

9           A       If you have the same situation that you

10  have there that day, that's very possible or, in my

11  opinion, would happen.

12          Q       Okay.  Well --

13          A       In my opinion, you would have that

14  same -- whether it would have resulted into a fire or

15  an explosion really would have been dependent on the

16  material in the bag house.

17          Q       I think that's obviously where we are

18  going to get to next is -- and, again, the ignition

19  source we come to is why on this day was there a

20  confluence of factors that occurred here.  And I am

21  not asking the question yet, but that's obviously

22  where I am going.

23                  Previously, based on your testimony and

24  based on the conditions that were there, is it your

Schloss (Morris)

Page 47

1   set it down, pretty soon the water starts condensing

2   on the outside of it and going -- running down the

3   sides of your Coke can.  Okay.

4              Take the same Coke can when it's 20

5   degrees outside, and the water does not form because

6   the temperature of the Coke is higher than the dew

7   point temperature of the air around it.

8              Reversing that and putting the moisture

9   on the inside of the bag house in a cold skin

10  temperature with steel that has very rapid temperature

11  exchanges, you are going to have a -- the bag house is

12  going to cool very quickly down to that outside

13  temperature and then the dew point, and you are going

14  to start having sweating on the inside of that bag

15  house.  It can sweat on the bags.  It can sweat on the

16  sides, in the hoppers.

17       Q     If -- if the bag house is shut down for

18  an extended period of time, for more than the up to

19  hour and a half that we have here, let's say 24 hours,

20  48 hours or longer, does that affect the -- that

21  situation with the condensation?

22       A     Once the condensation is into the

23  material, in the case with metal, as in aluminum, you

24  are going to start exothermic reactions.  That

Schloss (Morris)

Page 46

1          A     Depending on the -- one, if the bag

2    house is operating, and two is is what the outside

3    conditions are.  If the bag house is not operating

4    or -- or if it's cold outside, depending on what the

5    outside temperature and the dew points are, you will

6    start to condense on the inside of the bag house.

7                A lot of processes that are in

8    metal-producing plants, you insulate the bag house to

9    keep that transfer from happening so that you don't

10   end up with the skin temperature dropping below the

11   dew point temperature and condensing water into it.

12         Q     Okay.  And what if -- okay.  Is there

13   any similar type of situation that would occur when

14   the temperature outside is hotter than it is inside?

15         A     No.

16         Q     Okay.  So the difference in dew

17   point -- you could have a difference in dew point --

18         A     Two things.  One is the outside

19   temperature, which is going to determine what the

20   temperature of the steel in the bag house is and what

21   your inside humidity is on the -- on the bag house.

22                To use an example, if you have a Coke

23   can in the middle of the summertime, and the Coke is

24   40 degrees inside the can, you walk outside and you

Schloss (Morris)

Page 45

1    have any effect on the amount of -- or will that have

2    any effect on the dew point for the interior of the

3    Federal-Mogul plant?

4         A    Over time it would.  In that amount of

5    time, I don't think you would see -- my personal or my

6    professional opinion is you wouldn't see much of a

7    change in it.  Again, too, by having that

8    water-producing equipment, it was producing water

9    while it was running as well.  So the dust collector

10   would have been seeing that moisture over an extended

11   period of time.

12        Q    So, again, that -- whenever it was

13   operating over the seven years before, you are

14   indicating that there would have been moisture in the

15   air that was being transported into the bag house?

16        A    Yes.

17        Q    Is that correct?  Okay.  And that the

18   moisture that's being transported, if it's shut down

19   for a short period of time, such as a half an hour to

20   an hour and a half, would have no effect on the

21   moisture being transferred to the bag house?  That's a

22   bad question.  Let me withdraw that.  Let me ask

23   another question.  The -- the water vapor that gets to

24   the bag house, what happens to it when it's in there?

Schloss (Morris)

Page 44

1          Q       -- just the production line that was

2     for the aluminum dust, that created the aluminum dust?

3          A       My understanding was -- again, I didn't

4     check to see if the rest of the plant was running.  My

5     interest was in the lines that were served by that

6     dust collector.  And if you were running the process

7     -- if you were running the dry dust collectors, you

8     would have to be running the wet dust collectors to

9     handle another part of this same production line.  So

10    my assumption was is that since both of them were

11    running at that -- required to run, that it would be a

12    requirement that both the dust collector and the wet

13    dust collector would be running.  And, again, that's

14    based on how the system is currently designed or --

15    and what was specified in Federal-Mogul's design

16    documents.

17         Q       Okay.  And based on your prior answer,

18    it's your understanding that that particular line, the

19    aluminum dust ventilation system, including the water

20    vapor-producing equipment, had been shut down between

21    a half hour and an hour and a half before LCM started

22    its work?

23         A       Yes.

24         Q       The fact that it's shut down, does that

Schloss (Morris)

Page 43

1          Q      Okay.  Have you done any testing or

2     created any models to determine the extent to which

3     that particular equipment in the Federal-Mogul plant

4     would raise the dew point or increase the relative

5     humidity for the plant air?

6          A      No, but I know how to do it.  I do it

7     as part of my business.  I just did not do it in this

8     case.

9          Q      So, as you sit here today, can you

10    provide any basis for -- withdrawn.  Can you tell us

11    what the dew point was for the Federal-Mogul plant

12    inside the plant on December 31 of 2010?

13         A      No.

14         Q      Do you know whether or not the water

15    vapor-producing equipment was operating at

16    Federal-Mogul on that day?

17         A      I have been told that it was.

18         Q      Okay.  Told by who?

19         A      Again, when I asked the question was

20    the plant operating, they said up to the time when it

21    was shut down to start cleaning the ductwork.

22         Q      And when you say the plant being shut

23    down, is that the entire plant or --

24         A      No, the process.

Schloss (Morris)

Page 42

1    vapor into the plant.

2            Q      Is there any way to test that?

3            A      Yes.

4            Q      How would you test that?

5            A      You can test versus the outside.  You

6    take a measuring device that's going to measure

7    temperature and wet-bulb temperature or temperature

8    and absolute humidity.  There is different devices

9    that you can tell how much moisture is being added.

10           Q      And for this case, did -- did you do

11   any type of model or any type of testing -- well,

12   withdrawn.  Let me ask you this first:  Are the water

13   vapor-producing equipment that you referred to still

14   operating at Federal-Mogul?

15           A      The understanding I had was the plant

16   was running at -- up until the time it was shut

17   down --

18           Q      I'm sorry to cut you off.  Not that

19   day.  I am talking about after the explosion and when

20   you got the request to do your review in this case.

21   Do you know, as of today or at any time since you have

22   had it, whether or not that equipment is still being

23   used?

24           A      I don't have any direct knowledge.

Schloss (Morris)

Page 41

1    were all installed at the same time for this

2    production line, would mean there would be vapor --

3    free water vapor in the air.

4           Q      Okay.  And that would be for the entire

5    plant?

6           A      Well, I mean, you would have just in

7    the -- I looked at just the area of where they were

8    doing the production side of it.

9           Q      Okay.  With respect to the water

10   vapor-generating equipment, okay, does that raise the

11   relative humidity of the air for the entire plant?

12          A      Yes.  Relative humidity is a number

13   that says just exactly what it is.  It's relative to

14   how much moisture does it have versus how much

15   moisture can it have.  So what it was actually doing

16   was raising the entire dew point of the plant.

17          Q      Didn't you do any calculations for the

18   extent to which the dew point was raised in the

19   plant --

20          A      No.

21          Q      -- as a result of this equipment?

22          A      Other than my experience with wet dust

23   collectors is you are putting water vapor into the

24   plant.  You have got employees that are putting water

Schloss (Morris)

Page 40

1           Q       Or whether it was actually done?

2           A       That was outside of the scope of what I

3    was looking at.

4           Q       You mentioned specifically water

5    vapor-generating equipment in the plant?

6           A       Yes.

7           Q       Where did you get information about

8    that subject?

9           A       From the proposal -- or from

10   Federal-Mogul's specs on the original project, it

11   required two dry dust collectors and then two wet dust

12   collectors for the process, a different part of the

13   process.  A wet dust collector works by either

14   spraying water into the air to take out the

15   particulate or by running the air through a tank and

16   through a bath to remove the particulate as well.

17          Q       Okay.

18          A       There was talking about -- then their

19   specifications also had a sludge-handling equipment,

20   which meant what was coming off of the dust collector

21   is going to be a mixture of both particulate and water

22   that's going to come out wet to be dried.

23                  So just the inclusion of those two

24   pieces of equipment in the general area, because they

Schloss (Morris)

Page 39

1    procedures of the workers?

2            A       When I teach it and teach safe

3    operation of dust collectors, lockout/tagout is a big

4    issue in it.

5            Q       Okay.  And are you familiar that with

6    lockout/tagout that it's the individual working on the

7    equipment that's responsible for making sure that's

8    done?  Are you familiar with that standard?

9            A       Yes.  And I don't know who locked out

10   what or how many locks were on it.

11           Q       Okay.

12           A       Or what Federal-Mogul's internal

13   procedures are or requirements.

14           Q       Let's see.  Now, this may be similar,

15   but the operational condition of the plant, I guess

16   that -- we are talking about the same thing, either --

17   whether that's the machines or the dust collection

18   system.  And, again, you were just provided the

19   information that there was a lockout and tagout, but

20   you are not -- you don't have any information as to

21   whether or not that was checked by the plaintiffs?

22           A       No.

23           Q       Or who did it?

24           A       That was outside the scope --

Schloss (Morris)

Page 38

1          Q       -- and were told either by plaintiffs'

2     counsel or --

3          A       Either in deposition or that it was

4     locked out and tagged out.  That was also part of

5     LCM's proposal is that the lockout/tagout would be by

6     Federal-Mogul.

7          Q       And while we are talking about

8     lockout/tagout, are you offering any opinions with

9     respect to the safety procedures followed by the

10    plaintiffs or LCM in their work here?

11         A       No, other than I know, you know, safe

12    work around the -- around combustible dust.  I teach

13    it.  I do seminars on it.

14         Q       So, for example, Mr. -- I want you to

15    assume Mr. Hodges testified at his deposition that he

16    did not check to see whether or not the Federal-Mogul

17    equipment was locked out or tagged out or whether the

18    bag house -- the dust collecting system had been

19    locked out and tagged out.  You are not here to offer

20    any opinion as to whether that's proper procedure or

21    otherwise; is that correct?

22         A       I have no information on that.

23         Q       Okay.  Is that something that would be

24    within your expertise, to evaluate the safety

Schloss (Morris)

Page 37

1    I have seen between a half hour and an hour and a

2    half.

3           Q       Do you remember where you got that

4    information from?

5           A       No.  It could have been provided by

6    counsel.

7           Q       In what form?  By --

8           A       Just asking a question and statement.

9    Or it may have been in one of the depositions.  I am

10   not sure.

11          Q       But did you do anything to verify that

12   other than either being told by counsel or maybe

13   reading it in one of the depositions?

14          A       No.  I didn't contact the plant or

15   anybody at that point.  I requested -- I mean, I

16   requested that information, and that's what I was

17   told.

18          Q       I guess the other one similar to that

19   was whether or not the dust collector system was

20   operating at the time, correct?

21          A       Yes.

22          Q       Okay.  And that's information that you

23   asked was it on at the time --

24          A       I have seen that --

Schloss (Morris)

Page 36

1    go through and eliminate the potential sources of

2    ignition, correct?

3              A       Yes.

4              Q       And when you do that, do you have a

5    process whereby you go through eliminating the least

6    likely to the most likely?  Or do you go most likely?

7    Do you have a process to do that?

8              A       I look at what the impact of each one

9    of them would be and whether that was available, you

10   know, that -- like say the process equipment, whether

11   it was running or not.  If it's not running, then

12   that's -- eliminates it as a source.  I look through

13   each one of them equally to make that decision.

14             Q       So based on the list that you gave me,

15   it's fair to say that there were some that you easily

16   eliminated as a source of ignition?

17             A       Yes.

18             Q       First being the Federal-Mogul equipment

19   because, based on the information provided to you,

20   that equipment had been shut down that day, correct?

21             A       Uh-huh, yes.

22             Q       And do you know how long it had been

23   shut down for prior to the work on the ductwork?

24             A       I was told anywhere from a half hour --

Schloss (Morris)

Page 35

1           A       If they were -- if there was a reason

2    as a flashlight breaking or any source -- external

3    source of electrical spark.

4           Q       Okay.

5           A       If the dust collectors were operating,

6    which I am told they were not, that they were

7    electrically locked out.  Again, the type of material,

8    the aluminum dust.

9           Q       Okay.  Anything else?

10          A       The condition of settling in the

11   ductwork of the aluminum dust.  You know, if there was

12   an ignition source from the process equipment, which I

13   am told was locked out.

14          Q       When you say process equipment, you

15   mean the Federal-Mogul equipment?

16          A       The Federal-Mogul equipment, not the

17   dust collection.  NFPA will tell you ignition sources

18   are free.  You can never design all the ignition

19   sources out of a system.  You could have a short

20   circuit.  You can have lightning come in on it.  There

21   is a lot of different sources of ignition.

22          Q       Understood.  And --

23          A       Exothermal.

24          Q       Sure.  And part of your process is to

Schloss (Morris)

Page 34

1    documents, did you have various possible causes that

2    you were considering?

3              A      Yes.

4              Q      And can you tell me what causes you

5    were looking at or what sources of ignition you were

6    looking at as the cause of the explosion?

7              A      When I looked at the entire system --

8    and, again, taking the video out of it, I looked at

9    the role of what the workers would have been doing.

10             Q      When you say the workers, who are you

11   referring to?

12             A      The three individuals that were

13   injured, the two --

14             Q      The LCM employees, the plaintiffs, not

15   the Federal-Mogul employees?

16             A      No, the LCM employees.

17             Q      Okay.  So you look at what were the

18   plaintiffs doing.

19             A      What were the weather conditions, what

20   was the operational condition of the plant.

21             Q      Okay.

22             A      Was there water-generating or vapor --

23   water vapor-generating equipment in the plant.

24             Q      What else?

Schloss (Morris)

Page 33

1  operating.  Is that fair?

2          A       Based on that information, the

3  information provided, yes.

4          Q       Based on the information that you have

5  had to reach your opinion, that's -- that's the key to

6  determining what the cause of this explosion was,

7  correct?

8          A       Yeah.  Yes.

9          Q       Okay.  And in determining what the

10  ignition source was, that would also help to determine

11  where the origin of the explosion was as well,

12  correct?

13          A       Yes.  Again, looking at the video --

14          Q       Well, there is no question before you.

15  There is no question before you, so --

16          A       That could be carrying off from the

17  last one, so...

18          Q       Okay.  So in terms of your

19  investigation of this incident, is it fair to say that

20  you came to a point where you had to focus on what was

21  the source of ignition for the explosion on December

22  31?

23          A       Yes.

24          Q       And at your initial review of the

Schloss (Morris)

Page 32

1    was no.

2              Q       Okay.  So -- and again just to go back,

3    so the dispersion of the dust cloud was a condition

4    that would have been present on any day prior to this

5    as well, correct?

6              A       Yes.

7              Q       Okay.  Containment.  When you say

8    containment, what are you referring to?

9              A       The dust collector itself.

10             Q       And when you say the dust collector, is

11   that --

12             A       The enclosure of the bag house.

13             Q       So that's not the 55-gallon drum that's

14   at the bottom?  Or is that part of it?

15             A       It could be.  It could be.  If it's not

16   isolated, that's included in that volume as well.

17             Q       Okay.  And, clearly, that containment

18   system had been present since the system had been

19   installed and operated?

20             A       Yes.

21             Q       So the only -- only factor that we have

22   to consider is what's the source of ignition in terms

23   of what's different on this day to cause the explosion

24   than any other day that this system has been

Schloss (Morris)

Page 31

1   is present on a daily basis in this system?

2          A      Yes.  And a dust collector is a perfect

3   product classifier.  The heavy particles fall down

4   onto the -- into the hopper.  The light particles go

5   up onto the bags.  The filtration is actually provided

6   by a dust cake on those bags.  It's like your home

7   furnace filter.  About the time that you look at it

8   and it's all dirty, it's finally starting to work.  So

9   at that point you -- using the dust is actually what's

10  providing the filtration efficiency on the dust.  The

11  dust collector in normal operation is going to pulse

12  off that dust down into the -- into it, but, also, a

13  dust collector that's shut down will experience dust

14  falling off of the bags over a period of time.

15         Q      So fair to say that the bags don't get

16  rid of everything while it's on?

17         A      And they don't clean while it's --

18  while it's -- they don't completely clean when you

19  turn it off.

20         Q      Okay.

21         A      You can also end up with buildup on the

22  walls of the dust collector.  And I think in one of

23  the depositions it was asked had the dust collector

24  ever been cleaned or the bags changed, and the answer

Schloss (Morris)

Page 30

1    That's something that is present at all times and had

2    been present in this system every day, correct?

3              A    Yes.

4              Q    Okay.  Fuel.  In this case, what, in

5    your opinion, was the fuel for the explosion?

6              A    The aluminum dust.

7              Q    And, again, the aluminum dust was

8    something that had been present in the system since it

9    started operating some seven years earlier, correct?

10             A    Yes.

11             Q    And was there any difference on this

12   day in terms of the characteristics of the aluminum

13   dust in the system?

14             A    I -- without, you know, analyzing the

15   dust, I would assume that the same equipment and their

16   process is the same day after day, and the dust is

17   going to be the same every day that goes into it.  I

18   have no information of a process change that was made

19   prior to this or that had been made in the seven

20   years.

21             Q    All right.  I am going to skip over

22   ignition source for just a second because I know you

23   already mentioned the exothermic reaction there.

24   Dispersion of the dust cloud, is that a condition that

Schloss (Morris)

Page 29

1              In the -- by having a dust collector

2    that's handling combustible metals, especially, it's

3    important that the dust collector not have

4    condensation on the inside of the dust collector.

5              Based on the weather data that I

6    reviewed as well as the fact that the plant has wet

7    dust collectors that will be adding moisture to the

8    air on the inside of the plant, that the probability

9    -- or, in my opinion, is is that the dust collector

10   was condensing.  The material that was in there had a

11   exothermic reaction.  The exothermic reaction caused

12   the explosion.  And all of those things are

13   independent of what they were doing in the ductwork or

14   what somebody was doing on the other end of the plant.

15        Q     Okay.  Let's -- well, let's go through

16   what was present on that day.  And I will ask this in

17   a -- I may ask this a couple ways.  So if I say it in

18   a confusing way, please let me know.

19        A     Okay.

20        Q     I will rephrase the question, or we

21   will repeat it back so that we make sure that we are

22   talking about the same thing.

23              You said five things need to be present

24   for an explosion to occur.  The first one is oxygen.

Schloss (Morris)

Page 28

1   the explosion occurred on that day?

2          A      Explosions don't really pick what day

3   they want to happen.  It's a coming together of, you

4   know, multitude of things all at one time.  Nobody

5   gets up and schedules one for 10 o'clock in the

6   morning.  So it could have -- it could have happened

7   that day, and it could have went 40 more years without

8   running.

9          Q      Okay.  Well then --

10         A      The length of time really doesn't --

11  the length of time that the equipment has been running

12  does not make it any safer.  I have a lot of customers

13  that say, well, we have run 20 years without an

14  explosion.  Say, well, yep, you ran 20 years without

15  an explosion, and you had one.  What happened in the

16  first 20 years.

17         Q      Well, I guess that's where I am going

18  next is, then what are the factors that need to be

19  present or were present on December 31, 2010, that, in

20  your opinion, brought about this explosion?

21         A      To have an explosion, you need five

22  things:  You need oxygen, you need fuel, you need an

23  ignition source, you need dispersion of the dust

24  cloud, and you need containment.

Schloss (Morris)

Page 27

1    know, based on all of those things and where I

2    determined the explosion originate, it would have made

3    no difference if they were working on it or not

4    working on it.

5             Q       Okay.  Why is that?

6             A       Because I don't think they had -- in my

7    professional opinion, the explosion didn't originate

8    at the employees.  It originated in the dust

9    collector, and there was nothing that the employees

10   were doing that was going to change that fact or

11   contribute to it in the dust collector per my

12   findings.

13            Q       All right.  And this ventilation system

14   had been operating for approximately seven years --

15            A       Yes.

16            Q       -- prior to this day?

17            A       Uh-huh.

18            Q       Okay.  Were there any conditions that

19   were present on December 31, 2010, that were different

20   than any other day that it had been operating up until

21   then?

22            A       I don't have that information.

23            Q       Okay.  Do you have an opinion with a

24   reasonable degree of engineering probability as to why

Schloss (Morris)

Page 26

1           Q       Okay.  If Mr. Hodges, Mr. Bonds, and

2    Mr. Spangler were not present cleaning the ductwork at

3    Federal-Mogul on December 31, 2010, would that

4    explosion have occurred?

5           A       Could that explosion have occurred, or

6    would that --

7           Q       I am asking first would that.

8           A       It's possible that the explosion could

9    have occurred based on the information that I have

10   saw.  The role that the employees played in that

11   decision -- or in that explosion, it's -- I would say

12   based on what I found, it could have exploded without

13   them being there.  That's my -- my professional

14   opinion is, is from what I saw and working on

15   different dust collectors like that that there's a

16   possibility that that could happen.

17          Q       Okay.  So to put it another way, I

18   suppose -- well, let me go into another question with

19   that.  Do you have an opinion as to whether or not any

20   of the actions taken by the plaintiffs that day in

21   cleaning the ductwork caused or contributed to the

22   explosion occurring specifically on that day?

23          A       From my analysis of the explosion and

24   of the equipment and the videotape and the -- you

Schloss (Morris)

Page 25

1    that correct?  Are those two different things, or is

2    that the same?

3              A     Yes, it's two different things.

4              Q     All right.  Let me ask you this

5    question:  In -- I understand that this was a -- the

6    event took place on December 31 of 2010, correct?

7              A     Per the information that I have been

8    handed, yes.

9              Q     Okay.  And that was at the

10   Federal-Mogul plant in Blacksburg, Virginia, correct?

11             A     Per the information that I have been

12   provided, yes.

13             Q     So my question to you is:  Would this

14   event have occurred on December 31, 2010, whether or

15   not the plaintiffs were at the Federal-Mogul plant

16   that day?

17             A     Can you clarify?  I don't understand.

18             Q     Sure.  We know an explosion occurred on

19   that day, and we know that the three plaintiffs were

20   there for LCM cleaning the ductwork.  My question is:

21   Was -- would that explosion have occurred on December

22   31, 2010, whether or not the plaintiffs, as LCM

23   employees, were there cleaning the ductwork that day?

24             A     Try one more time.

Schloss (Morris)

Page 24

1    been a component in making those decisions.  But

2    looking at the actual equipment that as it was

3    destructed, it wouldn't have changed my opinion of the

4    designs.

5           Q     Okay.  And, again, I am trying to

6    separate two parts out here, because part of your

7    opinion seems to be that the ventilation system

8    itself -- that you were reviewing its design at the

9    outset.

10          A     Uh-huh.

11          Q     Whether it was capable of performing

12   the functions that it was intended to do at that time;

13   is that correct?  That's one aspect?

14          A     Based on the information that was

15   available.

16          Q     Okay.

17          A     Publicly available at that time.

18          Q     All right.  The second thing that you

19   are referring to here is looking at the event of the

20   explosion itself.

21          A     Yes.

22          Q     And whether or not the component parts

23   that had been selected as part of that design were

24   appropriate based on that event and what occurred; is

Schloss (Morris)

Page 23

1    information to make a determination is, was the

2    information that would have been available at the time

3    that the equipment was selected, if that was -- if the

4    equipment was selected for that -- you know, based on

5    that information or also reviewing the explosion is

6    did a higher pressure or a higher Kst did the

7    equipment experience in the explosion.

8            Q      Is it fair to say that if you had that

9    information, you could give a more precise or a more

10   certain opinion with respect to the design of the

11   ventilation system?

12           A      It would have been part of making the

13   analysis of it, but it wouldn't have changed the

14   outcome of my opinion.

15           Q      Okay.  Why not?

16           A      Because the equipment -- the

17   destruction of the equipment indicated that the -- in

18   the case of the dust collector, that the vent weren't

19   properly -- or weren't large enough to release the

20   vents, and the dust collector tore itself apart or had

21   structural failure.  In the case of the back blast

22   damper, it structurally failed due to the pressures.

23                  Again, that doesn't -- changing --

24   changing knowing what the dust going into would have

Schloss (Morris)

Page 22

1    the application.

2            Q        And since that information is not

3    available, does that have any impact on your certainty

4    or your opinion as to what you have expressed in your

5    report here?

6            A        It has had an impact in what was the

7    final -- or the initial design information to -- and

8    by -- let me get my thoughts together here.

9            Q        Well, let me see if I can ask it more

10   specifically.  You said one of the things that you

11   were reviewing was the design of the system itself.

12   How would knowing the composition of the dust affect

13   your opinion in this case on the design of the system?

14           A        It would determine if the dust

15   collection equipment and the dust collection system

16   was capable of withstanding the pressures and the

17   selection of the equipment would react fast enough for

18   the type of dust that was -- it was asked to filter.

19           Q        And without that information, were you

20   able to reach an opinion as to the design of the

21   system?

22           A        Based on the destructive forces that I

23   observed on the equipment -- and, again, this is based

24   on -- this is what I do all the time.  Backed into the

Schloss (Morris)

Page 21

1              A        Minimum ignition energy that it would

2      take to ignite it, minimum explosive concentrations,

3      things that you would use to analyze the dust and the

4      proper selection of the equipment.

5              Q        For the ventilation system itself?

6              A        For the ventilation system itself,

7      including the dust collector, ductwork.

8              Q        And why would that be important to your

9      final opinion?

10             A        To determine the cause of the

11     explosion; determine the severity of the explosion in

12     the dust collector, in the backdraft damper, and in

13     the ductwork; to determine the origin of the explosion

14     as well as severity of the dust cloud that was -- or

15     the gasses that were given off by it.

16             Q        And, again, so you are referring to

17     dust that was collected in the ductwork itself as well

18     as the dust that was present in the bag house at the

19     time?

20             A        Yes.  The reason that is is to properly

21     select the equipment and the explosion protection, you

22     have got to know the numbers of the Kst, which is rate

23     of pressure rise over rate of time, and pressure

24     maximum to decide the selection of the equipment for

Schloss (Morris)

Page 20

1          Q       And can you explain to me what you mean

2     by dust testing of the aluminum dust?

3          A       The dust test would have been provided

4     by a company similar to Chilworth, Fenwal, where they

5     actually run the chemical characteristics and have --

6     explode the dust to measure what the rate of rise of

7     the pressure over time, delta P over delta T, which is

8     used in calculating Kst, and also Pmax, which is the

9     maximum pressure involved in the explosion.

10                 I was told that the dust had not been

11    tested prior to that, that there was dust that --

12    there was dust samples available.  But due to the time

13    since the explosion, unless it was really tested prior

14    to the explosion, anything after that point wouldn't

15    give you an accurate representation of what was in the

16    dust collector or the ductwork at that time.

17         Q       Okay.  And, again, sometimes I will

18    need to go and clarify just so that I understand.

19    Your interest in finding out was what the components

20    were of the dust that was described as being in the

21    vents at the time of the explosion, correct?

22         A       Both components and the chemistry of

23    it, what the explosive values of the material was.

24         Q       All right.

Schloss (Morris)

Page 19

1          A        No.

2          Q        Have you had any personal interviews

3    with any other LCM employees, such as Danny Collins?

4          A        No.

5          Q        Prior to preparing your report for

6    plaintiffs' counsel, did you request any additional

7    information that was not provided to you?  You know,

8    let me withdraw that and ask it another way.  Have you

9    asked for any information from plaintiffs' counsel

10   that has not been provided to you?

11         A        There is nothing that I have asked for

12   that's not been provided to me.  To give you a more

13   full answer, on the -- what I reviewed and the

14   information is in my report on Pages 7, 8, 9, and 10.

15   So that's more of a total listing of what I received

16   and what I reviewed.

17         Q        And I understand that.  I understand

18   what you did use.  I am just asking if there was

19   something that you asked for that you were told either

20   it doesn't exist or we don't have it or we will get it

21   for you, anything like that.

22         A        The only information that I asked for

23   that was -- that I was told was not available was dust

24   testing of the aluminum dust prior to the explosion.

Schloss (Morris)

Page 18

1    from witnesses who were present at the time of the

2    event?

3             A       The reports that I see from OSHA are

4    usually at the citation level, not at the

5    investigation level.

6             Q       Would you agree with me that having

7    statements from witnesses who were present at the time

8    of the event is important in a full evaluation of the

9    causes of an event such as this?

10            A       From the information that I have seen

11   and the depositions that I have read, I felt those

12   were the key players in the evaluation of the

13   explosion and didn't require any additional workers or

14   any additional information.

15            Q       Have you ever read any statements from

16   any Federal-Mogul employees who were present at the

17   time of the explosion?

18            A       I am not sure if David Garard was at

19   the -- present at that time or not.

20            Q       And David Garard is the only

21   Federal-Mogul employee whose statements --

22            A       That I can recollect right now.

23            Q       Have you ever had any personal

24   interviews with any of the plaintiffs in this case?

Schloss (Morris)

Page 17

1    provided.

2            Q       Did you have any reports regarding the

3    investigation of the explosion?

4            A       By?

5            Q       By the Blacksburg Fire Department, by

6    OSHA, by any governmental agency.

7            A       I have looked at the -- and this was

8    when we got in to do the site visit and the analysis

9    of the -- of all the information, I looked at the fire

10   department's evaluation.  Did not look at OSHA's

11   evaluation.

12           Q       Is there some reason you have not

13   looked at the OSHA report?

14           A       No.

15           Q       Would that contain information that

16   would be helpful to you in reaching a hypothesis or an

17   opinion in this matter?

18           A       I don't feel that OSHA would have

19   anything in their report that would be more than what

20   was provided by the other information that I got.

21           Q       Are you familiar with OSHA reports that

22   are done in situations such as this?

23           A       Yes.

24           Q       Do those reports contain statements

Schloss (Morris)

Page 16

1   first time?

2           A       I think August, early August.

3           Q       Of this year?

4           A       Of this year.

5           Q       So between November of 2011 and August

6   of 2013, there was a continuous stream of information

7   being provided to you by the plaintiffs' counsel?

8           A       Yes.  I mean, not every day did I

9   receive something on it, but it may go two or three

10  months and I would review something, and then maybe a

11  month later I'd end up reviewing something.

12          Q       Okay.  Prior to your first visit to the

13  site in August of 2013, at that point -- prior to that

14  time, what written information or documentation did

15  you have other than what we have already discussed,

16  which is the video, the deposition transcripts of the

17  plaintiffs and the Federal-Mogul employees, and the

18  design --

19          A       Design information.

20          Q       -- information and the exhibits from

21  the depositions?

22          A       The order information from -- for

23  Dustex, the order information for Kirk & Blum, all

24  relative documents about the equipment of what was

Schloss (Morris)

Page 15

1    in the system, make sure that it was -- met the

2    function required, NFPA requirements, or the safe

3    operating.

4            Q       You said earlier independent review of

5    all the information.  At this point in time, all

6    you've told me that you have received were the

7    depositions of the plaintiffs and the Federal-Mogul

8    employees and the exhibits with those depositions.

9            A       I guess the --

10           Q       Is that correct?

11           A       The initial part of it, the initial

12   contact would be to do that independent review.  As

13   the depositions came in and requested different

14   information that was provided, I reviewed that

15   information.  But the scope of what my direction was

16   was to take a look at the total system and analyze the

17   system and its components.

18           Q       Is it fair to say that in order to

19   analyze the system and its components, then all you

20   needed was the deposition exhibits and the design

21   plans that you referred to?

22           A       And also to visit the site, look at the

23   equipment.

24           Q       When did you visit the site for the

Schloss (Morris)

Page 14

1    specific aspect of the incident?

2         A    No.

3         Q    Were you asked the question like we'd

4    like to hear your opinion on what the cause of the

5    explosion was or some other aspect of this?

6         A    No.  What I was asked for was an

7    independent review of all the information with really

8    no pressure to say here is what your answer needs to

9    be in the end of it.  A big part of my business is

10   providing that for manufacturing companies, is review

11   what they have to see if it's in compliance or where

12   they are deficient.

13        Q    And that's where I was going, whether

14   they were asking you to evaluate, for example, the

15   ventilation system that was in place to determine

16   whether or not it was in compliance, if that was the

17   request, or if the request was can you provide us your

18   opinion on the function of the various components of

19   the system in the explosion that occurred.

20        A    In both of those.  In our business when

21   we do an analysis, we look at each piece of equipment.

22   If I was called into a plant to look at their dust

23   collection system to see if it was in compliance, we

24   would look at the total system and then each component

Central Virginia Reporters (540) 380-5017

Schloss (Morris)

Page 13

1   when I received any of the information.  It's just

2   been ongoing.

3            Q       Other than the deposition transcripts,

4   in terms of your initial review of the case, was there

5   anything else that you referred to when you first were

6   retained?

7            A       No.

8            Q       Did there come a point in time that you

9   requested additional documents from plaintiffs'

10  counsel for your review?

11           A       Yes.

12           Q       What documents did you request?

13           A       Just design information from Dustex,

14  and I think it's more of the -- along the line of

15  exhibits that were in -- or information that was in

16  the depositions.

17           Q       And again referring to the depositions

18  of the plaintiffs and the Federal-Mogul employees?

19           A       Yes.  Again, the exact timeline of when

20  I received what, I could go back and reconstruct it

21  maybe from e-mails or telephone conversations, but I

22  don't really recollect when that was -- happened.

23           Q       When you were first retained to review

24  the case, were you asked to focus your review on any

Schloss (Morris)

Page 12

1    you found news reports about the explosion that

2    occurred at the Federal-Mogul plant as part of your

3    ongoing professional duties?

4            A       Yes.

5            Q       Did there come a point in time that

6    plaintiffs' counsel provided you with a factual

7    background regarding their clients and/or the

8    incident?

9            A       Yes.  At what time or the dates, I am

10   not sure.

11           Q       I'm more interested in what -- what

12   information was provided to you.

13           A       Started -- the best of my memory, it

14   started with depositions.

15           Q       Okay.  And depositions of?

16           A       Depositions of the employees that were

17   injured, depositions from Federal-Mogul's employees.

18           Q       Did you receive those -- were they

19   transcripts of the depositions?

20           A       Yes.

21           Q       And did you receive those before you

22   received any other written materials relating to this

23   incident?

24           A       I really don't have a good timeline on

Schloss (Morris)

Page 11

1    for this case?

2              A       No.

3              Q       Was that done by another meeting, a

4    phone call, a letter?

5              A       Best I can remember, another phone

6    call.

7              Q       Were you given any additional

8    information about the case through that phone call?

9              A       No, just to discuss the -- whether I

10   was interested in working with them on the case.

11             Q       And was there a general discussion of

12   what the case was about at that time?

13             A       Yes.

14             Q       Can you tell me what you recall about

15   that conversation?

16             A       I also knew from news reports what the

17   case was about as well.

18             Q       And had you looked at the news reports

19   on your own or at the request of Mr. Brown and

20   Mr. Johnson?

21             A       On my own in that I do a lot on web

22   sites and with the chemical safety board.  I am not

23   sure where it would have come up at.

24             Q       Okay.  And again so that I am clear,

Schloss (Morris)

Page 10

1   case that you were working on?

2           A      Uh-huh.

3           Q      And while you were having that meeting,

4   there was a discussion about this case?

5           A      Yes.

6           Q      And after viewing the video, did you

7   offer any opinions or information on what further

8   documents or data you would need?

9           A      No, not at that time.

10          Q      All right.  Did there come a point in

11  time that you were retained to review additional

12  documents in this case?

13          A      Yes.

14          Q      When was that?

15          A      I am not real sure of the dates, but

16  would have been within the last year.

17          Q      You said the case was first mentioned

18  to you in November 2011?

19          A      Yes.

20          Q      So sometime during 2012 was when you

21  were contacted, or was it in 2013?

22          A      I don't recollect.

23          Q      Do you have any documents that would

24  refresh your recollection as to when you were retained

Schloss (Morris)

Page 9

1          A       I think November of 2011.

2          Q       Who was it that contacted you?

3          A       Mr. Brown and Mr. Johnson.

4          Q       Was that in person or by phone?

5          A       In person.

6          Q       And was that here in Roanoke or at your

7    offices in South Carolina?

8          A       It was in Hilton Head while I was on

9    vacation.

10                 MR. ALEXANDER:  Only you?

11

12   BY MR. MORRIS:

13         Q       Prior to that meeting, had you received

14   any contact, any documents, any information about the

15   case?

16         A       No.

17         Q       Can you tell me what information you

18   were provided about the case at that first meeting.

19         A       We were -- just reviewed video of the

20   explosion, discussed just the video, and that was the

21   extent of it.  The main part of the meeting was for a

22   different case I was working with Mr. Brown on.

23         Q       I see, okay.  And just so that I am

24   clear, so the meeting was set up to discuss another

Schloss (Morris)

Page 8

1   today, did you bring any written materials with you?

2          A      Other than the report and just really

3   what's been issued, no.  Nothing else in writing.  No

4   notes.

5          Q      When you say issued, what -- what are

6   you referring to?

7          A      The report that I issued.

8          Q      Okay.  Do you have any documents that

9   have been provided to you by plaintiffs' counsel?

10         A      Yes.

11         Q      What documents do you have that were

12  provided to you by plaintiffs' counsel?

13         A      They were detailed in the report.

14         Q      Okay.  So in the report there is a

15  listing of all the references in terms of documents

16  related --

17         A      Yes.

18         Q      -- to this case.  And other than those,

19  you have no other documents?

20         A      At this time I cannot think of any

21  other documents that I was provided since then.

22         Q      Can you tell me when you were first

23  contacted by plaintiffs' counsel with respect to this

24  matter?

Schloss (Morris)

Page 7

1   Doug Edwards?

2           A       Yes.

3           Q       Who is Doug Edwards?

4           A       Doug Edwards was my counterpart in

5   Cincinnati.  He was the director of engineering and

6   was responsible for the engineering portions of

7   Kbd/Technic in Cincinnati.

8           Q       And during the time that you worked at

9   Kbd/Technic, did you ever work on any projects

10  together with Mr. Edwards?

11          A       Yes.

12          Q       And can you tell me what each of your

13  roles were in those projects?

14          A       I would either be lead designer and he

15  would be a support or the other way around, and I

16  would provide engineering support for -- on his

17  projects.

18          Q       Okay.  So it's a collaborative effort

19  for --

20          A       Collaborative effort.

21          Q       And that would be for a client of

22  Kbd/Technic?

23          A       Yes.

24          Q       With respect to your deposition here

Schloss (Morris)

Page 6

1   report that you provided to the plaintiffs' attorneys.

2                   For purposes of the record, can you

3   please give us your name and your address.

4          A       Martin Schloss, 103 Hickory Hill Lane,

5   Greenville, South Carolina, 29609.

6          Q       Mr. Schloss, as I said, I represent

7   Kirk & Blum.  Are you familiar with Kirk & Blum?

8          A       Yes.

9          Q       And how is it that you are familiar

10  with Kirk & Blum?

11         A       I worked for a sister company of Kirk &

12  Blum, Kbd/Technic.

13         Q       When did you work for Kbd/Technic?

14         A       2000 -- let me check here.  2007 to

15  2010.

16         Q       And what was your position with

17  Kbd/Technic?

18         A       Southeast regional manager.

19         Q       What were your job duties?

20         A       Responsible for the design,

21  engineering, sales, and operations of the southeast

22  region of the consulting engineering company.

23         Q       During the time that you worked at

24  Kbd/Technic, did you ever have any encounters with